PATRICK M. RYAN (SBN 203215)
pryan@bzbm.com
STEPHEN C. STEINBERG (SBN 230656)
ssteinberg@bzbm.com
GABRIELLA A. WILKINS (SBN 306173)
gwilkins@bzbm.com
BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

Attorneys for Plaintiffs CISCO SYSTEMS, INC. and
CISCO TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC., and CISCO TECHNOLOGY, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>SHENZHEN USOURCE TECHNOLOGY CO.; SHENZHEN WAREX TECHNOLOGIES CO., LTD.; and WAREX TECHNOLOGIES LIMITED,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>1  FEDERAL TRADEMARK INFRINGEMENT AND COUNTERFEITING, 15 U.S.C. § 1114;<br>2. FEDERAL UNFAIR COMPETITION, 15 U.S.C. § 1125;<br>3. FEDERAL DILUTION OF MARK, 15 U.S.C. § 1125(c);<br>4. CALIFORNIA FALSE ADVERTISING, CAL. BUS. & PROF. CODE § 17500;<br>5. CALIFORNIA UNFAIR COMPETITION, CAL. BUS. & PROF. CODE § 17200.<br><br>[[JURY TRIAL DEMANDED]<br><br>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (together, "Cisco" or "Plaintiffs"), by and through their attorneys, Bartko Zankel Bunzel & Miller, bring this action for damages and injunctive relief against Defendants Shenzhen Usource Technology Co. ("Usource")

and Shenzhen Warex Technologies Co., Ltd. and Warex Technologies Limited (together, "Warex") (collectively, "Defendants"), allege as follows:

## I. INTRODUCTION

1. Counterfeiters are increasingly exploiting consumers' needs for certain products during a time when there are significant halts and delays in production of authentic products, resulting in severe shortages in the marketplace. The substitution of inauthentic products using counterfeit marks in place of genuine products can be catastrophic, and not just to the interests of businesses that manufacture and sell genuine products using the trademarks they have spent years developing. Counterfeit products have the potential to be very dangerous. Specifically, at issue in this case are inauthentic products that could be mistaken as real by Cisco's hospital, military, or other critical infrastructure customers. Not only does this result in innocent customers receiving something fake that they believe to be genuine, but it also exposes sensitive patient, military, and government information to potential breaches, or worse, puts people in physical danger. Now more than ever, consumers, companies, and governments need the Courts to intervene to cease this destructive and dangerous behavior.

2. Cisco brings this urgent action not only to protect its brand, but more importantly to protect its customers, the customers' employees, and the general public from the imminent risk of danger posed by the sale of certain counterfeit products.

3. Cisco has a robust brand protection program that takes a multilayered approach to the problem of counterfeiting, which is global in scope and affects the entirety of the network industry. Cisco's strategies include collaborating with law enforcement in various countries where counterfeits are made or sold, including both the U.S. and China, to try to shut down larger manufacturers and sellers. Cisco also employs third-party private investigators or consultants to identify and purchase suspected inauthentic Cisco products, online. And Cisco sometimes resorts to litigation like the present case in order to protect its rights.

4. This is an action against Defendants for willful and significant infringement of Cisco's trademark rights related to CISCO® branded pluggable transceivers ("Cisco Transceivers"). Put simply, Defendants are marketing and advertising transceivers not

manufactured by or associated with Cisco and using Cisco's branding to pass them off to unsuspecting consumers as Cisco products.

5. Transceivers are electronic devices that transmit and receive communications and data by using fiber optic technology. Various public and private entities use Cisco Transceivers for their computer network systems, such as healthcare systems and hospitals, the U.S. government and military, public transit systems and utilities, Internet Service Providers, wireless phone carriers, and other large corporations. The sale of counterfeit transceivers in the marketplace puts Cisco's customers, the customers' employees, and the people they serve, at risk of significant business disruption, privacy and security breaches, data loss, and unpredictable and unsafe technological malfunctions.

6. Defendants are advertising and offering for sale, using, and/or labeling or otherwise marking transceivers with unauthorized representations of Cisco's well-known and federally registered trademarks, and then selling and distributing, or aiding and abetting others in the sale and distribution of, these counterfeit products for ultimate sale to consumers who are unaware that the products are not genuine and may be dangerous. The customers purchasing these products for end use are duped into believing that the transceivers they receive or that are installed into their networks are genuine Cisco products when, in fact, they are not. A thorough inspection reveals that these products are not made with genuine approved parts, and their functionality is unknown and unpredictable; thus, dangerous.

7. Cisco is seeking injunctive and monetary relief to protect their customers, their customers' employees, various governments and their employees, and the general public, from the sale of these inauthentic and potentially dangerous goods, to enjoin Defendants from further unlawful and infringing conduct, and to recover full damages for Defendants' harmful behavior.

## II. THE PARTIES

8. Plaintiff Cisco Systems, Inc. ("CSI") is a California corporation with its principal place of business at 170 West Tasman Drive, San Jose, California 95134. Plaintiff Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W.

Tasman Drive, San Jose, California 95134.  CTI owns the trademarks used by CSI in marketing Cisco-branded products.

9. On information and belief, Defendant Usource is a Chinese limited company with its principal place of business at F9, Bldg. A, WeiYe ChuangXin YiBa Industrial Park, Baoan district, Shenzhen, China.  Usource conducts business in the United States, including within the State of California, by offering, selling, and exporting goods to customers in the Northern District of California and elsewhere in the United States.

10. On information and belief, Defendants Shenzhen Warex Technologies Co., Ltd. and Warex Technologies Limited are Chinese limited companies with the same principal place of business at 2 Floor, Building 6, Longbi Industry Park, Bantian, Shenzhen, China.  Warex conducts business in the United States, including within the State of California, by offering, selling, and exporting goods to customers in the Northern District of California and elsewhere in the United States.

### III.   JURISDICTION AND VENUE

11. This is an Action for violations of the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* (the "Lanham Act"), and related causes of action.  This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121(a), and 28 U.S.C. §§ 1331 and 1338(a) and (b).

12. This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367 because these claims are so related to Cisco's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

13. This Court has personal jurisdiction over each of the Defendants, each of whom has engaged in business activities in this District and the State of California, offered for sale their inauthentic products in this District and the State of California, knowingly and purposefully directed business activities to this District and the State of California, and availed themselves of the benefits afforded by California laws, and committed tortious acts, knowing that Cisco would suffer injuries in this District and the State of California.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b-c) in that a substantial part of the events or omissions giving rise to the claims occurred here and Defendants are subject to personal jurisdiction in this District.

### IV. INTRA-DISTRICT ASSIGNMENT

15. In accordance with Civil L.R. 3-2(c), this action is properly assigned on a District-wide basis because it relates to intellectual property rights.

### V. FACTUAL ALLEGATIONS

#### A. *Cisco's History and Background*

16. Founded in 1984, Cisco is a worldwide leader in developing, implementing, and providing the technologies behind networking communications, and information technology products and services. Cisco develops and provides a broad range of networking products and services that enable seamless communication among individuals, private businesses—including healthcare systems, Internet Service Providers, and wireless carriers—and public institutions, including government agencies and the military. The thousands of engineers who work at Cisco develop and create networking and communications hardware, software, and services that utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities and campuses, and around the world.

17. Cisco has sold networking equipment, including transceiver modules, since 1992. The transceivers that Cisco markets and sells are central to these systems. Cisco Transceivers are known in the market as reliable, high-quality products. Cisco ships over 10 million transceivers per year.

18. Cisco has established goodwill and a lauded reputation among the general public and its customers for its high-quality and reliable products by using its well-known Cisco trade name and trademarks.

#### B. *Cisco's Trademarks*

19. Cisco is the owner of the following relevant trademarks, all of which Cisco has registered with the Principal Register of the U.S. Patent and Trademark Office in connection with its various products (collectively, "Cisco Marks"):

- "CISCO" (U.S. Trademark Reg. Nos. 1,542,339; 2,498,746; 3,709,076; 3,978,294; 3,985,844; 3,990,147; 4,005,670)

- cisco (U.S. Trademark Reg. No. 3,759,451)

20. For over 30 years, Cisco has continuously used one or more of the Cisco Marks on its products in commerce. To this day, all Cisco products, including Cisco Transceivers, bear one or more of the Cisco Marks.

21. The Cisco Marks are distinctive and serve solely to identify and promote Cisco's genuine products and well-known brand. Cisco invests significant resources in extensive research, advertisement, and promotional efforts for the Cisco Marks. For decades, the Cisco Marks have been advertised and sold around the globe, resulting in wide-spread brand recognition.

### C. Cisco's Quality Control Measures

22. Transceivers encode and decode data by converting electrical signals to light pulses and sending data through a fiber optic cable. The transmitted data is then obtained by the receiving end and converted back into an electrical signal.

23. Cisco manufactures and sells various types of transceivers. Each is designed to exceed industry standards for safety, quality, reliability, and performance.

24. Cisco Transceivers are manufactured by one of three authorized third-party original equipment manufacturers ("OEMs").

25. Cisco's OEMs are required to follow strict quality-and-control standards, which govern the design of the product, the selection of components, the conditions of the production facility, and ongoing reliability testing, audits, and recordkeeping.

26. Cisco requires all OEMs to adhere to high-quality manufacturing and distribution standards. These standards ensure that the product meets feature specifications. Throughout the product's lifecycle, Cisco monitors each OEM's compliance with its quality-and-control standards.

27. Each of the OEM facilities is regularly audited. The OEMs maintain detailed production records for each serialized product and keep logs of each product's supply chain. This gives Cisco the ability to trace products using their serial number. Each quarter, the OEMs

participate in business reviews that thoroughly examine the manufacturer's practices and procedures and identify areas for improvement.

28. Before its products are approved for shipment, Cisco conducts reliability testing to uncover any undetected defects caused by the manufacturing process.



30. ████████████████████████████████████████████████████████

D. *Counterfeiting Harms Cisco, Consumers, Their Employees, and the Public*

31. Defendants are advertising and offering to sell, using, and/or have sold and distributed products that bear confusingly similar imitations of the Cisco Marks. Through these sales, Defendants are intentionally deceiving consumers into believing that they are purchasing and receiving products that are developed, manufactured, and screened by Cisco or another party legitimately associated with or affiliated with, or authorized, licensed, or approved by Cisco.

32. Beyond being inauthentic, the functionality, performance, and safety of these products is unknown and less reliable. These products have a higher probability of failing, degrading, malfunctioning, jeopardizing data security, and/or performing in an unsafe manner.

33. Cisco has no control over these products and has no way of testing the safety of these products. These products are not subjected to Cisco's quality-control standards and testing.

34. Consumers are likely to associate the negative qualities of inauthentic products with Cisco products. This does irreparable harm to Cisco by tarnishing the good names and reputations it has worked so hard to build and sustain. Further, the sale of these counterfeit goods deprives Cisco of legitimate sales and revenue.

35. Consumers are also irreparably harmed by Defendants' conduct because they receive inauthentic products, which are at risk of being lower quality, less reliable, and less safe than the high-quality and genuine Cisco products they expect and deserve.

36. Six important industries comprise the majority of Cisco's customers: healthcare and hospitals, the U.S. government, utility companies, financial services, transportation companies, and communications providers. All of these entities rely on Cisco Transceivers to transfer data and communications and for data storage and security. They also count on Cisco Transceivers to perform critical functions for their employees, customers, and the general public.

37. The criticality of Cisco's products is exemplified by the U.S. military's use of these products, including depending on these products to protect lives. For example, in *United States v. Ehab Ashoor,* No. H-09CR-307 (S.D. Tex.), a criminal action brought by the U.S. government against a counterfeiter of Cisco products, U.S. Marines Staff Sergeant Lee Chieffalo testified that "[t]he Marine Corps' network infrastructure is solely Cisco equipment." Mr. Chieffalo explained that since Cisco equipment only operates properly in conjunction with other authentic Cisco products, the danger of acquiring and using a counterfeit Cisco product could be detrimental to the entire Cisco-based classified network the Marine Corps utilizes. The potential catastrophic risk was described as, "[m]arines could die."

38. The danger of counterfeit Cisco products has long been recognized as a national-security concern. From 2005 until 2010, the U.S. Department of Justice, together with the Federal Bureau of Investigation ("FBI"), Homeland Security, various Office of Inspector General offices and other governmental departments, conducted a widescale investigation into counterfeit Cisco products, known as "Operation Network Raider." This was a domestic and international initiative "targeting the illegal distribution of counterfeit network hardware manufactured in China," according to a March 2010 Department of Justice press release.

39. By March 2010, Operation Network Raider had resulted in 30 felony convictions and more than 700 seizures of counterfeit Cisco network hardware and labels with an estimated retail value of more than $143 million. As stated by Assistant Attorney General Breuer, "[t]rafficking in counterfeit computer components is a problem that spans the globe and impacts most, if not all, major network equipment manufacturers."

40. Investigations like this demonstrate the grave danger to employees of Cisco's customers, including members of the military, as well as the general public, which is posed by counterfeiters of Cisco products. Assistant Security of Homeland Security John Morton highlighted this point by stating, "[t]hese cases involve greedy businessmen hocking counterfeit and substandard hardware to any buyer—whether it could affect the health and safety of others in a hospital setting or the security of our troops on the battlefield" and "[t]hey pose a triple threat to our nation by stealing from our economy, threatening U.S. jobs and potentially putting the safety of our citizens at risk."

E. *Cisco's Discovery of Defendants' Counterfeit Products*

41. Because the counterfeit problem is so vast and serious, Cisco also conducts its own internal processes to combat counterfeiters by investigating and policing suspect counterfeit products. As part of these efforts, Cisco employs third-party private investigators or consultants to identify and purchase suspected inauthentic Cisco products.

42. And so it is here. Cisco's consultants found Defendants advertising and offering for sale purported Cisco Transceivers online, and purchased samples of such products from Defendants, who then sent these products to an address in the Northern District of California.

43. To investigate potentially counterfeit goods, Cisco utilizes three lab facilities located in The Netherlands, Hong Kong, and San Jose, California, and during the COVID-19 crisis, select Cisco investigators have home labs for use in these investigations. Only select members of the Cisco Brand Protection team are allowed access to the products under investigation to ensure the proper chain-of-custody and to prohibit any tampering with the products during the investigation process.

44. Once the products were received from Defendants, they were delivered to Cisco's engineering investigator for testing. A strict chain-of-custody was followed throughout the entire transfer process. Cisco's engineering investigator then used specialized tools to assess each product's authenticity. All of the products at issue here were determined to be inauthentic. The engineering investigator's findings for these products are detailed in an Executive Summary Report ("ESR").

45. After conducting its testing, Cisco shared the pertinent data for each product, including photographs, with the OEM identified by the counterfeit label, if any. An internal test engineer for the OEM then separately evaluated whether the product was authentic. The OEM's findings for these products are also detailed in an ESR. The ESR demonstrates that the OEM agreed with Cisco's assessment that the products are inauthentic.

F. *Defendants' Unlawful Conduct*

46. Usource advertises numerous transceivers as being from "Cisco," including, but not limited to, the SFP-10G-LR, one of the best-known and best-selling Cisco Transceivers. A consultant in the Northern District of California purchased the following products from Usource after initially corresponding through Usource's Alibaba storefront (Alibaba is a Chinese e-commerce company comparable to Amazon, through which other companies can advertise and sell products) and then by email through the domain, usourcetech.com:

| PRODUCT ID | PRODUCT SERIAL NUMBER | LABEL SERIAL NUMBER |
|---|---|---|
| Cisco SFP-10G-LR | FNS194307A2 | WAMT755673 |
| Cisco SFP-10G-LR | FNS194307A4 | WAMT755673 |

47. Each product bore a counterfeit Cisco Mark, an example of which is shown below, and each product was determined by Cisco's and its OEM's engineers to be inauthentic:



48. Cisco's and its OEM's engineers determined that the purported Cisco Transceivers sold by Usource differ from authentic Cisco products in at least the following ways:



49. Warex advertises numerous transceivers as being from "Cisco," including the SFP-10G-SR and SFP-10G-LR, two of the best-known and best-selling Cisco Transceivers. A

consultant in the Northern District of California purchased the following products from Warex after corresponding by email through the domain, warex.cn:

| PRODUCT ID | SERIAL NUMBER |
|---|---|
| SFP-10G-SR-C | WX1150124431 |
| SFP-10G-SR-C | WX1150124432 |
| SFP-10G-LR-C | WX1150124421 |
| SFP-10G-LR-C | WX1150124422 |

50. Each product was advertised and offered for sale as being a Cisco product, using Cisco's name and Cisco part numbers, and Warex promised they would read electronically as Cisco products and be "Cisco-compatible," and, in fact, each transceiver ultimately had ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

51. Each product was determined by Cisco's engineer to be inauthentic.

52. Cisco's engineer determined that the purported Cisco Transceivers sold by Warex differ from authentic Cisco products in at least the following ways:



d.

### FIRST CLAIM FOR RELIEF

*Federal Trademark Infringement and Counterfeiting*

**(15 U.S.C. § 1114 [Lanham Act § 32] Against All Defendants)**

53. Cisco hereby incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

54. The Cisco Marks are all valid marks entitled to protection under the Lanham Act and registered on the principal register in the United States Patent and Trademark Office. Plaintiffs are the exclusive owners and registrants of their individual marks.

55. Without Cisco's consent or authorization, Defendants are using, and will continue to use, in commerce, reproductions, counterfeits, copies, or colorable imitations of the Cisco Marks in connection with the sale, offering for sale, distribution, or advertising of counterfeit and/or inauthentic Cisco Transceivers.

56. Without Cisco's consent or authorization, Defendants are reproducing, counterfeiting, copying, or colorably imitating the Cisco Marks and applying them to labels and/or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of counterfeit and/or inauthentic Cisco Transceivers.

57. Defendants' counterfeiting and infringing activities have caused, are causing, or are likely to cause, confusion, mistake, and deception among the consuming public as to the origin, sponsorship, and quality of Defendants' counterfeit products.

58. On information and belief, Cisco alleges that Defendants' conduct was committed willfully, in bad faith, and with knowledge of Cisco's exclusive rights to its marks, or with willful blindness to the same, and with the intent to cause confusion, mistake, and/or to deceive.

59. As a direct and proximate result of Defendants' counterfeiting and infringing activities, Cisco has suffered irreparable harm and damage to its valuable marks—and damage to their reputation and goodwill—to which there is no adequate remedy at law. This irreparable harm will continue unless Defendants' conduct is stopped.

60. Cisco is entitled to injunctive relief against Defendants pursuant to 15 U.S.C. § 1116(a), an order for the destruction of all infringing activities, as well as all monetary relief and other remedies available under the Lanham Act, including, but not limited to, treble damages and/or profits, statutory damages, reasonable attorneys' fees, costs, and prejudgment interest under 15 U.S.C. § 1117(a).

**SECOND CLAIM FOR RELIEF**

*Federal Unfair Competition*

**(False Designation of Origin and False Advertising, 15 U.S.C. § 1125(a),**

**[Lanham Act § 43(a)] Against All Defendants)**

61. Cisco hereby incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

62. Defendants, in the connection with the sale of inauthentic Cisco products, falsely describe the origin of and/or use misleading descriptions and representations of fact in commerce.

63. Defendants' unauthorized conduct has caused, is likely to cause, and will continue to cause, confusion or mistake, or has deceived, is likely to deceive, and will continue to deceive, consumers as to Defendants' products' affiliation, connection, sponsorship, approval, origin, or association with Plaintiffs, in violation of 15 U.S.C. § 1125(a)(1)(A).

64. Defendants misrepresent the nature, characteristics, qualities, and/or geographic origin of their inauthentic products in commercial advertising or promotion, in violation of 15 U.S.C. § 1125(a)(1)(B).

65. Cisco is entitled to recover Defendants' unlawful profits and Cisco's damages, including attorneys' fees under 15 U.S.C. § 1117(a).

66. Defendants' willful and intentional conduct is in violation of 15 U.S.C. § 1114(1), and Cisco is entitled to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

67. Defendants' conduct will continue to cause substantial and irreparable injury to Cisco and its businesses and goodwill. Cisco has no adequate remedy at law and is thus entitled to injunctive relief pursuant to 15 U.S.C. § 1116(a).

**THIRD CLAIM FOR RELIEF**

*Federal Dilution of Mark*

**(15 U.S.C. § 1125(c) [Lanham Act § 43(c)] Against All Defendants)**

68. Cisco hereby incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

69. The Cisco Marks are famous, distinctive, and widely recognized by the consuming public, pursuant to 15 U.S.C. § 1125(c).

70. Defendants' use of marks or trade names in commerce is likely to cause dilution of the Cisco Marks in violation of 15 U.S.C. § 1125(c).

71. Cisco is entitled to injunctive relief to stop the dilution of their marks, pursuant to 15 U.S.C. §§ 1116(a) and 1125(c).

### FOURTH CLAIM FOR RELIEF

*California False Advertising*

**(Cal. Bus. & Prof. Code § 17500 Against All Defendants)**

72. Cisco hereby incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

73. Defendants have knowingly or willfully made false or misleading statements in connection with the sale of their inauthentic products.

74. In advertising and promoting their products, Defendants knew or, with the exercise of reasonable care, should have known, that their statements were false and misleading.

75. As a direct, proximate, and foreseeable result of Defendants making these false and misleading statements, Cisco has suffered, and will continue to suffer, irreparable harm to its individual brands, reputations, and goodwill. Cisco has no adequate remedy at law to compensate for these substantial injuries and is thus entitled to injunctive relief.

76. As a direct, proximate, and foreseeable result of Defendants making these false and misleading statements, Cisco has suffered, and will continue to suffer, money damages in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF

*California Unfair Competition*

**(Cal. Bus. & Prof. Code § 17200 Against All Defendants)**

77. Cisco hereby incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

78.     Defendants have knowingly and willfully participated in unlawful, unfair, and fraudulent business practices and unfair, deceptive, untrue, and misleading advertising prohibited by Cal. Bus. & Prof. Code § 17200, by advertising and selling inauthentic products using counterfeit Cisco Marks, in violation of the Lanham Act, 15 U.S.C. § 1114, as well as the other acts alleged herein.

79.     As a direct, proximate, and foreseeable result of Defendants' unfair and deceptive conduct, Cisco has suffered, and will continue to suffer, irreparable harm to their individual brands, reputations, and goodwill.  Cisco has no adequate remedy at law to compensate for these substantial injuries and are thus entitled to injunctive relief.

80.     As a direct, proximate, and foreseeable result of Defendants' unfair and deceptive conduct, Cisco has suffered, and will continue to suffer, lost business and revenue.  Plaintiffs are entitled to restitution damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Cisco respectfully prays for the following relief:

A.     Judgment in favor of Cisco that Defendants infringed Cisco's trademark rights under 15 U.S.C. § 1114;

B.     Judgment in favor of Cisco that Defendants competed unfairly with Cisco, in violation of Cisco's rights under common law, 15 U.S.C. § 1125(a), and/or California Bus. & Prof. Code § 17200;

C.     Judgment in favor of Cisco that Defendants' conduct is likely to dilute Cisco's famous marks in violation of Plaintiffs' rights under 15 U.S.C. § 1125(c);

D.     Judgment in favor of Cisco that Defendants made false and misleading statements about and falsely and misleadingly advertised their counterfeit products, in violation of Cisco's rights under California Bus. & Prof. Code § 17500;

E.     A temporary restraining order and preliminary and permanent injunction enjoining Defendants and their subsidiaries, parents, agents, officers, members, directors, servants, employees, attorneys, successors, assigns, affiliates, and joint ventures, and any person(s) in active

concert or participation with them, and/or any person(s) acting for, with, by, through, or under them, from:

    a. Manufacturing, producing, sourcing, importing, exporting, selling, offering to sell, distributing, licensing, promoting, or labeling any goods that display any words, symbols, or designs that resemble or replicate the Cisco Marks, or are likely to cause confusion, mistake or deception of, or in connection with, any of Cisco's products, whether genuine or counterfeit;

    b. Using any logo, trade name, trademark, symbol, term, name, word, representation, or combination thereof, that causes, or is likely to cause, confusion, mistake, or deception as to the origin, ownership, affiliation, sponsorship, association, or connection, in any way, of Cisco or its products, or any false designation of origin, false or misleading description or representation of fact, or any false or misleading advertisement of the same;

    c. Destroying any documentation or record of the manufacture, sale, offer of sale, communication regarding, advertisement, distribution, shipment, receipt, or payment of, any product that Defendants represented as one of Cisco's products;

    d. Infringing the rights of Cisco, in and to any use of the Cisco Marks or otherwise damaging Cisco's goodwill, name, and/or business reputation;

    e. Diluting the Cisco Marks;

    f. Promoting the sale of any goods or services by associating the same, genuine or otherwise, with Cisco or the Cisco Marks;

    g. Competing unfairly in any manner with Cisco; and

    h. Assisting, aiding, abetting, or working with any other person or business to engage or participate in any of the above listed activities as referenced in subparagraphs (a) through (g).

F. An order that Defendants must immediately produce to Cisco a complete list of all individuals, businesses, and entities from whom they purchased, and to whom they sold, offered to

1 sell, or distributed, the infringing products at issue in this Complaint, including for each the
2 products and respective quantities and amounts paid;

3       G.     Judgment that Defendants immediately transfer to Cisco their entire inventory of
4 infringing products, including, but not limited to, transceivers that are in their possession or under
5 their control, that bear the Cisco Marks or anything resembling the Cisco Marks;

6       H.     Cisco to recover all damages and lost profits in an amount to be proven at trial;

7       I.     Cisco to be awarded punitive damages from each Defendant;

8       J.     An accounting of each Defendant's profits attributable to their illegal and
9 infringing acts and an award of: (1) Defendants' profits; and (2) all of Cisco's damages pursuant to
10 15 U.S.C. § 1117;

11       K.     Cisco to be awarded all of Defendants' ill-gotten profits and gains, and/or any other
12 unjust benefits received by Defendants from Defendants' manufacture, sale, and/or distribution of
13 counterfeit Cisco products;

14       L.     Statutory damages;

15       M.     Treble damages and/or enhanced damages;

16       N.     An order to freeze Defendants' assets pending a final determination of liability and
17 damages;

18       O.     An order for an accounting of and imposition of a constructive trust on all of
19 Defendants' funds and assets connected to their infringing acts;

20       P.     Pre- and post-judgment interest;

21       Q.     All reasonable attorneys' fees, costs, and investigative expenses associated with
22 Defendants' infringing acts; and

23       R.     Any and all other relief the Court deems just, proper, fair, and equitable.

24 ///
25 ///
26 ///
27 ///
28 ///

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Cisco demands a trial by jury of all claims asserted in this Complaint so triable in this action.

DATED: July 15, 2020

Respectfully submitted,

BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation

By: _____
PATRICK M. RYAN
Attorneys for Plaintiffs
CISCO SYSTEMS, INC. and CISCO TECHNOLOGY, INC.