PATRICK M. RYAN (SBN 203215)
  *pryan@bzbm.com*
STEPHEN C. STEINBERG (SBN 230656)
  *ssteinberg@bzbm.com*
GABRIELLA A. WILKINS (SBN 306173)
  *gwilkins@bzbm.com*
BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

Attorneys for CISCO SYSTEMS, INC. and
CISCO TECHNOLOGY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC.; and CISCO TECHNOLOGY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SHENZHEN USOURCE TECHNOLOGY CO.; SHENZHEN WAREX TECHNOLOGIES CO., LTD.; and WAREX TECHNOLOGIES LIMITED, <br><br> Defendants. | Case No. 5:20-cv-04773-EJD <br><br> **PLAINTIFFS' EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, EXPEDITED DISCOVERY, ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> **Date:** <br> **Time:** <br> **Courtroom:    4, 5th Floor** <br> **Honorable Edward J. Davila** <br><br> **REDACTED VERSION OF** <br> **DOCUMENT SOUGHT TO BE SEALED** |

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

# <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................2

II.    STATEMENT OF ISSUES TO BE DECIDED ..................................................3

III.   STATEMENT OF RELEVANT FACTS ...........................................................4

     A.    Cisco and Its Transceivers.....................................................................4

     B.    Counterfeit Cisco Transceivers Are Dangerous .....................................5

     C.    Trademarks Used on Cisco Transceivers ...............................................6

     D.    Discovery and Testing of Counterfeit Cisco Transceivers.....................7

          1.    Usource ......................................................................................8

          2.    Warex .........................................................................................9

IV.   ARGUMENT ..................................................................................................10

     A.    The Court Should Issue the Requested Relief Without Prior Notice .....10

     B.    The Court Should Grant the Requested Immediate and Preliminary
          Injunctive Relief Barring Further Counterfeiting Activities by Defendants
          and Anyone Associated or Acting in Concert With Them......................11

          1.    Cisco Is Likely to Succeed on the Merits...................................12

          2.    Cisco Will Suffer Irreparable Harm as a Result of Defendants'
                Activities Without an Injunction ................................................15

          3.    The Balance of Equities Favors Cisco .......................................15

          4.    An Injunction Is in the Public Interest .......................................16

          5.    At Minimum, Injunctive Relief Is Warranted Because There Are
                Serious Questions Going to the Merits and the Balance of Hardships
                and Other *Winter* Factors Strongly Favor Cisco ......................17

     C.    The Court Should Issue An Order to Freeze Defendants' Assets, Disable,
          Transfer Control of, and Redirect Defendants' Seller Identifications and
          Domain Names Used for Counterfeiting, and Bar Access to Listings and
          Other Fulfillment Activities for Sales of Products Using Infringing Marks ...........17

          1.    The Court Should Issue an Order Freezing Defendants' Assets ................18

          2.    The Court Should Issue an Order Freezing, Disabling, Transferring
                Control of, and Redirecting Defendants' Seller Identifications and
                Domain Names ..........................................................................21

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX
PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

3.  The Court Should Issue an Order Barring Access to Defendants' Listings and Preventing Fulfillment of Further Sales of Defendants' Products with CISCO Marks .................................................................23

D.  The Court Should Permit Cisco to Conduct Expedited Discovery ..........................24

E.  The Court Should Authorize Alternative Service of Process .................................26

F.  The Court Should Not Require Cisco to Post a Bond to Secure the Injunctive Relief, or Alternatively, Should Set It at No More Than $10,000 ..........28

V.   CONCLUSION ..................................................................................................28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*
5
   944 F.2d 1446 (9th Cir. 1991) ................................................................................................. 14

6

*Accuride Int'l, Inc. v. Accuride Corp.*
   871 F.2d 1531 (9th Cir. 1989) ................................................................................................. 13

7

*Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*
8
   No. 18-CV-06663-TSH, 2019 WL 1586776 (N.D. Cal. Apr. 12, 2019) ................................. 28

9

*AMF Inc. v. Sleekcraft Boats*
10
   599 F.2d 341 (9th Cir. 1979) ....................................................................................... 12, 13, 14

11

*Animale Grp. Inc. v. Sunny's Perfume Inc.*
   256 F. App'x 707 (5th Cir. 2007) ........................................................................................... 19

12

*Asmodus, Inc. v. Junbiao Ou*
13
   No. EDCV 16-2511 JGB (DTBx), 2017 WL 2954360 (C.D. Cal. May 12, 2017) ................ 23

14

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*
15
   174 F.3d 1036 (9th Cir. 1999) ................................................................................................. 13

16

*Carson v. Griffin*
   No. 13-CV-0520 KAW, 2013 WL 2403601 (N.D. Cal. May 31, 2013) ................................. 27

17

*Chanel, Inc. v. eukuk.com*
18
   No. 2:11-CV-01508-KJD, 2011 WL 6955734 (D. Nev. Dec. 28, 2011) .......................... 22, 23

19

*Chanel, Inc. v. Sunus Online Group, LLC*
20
   2014 WL 12558780 (C.D. Cal. Jan. 15, 2014) ....................................................................... 19

21

*Cleary v. News Corp.*
   30 F.3d 1255 (9th Cir. 1994) ................................................................................................... 14

22

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*
23
   321 F.3d 878 (9th Cir. 2003) ................................................................................................... 28

24

*Creative Labs, Inc. v. Cyrix Corp.*
25
   141 F.3d 1174 (9th Cir. 1998) ................................................................................................. 16

26

*Cuviello v. City of Oakland*
   No. C 06-05517 MHP (EMC), 2007 WL 2349325 (N.D. Cal. Aug. 15, 2007) ..................... 28

27

*Daimler AG v. A-Z Wheels LLC*
28
   334 F. Supp. 3d 1087 (S.D. Cal. 2018) .................................................................................. 13

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX
PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*Facebook, Inc. v. Banana Ads, LLC*
   No. C-11-3619 YGR, 2012 WL 1038752 (N.D. Cal. Mar. 27, 2012) ................................. 27

*First Tech. Safety Sys., Inc. v. Depinet*
   11 F.3d 641 (6th Cir.1993) ........................................................................................ 10

*Friends of the Wild Swan v. Weber*
   767 F.3d 936 (9th Cir. 2014) ................................................................................ 12, 17

*FTC v. Affordable Media*
   179 F.3d 1228 (9th Cir. 1999) ................................................................................... 19

*Gucci Am., Inc. v. Los Altos Boots, Inc.*
   2014 WL 12561613 (C.D. Cal. Aug. 27, 2014) ....................................................... 10, 11

*Gucci Am., Inc. v. Weixing Li*
   768 F.3d 122 (2d Cir. 2014) ................................................................................. 19, 21

*Gucci America, Inc. v. Wang Huoqing*
   No. C-09-05969 JCS, 2011 WL 31191 (N.D. Cal. Jan. 3, 2011) ................................... 20

*Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*
   425 F.3d 708 (9th Cir. 2005) ..................................................................................... 14

*Jenkins v. Pooke*
   No. C 07-03112 JSW, 2009 WL 412987 (N.D. Cal. Feb. 17, 2009) .............................. 27

*JL Beverage Co., LLC v. Jim Beam Brands Co.*
   828 F.3d 1098 (9th Cir. 2016) ................................................................................... 13

*Johnson v. Couturier*
   572 F.3d 1067 (9th Cir. 2009) ................................................................................... 19

*KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*
   408 F.3d 596 (9th Cir. 2005) ..................................................................................... 12

*Lahoti v. VeriCheck, Inc.*
   586 F.3d 1190 (9th Cir. 2009) ................................................................................... 12

*Las Vegas Sands Corp. v. Fan Yu Ming*
   360 F. Supp. 3d 1072 (D. Nev. Jan. 9, 2019) .............................................................. 22

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*
   51 F.3d 982 (11th Cir. 1995) ..................................................................................... 19

*Lockheed Missile & Space Co. v. Hughes Aircraft*
   887 F. Supp. 1320 (N.D. Cal. 1995) ........................................................................... 11

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*
   658 F.3d 936 (9th Cir. 2011) ..................................................................................... 14

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*Mattel, Inc. v. Walking Mountain Prods.*
  353 F.3d 792 (9th Cir. 2003)...................................................................... 13

*McLeod v. Hosmer-Dorrance, Inc.*
  192 USPQ 683 (N.D. Cal. 1976)........................................................... 15, 17

*Micron Tech., Inc. v. United Microelectronics Corp.*
  No. 17-CV-06932-MMC, 2018 WL 6069646 (N.D. Cal. Nov. 20, 2018)............................ 27

*Microsoft Corp. v. Buy More, Inc.*
  136 F. Supp. 3d 1148 (C.D. Cal. 2015)............................................................. 13

*Microsoft Corp. v. Goldah.com Network Tech. Co.*
  No. 17-CV-02896-LHK, 2017 WL 4536417 (N.D. Cal. Oct. 11, 2017) ......................... 27, 28

*Moroccanoil, Inc. v. Zotos Int'l, Inc.*
  230 F. Supp. 3d 1161 (C.D. Cal. 2017)............................................................. 16

*Mullane v. Cent. Hanover Bank & Trust Co.*
  339 U.S. 306 (1950) .................................................................................. 27

*Neighborhood Assistance Corp. v. First One Lending Corp.*
  2013 WL 12113414 (C.D. Cal. Feb. 11, 2013) .................................................... 16

*Nike, Inc. v. Wu*
  349 F. Supp. 3d 310 (S.D.N.Y. 2018).............................................................. 27

*Otter Prod., LLC v. Anke Grp. Indus. Ltd.*
  No. 2:13-CV-00029-MMD-RJJ, 2013 WL 5910882 (D. Nev. Jan. 8, 2013) ....................... 23

*Phillip Morris USA Inc. v. Shalabi*
  352 F. Supp. 2d 1067 (C.D. Cal. 2004)............................................................. 13

*Playboy Enters., Inc. v. Baccarat Clothing Co.*
  692 F.2d 1272 (9th Cir. 1982)................................................................. 16, 18

*Redwen v. Sino Clean Energy, Inc.*
  No. CV 11-3936 PA, 2013 WL 12303367 (C.D. Cal. Jul. 9, 2013) ............................... 20

*Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*
  737 F. Supp. 1521 (S.D. Cal. 1989) ............................................................... 19

*Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*
  970 F.2d 552 (9th Cir. 1992)............................................................. 18, 19, 20

*Reno Air Racing Ass'n., Inc. v. McCord*
  452 F.3d 1126 (9th Cir. 2006)..................................................................... 10

*Republic of the Philippines v. Marcos*
  862 F.2d 1355 (9th Cir.1988)...................................................................... 18

*Rio Properties, Inc. v. Rio Int'l Interlink*
    284 F.3d 1007 (9th Cir. 2002)...................................................................... 26, 27

*Sas v. Sawabeh Info. Servs. Co.*
    No. CV 11-04147 GAF (MANx), 2011 WL 13130013 (C.D. Cal. May 17, 2011)............... 25

*SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*
    No. CV 15-08157-BRO (Ex), 2015 WL 6680807 (C.D. Cal. Oct. 19, 2015)...................... 25

*Semitool, Inc. v. Tokyo Electron Am., Inc.*
    208 F.R.D. 273 (N.D. Cal. 2002) .................................................................... 25

*Spy Optic Inc. v. Individuals, Partnerships & Unincorporated Associations*
    *Identified on Schedule A*
    No. CV 17-7649 DSF, 2017 WL 10592133 (C.D. Cal. Nov. 27, 2017)................... 22, 24, 25

*Sream, Inc. v. Sahebzada*
    No. 18-CV-05673-DMR, 2019 WL 2180224 (N.D. Cal. Mar. 6, 2019) ........................ 15, 16

*Steinway & Sons v. Robert Demars & Friends*
    No. 80-04404 TJH, 1981 WL 40530 (N.D. Cal. Jan. 28, 1981) ............................ 12

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*
    240 F.3d 832 (9th Cir. 2001)........................................................................ 11

*Talavera Hair Prod., Inc. v. Taizhou Yunsung Elec. Appliance Co., LTD*
    2018 WL 3413866 (S.D. Cal. May 10, 2018) ......................................... 10, 11, 24

*Triad Sys. Corp. v. Se. Exp. Co.*
    64 F.3d 1330 (9th Cir. 1995)........................................................................ 16

*U-Haul Int'l, Inc. v. Jartran, Inc.*
    681 F.2d 1159 (9th Cir. 1982)........................................................................ 16

*U.S. v. Ehab Ashoor*
    No. 4:09-CR-307 (S.D. Tex.) ........................................................................ 6

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*
    No. C 12-2582 CW, 2012 WL 2343670 (N.D. Cal. June 20, 2012) ...................... 13, 15, 28

*United Tactical Sys., LLC v. Real Action Paintball, Inc.*
    No. 14-CV-04050-MEJ, 2014 WL 6788310 (N.D. Cal. Dec. 2, 2014) ...................... 14, 16

*Williams-Sonoma, Inc. v. Friendfinder, Inc.*
    No. C06-6572JSW (MEJ), 2007 WL 4973848 (N.D. Cal. Dec. 6, 2007)........................ 22

*Williams-Sonoma, Inc. v. Online Mktg. Servs., Ltd.*
    No. C 06-06572 JSW, 2008 WL 596251 (N.D. Cal. Mar. 4, 2008)........................ 22

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

*Winter v. Natural Res. Defense Council, Inc.*
    555 U.S. 7 (2008) ................................................................................... 12, 17

*Yee v. NIVS Intellimedia Tech. Group, Inc.*
    No. CV 11-8472 JGB, 2013 WL 1276024 (C.D. Cal. March 25, 2013)................................ 20

**Statutes**

15 U.S.C.
    § 1114 ................................................................................................ 3, 13
    § 1114(1) ................................................................................................ 12
    § 1114(2)(D) ................................................................................................ 22
    § 1117 ................................................................................................ 17
    § 1125 ................................................................................................ 3
    § 1125(a) ................................................................................................ 13
    § 1125(a)(1) ................................................................................................ 13
    § 1125(d)(2) ................................................................................................ 22

Califorña Business and Professions Code
    § 17200 ................................................................................................ 3, 15
    § 17500 ................................................................................................ 3, 15

**Court Rules**

Federal Rules of Civil Procedure
    Rule 4(f)(3) ................................................................................................ 26
    Rule 26(d) ................................................................................................ 24
    Rule 65(b) ................................................................................................ 10

Northern District of California Local Rules
    Rule 65-1 ................................................................................................ 10

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE that on _____, 2020, at _____ [a.m.]/[p.m.] (or as soon thereafter as the matter may be heard) before the General Duty Judge for July 2020, The Honorable Beth Labson Freeman, in Courtroom 3 of the above entitled courthouse, located at 280 South First Street, San Jose, California 95113, or another District Judge (if so assigned), Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (together, "Cisco") will and hereby do move *ex parte* for a Temporary Restraining Order ("TRO") and, upon its expiration, a Preliminary Injunction prohibiting Defendants Shenzhen Usource Technology Co. ("Usource"), and Shenzhen Warex Technologies Co., Ltd. and Warex Technologies Limited (together, "Warex") (collectively, "Defendants") from continuing to advertise, offer for sale, sell, and distribute counterfeit Cisco transceivers in the United States, and/or continuing to use the CISCO Marks in connection with advertising and selling transceivers. Cisco also seeks an order freezing Defendants' assets, disabling their online presence, and barring access to their listings and fulfillment of further sales. Cisco also seeks expedited discovery so it can identify all channels through which Defendants are manufacturing and distributing counterfeit Cisco products and locate all of Defendants' unlawfully gained assets. In addition, Cisco seeks an order authorizing alternative service of process by email, as email service is not prohibited and is reasonably calculated to provide notice when Defendants operate and do business online, and, further, personal service is presently nearly impossible. This Motion is based on the accompanying Memorandum of Points and Authorities; the supporting declarations of First Witness, Second Witness, and Third Witness,[1] and exhibits thereto; all other papers and pleadings on file; and such additional arguments and evidence as may be presented to the Court at or before a hearing on this Motion.

---

[1] Cisco is concurrently seeking leave to file these declarations partially under seal, including sealing the names of these individuals in order to preserve the secrecy of other ongoing and future investigations of counterfeiters, and to protect the individuals themselves from potential retaliation, particularly cyber-attacks.

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

**I.   INTRODUCTION**

Cisco brings this emergency *ex parte* motion to block dangerous counterfeit transceivers from entering the United States market. Cisco is the leading designer and manufacturer of transceivers—devices that transmit and receive data—used in public and private networks. Cisco's customers include the U.S. government and military, healthcare systems and hospitals, Internet Service Providers ("ISPs"), wireless phone carriers, and public transit systems and utilities, among others. Cisco's transceivers are a key foundational component of the U.S. communications infrastructure. The counterfeit Cisco transceivers sold by Defendants pose a serious risk of potential harm to that national infrastructure and Cisco's reputation. For example, many healthcare networks across the U.S. rely on Cisco transceivers, and the risk of using substandard counterfeit products that may fail could impact services. Put simply, lives are at stake. As a Marine Staff Sergeant testified, since the U.S. military depends on Cisco gear "built to specifications that [the Marines] use for reliability and environmental hardness," the risk of deploying substandard counterfeit Cisco products into the Marines' network could not be higher: "Marines could die."

As part of Cisco's global anti-counterfeiting efforts, often done in conjunction with law enforcement and governments around the world, Cisco recently discovered that Defendants were offering potentially fake Cisco transceivers online to U.S. customers. Cisco's consultant purchased Defendants' suspect transceivers, which they shipped to this District. Cisco analyzed and tested these transceivers and confirmed that they were inauthentic, i.e., these products were not made by or associated with Cisco despite being passed off to unsuspecting consumers as Cisco products. On the outside, Defendants' transceivers are advertised, offered for sale, and/or have product labels with counterfeit CISCO Marks, and are otherwise designed to create the impression that they are authentic Cisco transceivers. Internally, the transceivers use unapproved, untested, and non-genuine parts, and are not subjected to Cisco's high design, build, and inspection standards.

Cisco seeks to bar these dangerous counterfeit products from the U.S. by bringing this action for trademark infringement, counterfeiting, and false designation of origin and advertising

and dilution under the federal Lanham Act (15 U.S.C. §§ 1114, 1125), and unfair competition and false advertising under California law (Cal. Bus. & Prof. Code §§ 17200, 17500).

Cisco seeks four types of relief, which have been granted by this Court and others in this Circuit in counterfeiting actions, in order to promptly stop Defendants from selling counterfeit products in the U.S., preserve evidence and the potential to recover any ill-gotten gains from past sales, and give notice of this case to Defendants. First, Cisco seeks a TRO and preliminary injunction barring Defendants from using the CISCO Marks and selling transceivers designed to appear to be Cisco products. Second, to preserve the ability to recover any profits Defendants earned from their infringement and maintain the status quo, Cisco seeks an order freezing Defendants' assets, disabling their seller identifications and domain names, and shutting down their ability to offer or sell any fake Cisco products online or ship them to U.S. customers. Third, Cisco seeks limited expedited discovery to locate and remove from the market any other infringing products being sold in the U.S., and locate Defendants' profits from past sales. Fourth, given the difficulty in serving process and risk of extensive delays in China, particularly during the COVID-19 crisis, Cisco requests authorization to effect service of process by email.

## II.     STATEMENT OF ISSUES TO BE DECIDED

A.   Should Cisco be permitted to file the motion and should the Court issue the requested relief *ex parte* before notice to Defendants, who are likely to conceal or dispose of the counterfeit goods, proceeds, or records if given prior notice?

B.   Should the Court issue a temporary restraining order and order to show cause why a preliminary injunction should not be issued barring further infringing activities by Defendants when Cisco has shown it is almost certain to succeed on the merits of its claims, it would be irreparably harmed by continued infringement, and the balance of equities and public interest also strongly favor injunctive relief?

C.   Should the Court issue an Order to freeze Defendants' assets, disable, transfer control of, and redirect Defendants' seller identifications and domain names used to sell counterfeit products, and bar access to listings and other fulfillment activities for sales of products with infringing marks, to preserve the possibility of all potential equitable remedies and prevent further infringement under new names?

D.   Should the Court issue an Order permitting Cisco to conduct certain narrowly focused expedited discovery when they need it to ascertain the full extent of Defendants' infringement and there would be little or no prejudice to Defendants?

E.   Should the Court authorize alternative service of process on Defendants by email when it is not prohibited by international agreement and is reasonably calculated to give Defendants notice?

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1       F.      Should the Court require Cisco to post a bond to secure the requested injunctive relief when there is no risk of harm to Defendants from simply being precluded from selling counterfeit products?

## III.   STATEMENT OF RELEVANT FACTS

### A.   Cisco and Its Transceivers

Cisco has been selling networking equipment, including transceivers ("Cisco transceivers"), since 1984. *See* 7/14/20 Decl. of First Witness ("Decl. No. 1") ¶¶ 4, 6. Cisco is a world leader in developing, implementing, and providing the technologies behind networking, communications, and information technology products and services, and ships over 10 million transceivers per year. *Id.* ¶¶ 4, 10.

Transceivers are electronic devices that transmit and receive data. *See* 7/14/20 Decl. of Second Witness ("Decl. No. 2") ¶ 7. In basic terms, a transceiver encodes and decodes data by converting an electrical signal into light pulses and back again, which are sent through a fiber optic cable. *Id.* Transceivers provide the vital connections in networks. *See* Decl. No. 1 ¶ 11. The quality and performance of networks in the U.S. and around the world depend on authentic and high-quality Cisco transceivers. *Id.* Cisco sells a wide-range of transceivers varying in size, functionality, and price. *See* Decl. No. 2 ¶ 7. Cisco designs all of its transceivers to meet and exceed industry standards for quality, reliability, safety, and performance, which vary depending on the industry, e.g., there are higher standards for military than commercial applications. *Id.* A variety of U.S. industries, including the government and military, healthcare systems and hospitals, and ISPs and wireless phone carriers, rely on Cisco transceivers to perform critical applications, and ensure the integrity of data transfer and communications. *See* Decl. No. 1 ¶ 12.

Authentic Cisco transceivers are manufactured by well-vetted and carefully controlled and monitored third-party vendors called original equipment manufacturers ("OEMs"). *See* Decl. No. 2 ¶ 8. Each of these OEMs utilize specialized equipment and heavily tested processes and components to produce consistent, high-performing products on which customers can rely. *Id.* Cisco requires its OEMs to follow strict quality and control standards that govern the entire lifecycle of each transceiver, from its design, components, and manufacture, to distribution and post-sale support. *Id.* ¶ 9. Each OEM undergoes reliability testing to expose potential defects in

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1    the manufacturing process, and regular reviews to examine the OEM's practices and procedures

2    and identify areas for improvement. *Id.* Cisco regularly audits each OEM, which must maintain

3    detailed records for each product's movement throughout the supply chain to enable Cisco to

4    monitor each transceiver's distribution and support customers via serial number traceability. *Id.*

5    Cisco uses these controls to safeguard its reputation for quality, safety, and reliability. *Id.*

6          **B.      Counterfeit Cisco Transceivers Are Dangerous**

7          Defendants' transceivers are confusingly similar to Cisco's genuine products. Defendants'

8    transceivers are marketed and sold using and/or bear counterfeit and confusingly similar imitations

9    of the CISCO Marks, or are otherwise designed to create the impression that they are authentic

10   Cisco products. In fact, these counterfeit transceivers are not manufactured by Cisco or any party

11   associated with, or authorized, licensed, or approved by Cisco. *See* Decl. No. 2 ¶¶ 14-25; Decl.

12   No. 1 ¶¶ 16-18. Defendants deceive customers by delivering inferior counterfeit products instead

13   of high-quality genuine Cisco products. Decl. No. 1 ¶ 21.

14         The counterfeit transceivers sold by Defendants pose significant dangers. As counterfeits

15   use untested and unapproved components and manufacturing processes, they may not function

16   properly or at all, and/or may not function correctly in combination with authentic Cisco products.

17   *Id.* Nor are they updated with the latest Cisco software, which exposes users to security and

18   intrusion vulnerabilities. *Id.* ¶¶ 21-22. Data integrity is critical to the industries that use Cisco

19   transceivers, and they need to reliably and securely transmit and receive sensitive data. *Id.*

20   Counterfeit transceivers jeopardize the integrity, reliability, and security of these networks and the

21   people they serve. *Id.* The risk posed by counterfeit transceivers includes physical harm. *Id.* ¶¶ 22-

22   23. Cisco transceivers use transmitter laser technologies, which require eye safety testing and

23   manufacturing calibration to ensure users' physical safety. *Id.* ¶ 22. Counterfeit transceivers are

24   unlikely to be subjected to this testing or meet these standards. *Id.* A poorly designed transceiver

25   can also emit excessive electromagnetic energy that interferes with adjacent equipment, which

26   could be detrimental in a sensitive environment, e.g., a military facility or hospital. *Id.*

27         Counterfeit transceivers put lives in jeopardy. The U.S. military uses Cisco-based networks

28   for its battle operations. In a criminal action against a counterfeiter of Cisco networking hardware,

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1    *U.S. v. Ehab Ashoor*, No. 4:09-CR-307 (S.D. Tex.), U.S. Marines Staff Sergeant Lee Chieffalo

2    testified that "[t]he Marine Corps' network infrastructure is solely Cisco equipment," and "the

3    equipment that Cisco uses has proprietary protocols and software on them that operates only with

4    other Cisco gear" that is "built to specifications that [the Marine Corps] use[s] for reliability and

5    environmental hardness." Decl. No. 1 ¶ 14, Ex. 1B. He testified that the use of substandard

6    counterfeit Cisco products presented the risk that "Marines could die." *Id.* The Department of

7    Homeland Security reached the same conclusion: "These cases [of counterfeit Cisco networking

8    products] involve greedy businessmen hocking counterfeit and substandard hardware to any

9    buyer-whether it could affect the health and safety of others in a hospital setting or the security of

10   our troops on the battlefield. They pose a triple threat to our nation by stealing from our economy,

11   threatening U.S. jobs and potentially putting the safety of our citizens at risk." *Id.* ¶ 15, Ex. 1C.

12   The current crisis related to COVID-19 further reinforces the risk to human life posed by

13   counterfeit transceivers, as Cisco transceivers are used by healthcare systems and hospitals to

14   provide reliable data networks that are critical to patient care. *Id.* ¶ 22.

15       **C.**     **Trademarks Used on Cisco Transceivers**

16       Cisco owns the following well-established famous and registered trademarks, among

17   others (together, the "CISCO Marks"), that appear on genuine Cisco products:

18   - "CISCO" (U.S. Trademark Reg. Nos. 1,542,339; 2,498,746; 3,709,076; 3,978,294;
19       3,985,844; 3,990,147; 4,005,670)

20   - cisco (U.S. Trademark Reg. No. 3,759,451)

21   *Id.* ¶¶ 5-10, Ex. 1A. Cisco has used, and is currently using, the CISCO Marks continuously and

22   exclusively in commerce, including in connection with its sale of Cisco transceivers, and plans to

23   continue such use in the future. *Id.* Cisco has invested heavily in the Cisco brand, and prominently

24   displays the CISCO Marks in its advertising materials. *Id.* As a result, the CISCO Marks are

25   widely recognized and well-known to the public, and are synonymous with reliable, high-quality

26   networking hardware products. *Id.* Cisco has spent, and continues to spend, billions of dollars

27   marketing and promoting in interstate commerce its products in connection with the CISCO

28   Marks. *Id.* ¶ 10. Due to Cisco's longtime use of and investment in the CISCO Marks and the

1   quality of Cisco's products, the Cisco brand has built up a tremendous amount of consumer

2   goodwill. *Id.* The CISCO Marks are famous and symbolize this goodwill, and are invaluable assets

3   to Cisco. *Id.*

4   **D.    Discovery and Testing of Counterfeit Cisco Transceivers**

5   The success of Cisco's brand has attracted criminal counterfeiters who illegally profit by

6   selling fake Cisco products. To combat this, Cisco investigates suspicious listings on online

7   marketplaces, and in this case, arranged for a consultant to buy suspect Cisco transceivers from

8   Defendants. *See* Decl. No. 2 ¶ 14; 7/14/20 Decl. of Third Witness ("Decl. No. 3") ¶¶ 3-4, 6.

9   Defendants delivered transceivers purchased by Cisco's consultants to an address in █████

10  ███████████████, and the consultant then shipped the products to Cisco for testing. Decl. No.

11  2 ¶ 15; Decl. No. 3 ¶¶ 6, 28-29.

12  Counterfeiters use different methods to avoid detection. ████████████████████

13  ████████████████████████████████████████████████████████████

14  ██████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ██████████████████████████████. Decl. No. 3 ¶ 5. ████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████

19  ██████████████. *Id.* ¶¶ 5, 19. ████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████. *Id.*

22  Cisco has labs and engineering investigators who can test potentially counterfeit products,

23  using specialized tools and product data to compare suspect products with authentic products.

24  Decl. No. 2 ¶¶ 12-13. A Cisco expert in product testing, analysis, and authentication, analyzed

25  each transceiver received from Defendants to determine whether it was genuine. *See generally*

26  Decl. No. 2. As set forth below, Cisco's engineering investigator first personally evaluated each

27  product using Cisco's standard techniques for evaluating potential counterfeits, and determined

28

2790.000/1536147.7                                      7                      Case No. 5:20-cv-04773-EJD

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

that each of Defendants' products was, in fact, inauthentic in that it was indisputable that it had not

been manufactured by Cisco or by someone associated with Cisco. *Id.* ¶ 15.

### 1.     Usource

In May 2020, Cisco's consultant ordered two purported Cisco transceivers from Usource.

*See* Decl. No. 3 ¶¶ 7-9. Usource advertised, offered, and sold these transceivers as Cisco-brand

transceivers. *Id.* Usource sent them to Cisco's consultant in ███████████████, who found

they were labelled with the CISCO Marks as shown below:



Decl. No. 3 ¶ 14. Cisco's consultant then sent the purported Cisco transceivers to Cisco for

examination. *See id.* ¶¶ 28-29; Decl. No. 2 ¶¶ 16-17.

On July 1, 2020, Cisco's engineering investigator examined the two suspect purported

Cisco transceivers received from Usource. *See* Decl. No. 2 ¶ 18. As shown above, each suspect

transceiver had a label with the Cisco name and logo. *Id.*; Decl. No. 3 ¶ 14. After his analysis and

testing, Cisco's engineer provided images of the transceivers to the purported OEM identified on

the product labels, and that OEM's product engineers reviewed and analyzed the images and

provided their findings. Decl. No. 2 ¶ 19. Both Cisco's engineer and the OEM confirmed that the

products were clearly inauthentic in that they were not manufactured by Cisco or by someone

associated with Cisco in light of the many differences between them and authentic Cisco

transceivers. *Id.* ¶¶ 18-19. These differences include, but are not limited to: ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████. *Id.* ¶ 20.

1      **2.     Warex**

2          In May 2020, Cisco's consultant ordered four purported Cisco transceivers from Warex.

3  *See* Decl. No. 3 ¶¶ 16-22. Warex advertised and offered these transceivers using the CISCO Marks

4  as if they were genuine Cisco transceivers, and also advertised that they could customize labels.

5  *Id.* Cisco's consultant emphasized that " █████████████████████████████████████

6  █████████████████████████████████████████████████████████████████████████████████

7  █████████████████████████████████" *Id.* ¶ 19 (emphasis added).

8  Warex responded that █████████████████████████████████████████████████, "█████

9  █████████████████████████████████████████████████████████████████████████████████

10  ████████████████████████████." *Id.* This is consistent with one way

11  counterfeiters avoid prosecution in China ███████████████████████████████████████

12  ███████████████████████████. *Id.* The communications with Warex,

13  however, make clear that it knew the products were intended to be passed off to end customers as

14  genuine Cisco and not third-party products; thus, ██████████████████████████████

15  ████████████████████████████████████. Warex's

16  invoice confirmed that the order was for two units each of the "SFP-10G-LR-C" and "SFP-10G-

17  SR-C" (nearly identical to Cisco part numbers) that were "Cisco compatible." *Id.* ¶¶ 20-21. Warex

18  sent the products to Cisco's consultants in ██████████████████, who then forwarded them to

19  Cisco for examination. *Id.* ¶¶ 6, 28-29; Decl. No. 2 ¶¶ 21-22.

20          On July 1, 2020, Cisco's engineering investigator examined the four suspect purported

21  Cisco transceivers received from Warex. *See* Decl. No. 2 ¶ 23. Each suspect transceiver had ████

22  ██████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████████████████████████████

24  █████████████████████████. *Id.* For all four suspect transceivers received from

25  Warex, Cisco's engineer confirmed that the products were clearly inauthentic as they were not

26  manufactured by Cisco or by someone associated with Cisco in light of the many differences

27  between them and authentic Cisco transceivers. *Id.* ¶ 24. These differences include, but are not

28  limited to: ████████████████████████████████████████████████████████████████████

1 ██████████████████████████████████████████████████

2 █████████████████████████████████████████████

3 ██████ . *Id.*

4 **IV.      ARGUMENT**

5      **A.      The Court Should Issue the Requested Relief Without Prior Notice**

6      Cisco moves the Court to issue a TRO and other relief *ex parte* pursuant to Federal Rules

7 of Civil Procedure 65(b) and L.R. 65-1, so that Defendants do not disappear and dispose of their

8 infringing goods and ill-gotten gains, as has happened with other counterfeiters. *See* Decl. No. 1

9 ¶ 24. The Ninth Circuit approves issuing *ex parte* TROs where notice would render further

10 prosecution fruitless, e.g., "[i]n the trademark arena, such cases include situations where an

11 alleged infringer is likely to dispose of the infringing goods before the hearing." *Reno Air Racing*

12 *Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). An applicant can justify excusal of

13 the notice requirement on this ground by showing "'that the adverse party has a history of

14 disposing of evidence or violating court orders or that persons similar to the adverse party have

15 such a history.'" *Id.* (quoting *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 651 (6th

16 Cir.1993)).

17      For example, in *Talavera Hair Prod., Inc. v. Taizhou Yunsung Elec. Appliance Co., LTD*,

18 the defendants sold their infringing products through online eCommerce marketplaces, including

19 Amazon and eBay, and the plaintiff had tried to stop similar sellers, only to see the same goods

20 reappear under new sellers. No. 18-CV-823-JLS (JLB), 2018 WL 3413866, at *4 (S.D. Cal. May

21 10, 2018). The court also noted nine other cases where TROs were granted against similar online

22 infringers who used eCommerce marketplaces to sell their infringing products. *Id.* Thus, the court

23 found that notice to the defendants would likely result in the disappearance or transfer of the

24 counterfeit products, so notice was not required and the plaintiff could proceed *ex parte*. *Id.*

25      Similarly, in *Gucci Am., Inc. v. Los Altos Boots, Inc.*, the court excused the plaintiff from

26 providing notice before issuing a TRO because: 1) the defendant could easily conceal the

27 counterfeit goods and related records given their nature and location outside the U.S.; and

28 2) similarly situated defendants in trademark infringement cases have a history of ignoring court

1  orders to preserve and instead destroying evidence after *ex parte* TROs and seizure orders were

2  denied. No. CV1406680 BRO (AJWX), 2014 WL 12561613, at *3-4 (C.D. Cal. Aug. 27, 2014).

3      Defendants in the present case are engaging in the same malfeasance as the counterfeiters

4  confronted in *Talavera* and *Gucci*. Defendants are willfully advertising and selling transceivers

5  using counterfeit CISCO Marks or otherwise designed to create the impression that they are

6  authentic Cisco transceivers, largely through storefronts on third-party eCommerce websites like

7  Alibaba. Cisco has been combatting similar counterfeiters on the same and similar websites, but to

8  little avail because when these websites disable infringing listings or the counterfeiters otherwise

9  get notice, the same goods often quickly reappear in new listings or on new eCommerce sites with

10 new seller names and identifications. *See* Decl. No. 1 ¶ 24.

11     Defendants are not only able and likely to conceal their counterfeit goods and related

12 evidence if they receive prior notice of the TRO and other relief sought by Cisco, but they are also

13 likely to do so in a way that enables them to continue business as usual. Their location in China,

14 where it is difficult to serve defendants (*see* infra, p. 27) and nearly impossible to enforce a

15 judgment (*see* infra, pp. 19-20), also increases the ease with which they can hide both counterfeit

16 goods and resulting profits. Cisco respectfully submits that it has made a sufficient showing that

17 notice would render further prosecution fruitless and Defendants are likely to dispose of their

18 infringing goods because "persons similar to" Defendants have a long history of doing so. Thus,

19 the Court should excuse Cisco from the notice requirements and allow it to proceed *ex parte*.

20    **B.    The Court Should Grant the Requested Immediate and Preliminary
           Injunctive Relief Barring Further Counterfeiting Activities by Defendants and
21         Anyone Associated or Acting in Concert With Them**

22     Cisco first seeks a temporary restraining order and order to show cause why a preliminary

23 injunction should not issue to put an immediate stop to Defendants' advertising, offering for sale,

24 sales, and distribution of counterfeit Cisco transceivers and use of the CISCO Marks in such

25 activities, and ensure that evidence, including the counterfeit products themselves, is preserved.

26     The standard for issuing a TRO is identical to the standard for a preliminary injunction.

27 *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001);

28 *Lockheed Missile & Space Co. v. Hughes Aircraft*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). A

1   plaintiff seeking preliminary injunctive relief must establish that: (1) "[it] is likely to succeed on

2   the merits"; (2) "[it] is likely to suffer irreparable harm in the absence of preliminary relief";

3   (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest."

4   *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show

5   that there are serious questions going to the merits—a lesser showing than likelihood of success on

6   the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in

7   the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v.*

8   *Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted)

9   (emphasis in original). Preliminary injunctive relief is routinely granted in cases involving

10  trademark infringement. The principle "that trademark infringement causes irreparable injury and

11  necessitates immediate injunctive relief" is well settled and "is universally recognized in the courts

12  of [the Ninth] circuit." *Steinway & Sons v. Robert Demars & Friends*, No. 80-04404 TJH (Mx),

13  1981 WL 40530, at *7 (N.D. Cal. Jan. 28, 1981). Defendants are selling potentially dangerous

14  counterfeit transceivers to U.S. customers, so there is a clear need for immediate injunctive relief.

**1.   Cisco Is Likely to Succeed on the Merits**

16  Cisco accuses Defendants of trademark infringement, counterfeiting, and false designation

17  of origin and advertising under the federal Lanham Act, and unfair competition and false

18  advertising under California law, by unauthorized use of the CISCO Marks and selling

19  transceivers designed to appear as if they were genuine Cisco products. A plaintiff claiming

20  trademark infringement under the Lanham Act must show it "owns a valid mark, and thus a

21  protectable interest" and that Defendants' "use of the mark 'is likely to cause confusion, or to

22  cause mistake, or to deceive.'" *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009)

23  (quoting *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir.

24  2005)); *see also* 15 U.S.C. § 1114(1). Cisco has established that it owns trademark registrations

25  for the CISCO Marks. Decl. No. 1 ¶¶ 5-10, Ex. 1A. And Cisco has shown that Defendants are

26  using those marks in connection with selling inauthentic Cisco transceivers in the U.S.

27  "To determine whether a likelihood of consumer confusion exists," courts in the Ninth

28  Circuit rely "on the eight-factor *Sleekcraft* test, which reviews: (1) the strength of the mark;

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

(2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)), abrogated in part on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003)). "The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a rote checklist." *Id.* (internal quotation marks and citation omitted).

Proving false designation of origin based on the same or similar trade names or symbols requires the same showing of a likelihood of confusion. *See Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534-35 (9th Cir. 1989) ("[T]he same broad standards of protection apply to trademarks and trade names. … "[L]ikelihood of confusion is unquestionably the key to a finding of infringement in either case."); *see also* 15 U.S.C. § 1125(a)(1); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 n.8 (9th Cir. 1999) (noting that while Lanham Act § 32 (15 U.S.C. § 1114) protects registered marks, § 43(a) (15 U.S.C. § 1125(a)) also protects against infringement of unregistered marks and trade dress and against a wider range of practices such as false advertising, but "the analysis under the two provisions is oftentimes identical").

The Ninth Circuit has held that the *Sleekcraft* test is appropriate to determine likelihood of confusion regarding a claim for false designation of origin. *Accuride,* 871 F.2d 1531 at 1536. But courts in this district and around the Ninth Circuit hold that in cases involving counterfeiting, "it is unnecessary to perform the eight-factor evaluation because counterfeit marks are inherently confusing." *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. C 12-2582 CW, 2012 WL 2343670, at *14 (N.D. Cal. June 20, 2012) (granting TRO and OSC re preliminary injunction) (citing *Phillip Morris USA Inc. v. Shalabi,* 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004)); *Microsoft Corp. v. Buy More, Inc.*, 136 F. Supp. 3d 1148, 1157 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476 (9th Cir. 2017) (quoting *Phillip Morris*, 352 F. Supp. 2d at 1073); *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1096 (S.D. Cal. 2018) (citing *Phillip Morris*, 352 F. Supp. 2d 1067 at 1073).

1        A counterfeit mark is: "(1) a non-genuine mark identical to the registered, genuine mark of

2    another, where (2) the genuine mark was registered for use on the same goods to which the

3    infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946

4    (9th Cir. 2011) (citing *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708,

5    721 (9th Cir. 2005)). This is a clear case of counterfeiting in which Defendants used the identical

6    marks in connection with, supposedly, the same goods. Thus, there is a likelihood of confusion as

7    a matter of law.

8        Cisco also meets the *Sleekcraft* factors to show a likelihood of confusion. Cisco has used

9    its trade name and the CISCO Marks since 1984 in connection with networking products,

10   including transceivers, so the marks are strong (*Sleekcraft* factor 1). Decl. No. 1 ¶¶ 4-6.

11   Defendants are selling the same kinds of products as Cisco—transceivers (factor 2)—and using

12   identical marks and trade names in their advertising and/or on the products themselves (factor 3).

13   And the use of identical marks and trade names to sell counterfeit products shows Defendants

14   intend to confuse the public (factor 7). Cisco is likely to succeed on the merits of its federal

15   trademark infringement, false designation of origin, and unfair competition claims.

16       As for Cisco's parallel claims for unfair competition and false advertising under California

17   state law, "[the Ninth] Circuit has consistently held that state common law claims of unfair

18   competition and actions pursuant to California Business and Professions Code § 17200 are

19   'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d

20   1255, 1262–63 (9th Cir. 1994). "An action for unfair competition under Cal. Bus. & Prof. Code

21   §§ 17200 et seq. is substantially congruent to a trademark infringement claim under the Lanham

22   Act. . . . Under both, the ultimate test is whether the public is likely to be deceived or confused by

23   the similarity of the marks." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions,*

24   *Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (internal quotation marks omitted).

25       Similarly, where plaintiffs establish that they are likely to succeed on the merits of federal

26   Lanham Act claims, then they also demonstrate a likelihood of success on parallel false

27   advertising claims under California law. *United Tactical Sys., LLC v. Real Action Paintball, Inc.*,

28   No. 14-CV-04050-MEJ, 2014 WL 6788310, at *16–17 (N.D. Cal. Dec. 2, 2014) (finding showing

1   of likelihood of success under the Lanham Act sufficient to meet burden for unfair competition

2   under Section 17200 and false advertising under Section 17500). As Cisco has shown it is likely to

3   succeed on the merits of its federal claims, Cisco has also shown it is likely to succeed on its

4   parallel claims for unfair competition and false advertising under California law.

5               **2.       Cisco Will Suffer Irreparable Harm as a Result of Defendants'
                            Activities Without an Injunction**

6

7           Where a plaintiff alleging trademark infringement shows "a high probability of confusion,"

8   it also "supports a finding of irreparable injury in the sense that it may not be fully compensable in

9   damages." *McLeod v. Hosmer-Dorrance, Inc.*, 192 USPQ 683, 686 (N.D. Cal. 1976). The "loss of

10  control over business reputation and damage to goodwill" constitutes irreparable injury supporting

11  injunctive relief for trademark infringement. *Sream, Inc. v. Sahebzada,* No. 18-CV-05673-DMR,

12  2019 WL 2180224, at *9 (N.D. Cal. Mar. 6, 2019), *report and recommendation adopted,* No. 18-

13  CV-05673-RS, 2019 WL 2180215 (N.D. Cal. Mar. 28, 2019); *see also Ubiquiti Networks,* 2012

14  WL 2343670, at *15 (where defendants sold counterfeit products, finding imminent danger of

15  irreparable injury and no adequate remedy at law, and issuing TRO as sales would likely damage

16  plaintiff's reputation and goodwill). In *Sream*, the plaintiff alleged it invested and built goodwill in

17  its brand and that its products were superior, while the defendant sold counterfeit products that

18  misled consumers and harmed the plaintiff's reputation and goodwill by being inferior. This

19  showed a risk of irreparable harm justifying an injunction. *Id.*

20          Similarly here, Cisco has spent decades investing in and building the goodwill in its brand

21  and reputation for designing, making, and selling high-quality products. *See* Decl. No. 1 ¶¶ 4-10.

22  Defendants' sales of counterfeit transceivers mislead customers, and threaten irreparable harm to

23  Cisco's goodwill that cannot be adequately redressed with money. This is particularly so when

24  Defendants' products were not subject to the same rigorous quality control measures and safety

25  testing as genuine Cisco transceivers. *See* Decl. No. 2 ¶¶ 7-9, 20, 24.

26              **3.       The Balance of Equities Favors Cisco**

27          A TRO or preliminary injunction will impose no legally cognizable hardship on

28  Defendants. "'Where the only hardship that the defendant will suffer is lost profits from an activity

which has been shown likely to be infringing, such an argument in defense "'merits little equitable consideration.'" *Sream*, 2019 WL 2180224, at \*10 (quoting *Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (superseded on other grounds)); *see also United Tactical Sys.*, 2014 WL 6788310, at \*23 (disregarding claimed hardship from loss of infringing sales). Defendants have no right to sell counterfeit Cisco transceivers or use the CISCO Marks; thus, any hardship of their being barred from doing so must be disregarded. At the same time, every sale of a counterfeit transceiver by Defendants is a lost sale for Cisco that detracts from the value of its trademarks and goodwill and risks serious and irreparable harm to its reputation (not to mention the public) by being a potentially dangerous product. Accordingly, the balance of equities strongly supports issuing a TRO and preliminary injunction in this case.

### 4. An Injunction Is in the Public Interest

In evaluating the public interest in enjoining suspected counterfeiters, courts should be mindful that despite the false view that "intellectual property disputes" concern fights between "two faceless entities," public policy strongly supports shutting down counterfeiters to protect end-consumers. *Neighborhood Assistance Corp. v. First One Lending Corp.*, 2013 WL 12113414, at \*5 (C.D. Cal. Feb. 11, 2013). This is so because "the policy justification for trademark law is to protect *human beings*," and "the purpose of the Lanham Act is 'to protect the public' from false and deceptive practices that create confusion in the marketplace." *Id.* (emphasis in original) (quoting *U-Haul Int'l, Inc. v. Jartran, Inc.*, 681 F.2d 1159, 1162 (9th Cir. 1982)). The Ninth Circuit has explained that "the consuming public is equally injured by an inadequate judicial response to trademark infringement," so "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982).

The Ninth Circuit has further held that a preliminary injunction barring probable trademark infringement "serve[s] the public interest by avoiding customer confusion-an important consideration in trademark cases." *Creative Labs, Inc. v. Cyrix Corp.*, 141 F.3d 1174 (9th Cir. 1998); *see also United Tactical Sys.*, 2014 WL 6788310, at \*23–24 ("the public interest is served by an injunction to prevent consumer confusion and misleading advertising"); *Moroccanoil, Inc. v.*

1    *Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161, 1178 (C.D. Cal. 2017) (granting preliminary injunction

2    and noting there were "serious questions as to whether consumers [were] likely [to] be confused

3    between the products, the public interest factor weigh[ed] in favor of issuing an injunction.").

4          Protecting the public interest is especially important here where countless American

5    businesses, including healthcare systems and hospitals, transportation and utility systems, and

6    government entities, including the U.S. military, depend on authentic Cisco transceivers to provide

7    reliable and secure access to the Internet. *See McLeod*, 1976 WL 21104, at *1 (finding "a greater

8    public interest in insuring that no confusion exists as to the source of plaintiff's and defendant's

9    products" and issuing preliminary injunction in case involving medical devices). Thus, the public

10   interest favors granting the requested TRO and preliminary injunction.

11                        **5.    At Minimum, Injunctive Relief Is Warranted Because There Are**
                                  **Serious Questions Going to the Merits and the Balance of Hardships**
12                                **and Other *Winter* Factors Strongly Favor Cisco**

13         Even if the Court found that Cisco fell short of showing it is likely to succeed on the

14   merits, Cisco would still be entitled to a TRO and preliminary injunction. As noted above, "if a

15   plaintiff can only show that there are serious questions going to the merits—a lesser showing than

16   likelihood of success on the merits—then a preliminary injunction may still issue if the balance of

17   hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied."

18   *Friends of the Wild Swan*, 767 F.3d at 942 (internal quotation marks and citations omitted). Here,

19   Cisco has at least raised serious questions on the merits of its claims by submitting detailed

20   evidence that Defendants used counterfeit CISCO Marks to sell inauthentic Cisco transceivers . As

21   shown above, the balance of hardships and public interest strongly favor Cisco, and it has also

22   shown that there is a risk of irreparable harm in the absence of an injunction. Thus, Cisco is also

23   entitled to a TRO and preliminary injunction under the secondary standard set forth above.

24                   **C.    The Court Should Issue An Order to Freeze Defendants' Assets, Disable,**
                            **Transfer Control of, and Redirect Defendants' Seller Identifications and**
25                          **Domain Names Used for Counterfeiting, and Bar Access to Listings and Other**
                            **Fulfillment Activities for Sales of Products Using Infringing Marks**
26

27         The Ninth Circuit holds that when a plaintiff seeks equitable remedies under the Lanham

28   Act, including recovery of a defendant's profits under 15 U.S.C. § 1117, a district court has

"inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992). This includes "'the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies.'" *Id.* (quoting *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1364 (9th Cir.1988) (en banc)). The Ninth Circuit explained "'it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement,'" and affirmed the district court's granting of TROs and preliminary injunctions to freeze the defendants' assets, in addition to preventing various counterfeiting-related activities. *Id.* at 559 (quoting *Playboy Enters.,* 692 F.2d at 1275).

Cisco seeks an order providing various types of injunctive relief that are ancillary to the Court's ability to private final relief, each of which is routinely granted in cases involving counterfeiting online, including: 1) freezing Defendants' assets to preserve the possibility of equitable relief, including an effective accounting and return of Defendants' fraudulently obtained profits; 2) disabling and transferring control of Defendants' seller identifications on third-party eCommerce websites and domain names to Cisco to prevent further infringement; and 3) barring access to and sales of counterfeit products on third-party eCommerce websites, as well as other third-party activities that facilitate the illegal sales, to effectively prevent further infringement.

This relief will ensure that Cisco can potentially obtain the full scope of equitable relief to which it is entitled, while removing Defendants' ability to market and sell the counterfeit products to customers in the United States. It will also incentivize Defendants to appear in this litigation rather than simply ignoring it and changing their names or moving their assets and sales to a new entity, as often happens with overseas counterfeiters, particularly in countries like China where it is difficult or impossible to enforce a U.S. judgment. *See* Decl. No. 1 ¶ 24.

### 1.    The Court Should Issue an Order Freezing Defendants' Assets

Cisco first seeks an order freezing Defendants' assets to preserve the possibility of equitable relief, including an accounting and return of their ill-gotten gains from counterfeiting. Cisco has already met the standards for granting a TRO and preliminary injunctive relief as to Defendants' counterfeiting activities. In addition, "[a] party seeking an asset freeze must show a

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1   likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if

2   relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Given the

3   deceitful and secretive nature of counterfeiting, courts in the Ninth Circuit regularly find that

4   dissipation of assets is likely and grant asset freezes in cases involving willful counterfeiting,

5   particularly overseas where defendants can hide assets from a potential judgment.

6       For example, *Reebok* involved an alleged scheme to "sell counterfeit REEBOK shoes in

7   Mexican border towns (such as Tijuana)." *Reebok*, 970 F.2d at 554. In freezing the defendants'

8   assets, the district court found that "[d]ue to the international aspect of the defendants' business,

9   the Court is concerned that unless the assets are frozen, defendants may hide their allegedly ill-

10  gotten funds." *Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521, 1527 (S.D.

11  Cal. 1989), *aff'd*, 970 F.2d at 563; *see also FTC v. Affordable Media*, 179 F.3d 1228, 1236–37

12  (9th Cir. 1999) (finding dissipation likely based on defendants keeping funds in the Cook Islands).

13      Similarly, in *Chanel, Inc. v. Sunus Online Group, LLC*, the defendants sold counterfeit

14  handbags and wallets online. No. EDCV 13-2194 JGB (DTBx), 2014 WL 12558780, at *1 (C.D.

15  Cal. Jan. 15, 2014). The court found "based on Defendants' blatant violations of trademark laws

16  there is likelihood that Defendants would transfer or hide the illegally obtained assets in order to

17  avoid a judgment in this action," and thus, granted a preliminary injunction freezing their assets.

18  *Id.* at *3 (noting that while this "may harm [the defendants], when weighing this harm against the

19  counterfeiting activities that have harmed Chanel, the balance of equities tips in Chanel's favor.")

20      Other Circuits agree that asset freezes are warranted to preserve assets in counterfeiting

21  cases, particularly overseas and/or online. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading*

22  *Inc.*, 51 F.3d 982, 987-88 (11th Cir. 1995) (affirming preliminary injunction freezing assets of

23  U.S.-based defendants who arranged for making counterfeit Levi's jeans in China for sale in

24  Europe); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132-33 (2d Cir. 2014) (confirming trial

25  authority to issue TRO and preliminary injunction freezing assets of defendants selling counterfeit

26  goods online); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007)

27  (affirming TRO and preliminary injunction freezing assets of defendants selling counterfeits).

28

1   Cisco seeks recovery of Defendants' profits from their wrongful use of the CISCO Marks

2   in connection with sales of transceivers, among other relief, so the Court is authorized to freeze

3   Defendants' assets under *Reebok*, 970 F.2d at 559. *See* Dkt. 1 (Compl.) at Prayer for Relief ¶¶ J-K.

4   The present action involves blatant unauthorized use of the CISCO Marks by Defendants,

5   including in their advertising for transceivers and sometimes on the transceivers themselves, and

6   Defendants are based in China and use third-party eCommerce online platforms like Alibaba to

7   market and sell their non-genuine Cisco products into the U.S.

8   It is not only likely that Defendants can and will dissipate their assets during the pendency

9   of this case if given the opportunity to do so, but it is also difficult if not impossible to enforce

10  U.S. judgments in China. *See, e.g.,* https://travel.state.gov/content/travel/en/legal/travel-legal-

11  considerations/internl-judicial-asst/Enforcement-of-Judges.html (noting no treaty or convention

12  provides for reciprocal recognition and enforcement of judgments); *Yee v. NIVS Intellimedia Tech.*

13  *Group, Inc.*, No. CV 11-8472 JGB (AJWx), 2013 WL 1276024, at *5 (C.D. Cal. March 25, 2013)

14  (stating that the Chinese company whose executives are Chinese residents "bore no real risk of

15  sanctions" given the difficulty of enforcing a U.S. judgment against a Chinese national); *Redwen*

16  *v. Sino Clean Energy, Inc.*, No. CV 11-3936 PA (SSx), 2013 WL 12303367, at *5-6 (C.D. Cal.

17  Jul. 9, 2013) (finding that the plaintiff "would face significant obstacles in enforcing any judgment

18  against the defendants' assets in China"); *Gucci America, Inc. v. Wang Huoqing*, No. C-09-05969

19  JCS, 2011 WL 31191, at *16 (N.D. Cal. Jan. 3, 2011) (noting that enforcing a judgment may be

20  difficult in China, and compelling transfer of counterfeiter's domain names to plaintiffs). Thus, the

21  Court should issue the requested order freezing Defendants' assets to preserve the possibility of

22  equitable relief, including an accounting and return of their profits from counterfeiting.

23  The Court's authority is not limited to freezing specific identified assets, nor to assets

24  within this District or the U.S., and can extend to banks and other non-parties that have custody of

25  Defendants' assets or provide payment services to Defendants. *See Reebok*, 737 F. Supp. at 1527–

26  28 (TRO and preliminary injunction that "any banks, savings and loan associations, or other

27  financial institutions … who receive actual notice of this order by personal service or otherwise,

28  are preliminarily enjoined from transferring, disposing of, or secreting any money, stocks or other

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

1   assets of these defendants, until further order of the court" except in limited circumstances); *Gucci*

2   *Am., Inc.*, 768 F.3d at 133 (rejecting argument that plaintiff had to identify particular property

3   derived from counterfeiting before obtaining TRO and preliminary injunction freezing all assets).

**2.    The Court Should Issue an Order Freezing, Disabling, Transferring Control of, and Redirecting Defendants' Seller Identifications and Domain Names**

6   Defendants are knowingly, intentionally, and willfully advertising, offering for sale,

7   selling, and distributing transceivers using counterfeit CISCO Marks. As far as Cisco is presently

8   aware, Defendants engage in these illicit activities through two primary channels on the Internet:

9   a) stores on third-party eCommerce marketplaces such as Alibaba ("eCommerce Websites"), using

10  their respective seller identifications on those websites; and b) separate commercial websites

11  maintained by Defendants themselves ("Domain Names"). Cisco has submitted lists of known

12  seller identifications, eCommerce Websites, and Domain Names that Defendants use to advertise,

13  offer for sale, and sell counterfeit Cisco products as Exhibits 3D – 3E to Decl. No. 3.

14  To effectively prevent Defendants from continuing their wrongful activities while this case

15  is pending, and preserve their assets for potential equitable relief, Cisco seeks an order freezing

16  Defendants' seller identifications and Domain Names to ensure that they cannot be transferred or

17  redirected, including those that are presently known and any others discovered in the case. Cisco

18  further requests that the order transfer control of the Domain Names to a U.S.-based registrar of

19  Cisco's choice pending final resolution of this action. Cisco also requests that such order call for

20  redirecting the Domain Names to notice of this case in order to prevent further irreparable harm

21  from Defendants' counterfeiting activities, and ensure they receive prompt notice of this action.

22  Counterfeiters operating online can, and often will, as soon as they receive notice of

23  litigation, take steps to conceal their activities and move their illegal businesses to other online

24  channels to thwart plaintiffs' ability to obtain and courts' ability to award meaningful relief, e.g.,

25  modifying domain name registrations, redirecting visitors to new seller identifications or domain

26  names, and/or transferring ownership of seller identifications and domain names. *See* Decl. No. 1

27  ¶ 24. Thus, in cases involving online counterfeiters, district courts in the Ninth Circuit often grant

28  preliminary orders freezing counterfeiters' domain names and seller identifications used on

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

eCommerce websites, and granting the other relief sought by Cisco. *See, e.g., Williams-Sonoma, Inc. v. Friendfinder, Inc.*, No. C06-6572JSW (MEJ), 2007 WL 4973848, at *10 (N.D. Cal. Dec. 6, 2007), *report and recommendation adopted as modified sub nom. Williams-Sonoma, Inc. v. Online Mktg. Servs., Ltd.*, No. C 06-06572 JSW, 2008 WL 596251 (N.D. Cal. Mar. 4, 2008) (temporarily barring sale or transfer of defendants' domain names); *Spy Optic Inc. v. Individuals, Partnerships & Unincorporated Associations Identified on Schedule A*, No. CV 17-7649 DSF (KSx), 2017 WL 10592133, at *2–3 (C.D. Cal. Nov. 27, 2017) (barring transfer of defendants' "Internet based e-commerce store website businesses under their seller IDs"); *Chanel, Inc. v. eukuk.com*, No. 2:11-CV-01508-KJD, 2011 WL 6955734, at *5–6 (D. Nev. Dec. 28, 2011) (injunction: a) barring defendants from transferring their domain names; b) directing domain name registrars to transfer to plaintiff's counsel, for deposit with the court, domain name certificates; c) directing registrars and top-level domain registries to change domain name registrar to GoDaddy.com; d) directing GoDaddy.com to redirect domain names to copy of complaints and other documents from the case; e) locking domain names from any modification or deletion by registrars or defendants); *Las Vegas Sands Corp. v. Fan Yu Ming*, 360 F. Supp. 3d 1072, 1082 (D. Nev. Jan. 9, 2019) (ordering domain name registrar and registries to maintain infringing domain names "on hold and lock").

The Lanham Act also expressly provides that in certain cases of online trademark infringement, domain name registrars, who control the transfer of domain names, must deposit domain name certificates with the court. *See* 15 U.S.C. § 1114(2)(D); 15 U.S.C. § 1125(d)(2). An order barring Defendants from transferring their seller identifications and Domain Names, requiring transfer of control of such domain names to a U.S.-based registrar of Cisco's choice (while legal ownership remains with Defendants), and requiring deposit of domain name certificates with the Court, would impose no real burden on Defendants. At the same time, it would ensure that ownership of the domain names cannot be changed until this action is resolved on the merits, thereby maintaining the potential for Cisco to obtain full relief.

Cisco also seeks to have Defendants' Domain Names automatically redirect to a website that provides notice of and access to filings in this action, or, alternatively, disable such websites. Such preliminary relief has been granted in cases involving online counterfeiters. *See, e.g.,*

*Chanel*, 2011 WL 6955734, at *5–6 (directing registrar to redirect domain names to webpage with copy of documents from the action); *Asmodus, Inc. v. Junbiao Ou*, No. EDCV 16-2511 JGB (DTBx), 2017 WL 2954360, at *5–6, 19 (C.D. Cal. May 12, 2017) (ordering defendant to post notice on its websites); *Otter Prod., LLC v. Anke Grp. Indus. Ltd.*, No. 2:13-CV-00029-MMD-RJJ, 2013 WL 5910882, at *4 (D. Nev. Jan. 8, 2013) (ordering any web hosting company, domain name registry, and/or domain name registrar getting notice to remove counterfeit and infringing products from defendant's website or alternatively to disable access to the website).

Redirecting (or at least disabling) Defendants' domain names would help prevent further infringement while this case proceeds, as Defendants could no longer advertise and sell counterfeit Cisco transceivers through those channels. Redirecting those domain names to notice of and filings from this case would also ensure that each Defendant receives prompt notice of this case and the relief sought by Cisco, as they would see it upon visiting their own websites. And as noted above, Defendants cannot complain about the potential impact of such relief, as the only hardship would be lost profits from infringing activities. *See supra* § IV–A–3.

### 3. The Court Should Issue an Order Barring Access to Defendants' Listings and Preventing Fulfillment of Further Sales of Defendants' Products with CISCO Marks

Cisco requests an order preventing Defendants from accessing their listings of counterfeit Cisco products through their seller identifications on online marketplaces—including, but not limited to, Alibaba—and barring third parties from assisting in further orders for such products. Specifically, Cisco requests that the Court order that any eCommerce Website provided with notice disable access to any such listings, advertisements, or images by Defendants, and that such marketplaces stop providing any service or payment to any of the Defendants that may facilitate their advertising, sales, and distribution of any such purported Cisco products. Cisco also requests an order requiring Internet search engines such as Google and Yahoo ("Internet Search Engines"), to remove from their indexes and search results any of the Domain Names or eCommerce Websites identified herewith, or other webpages owned or controlled by Defendants and associated with advertising, offering for sale, and selling of purported Cisco products. Cisco also requests that any third party that provides shipping services related to Defendants' sales of

1   purported Cisco products ("Common Carriers") be restrained from fulfilling any pending, or from

2   accepting any future, shipments by Defendants, and be ordered to sequester and turn over to Cisco

3   for inspection any of Defendants' purported Cisco products in the Common Carriers' possession,

4   custody, or control.

5          Courts in this Circuit have granted the same and similar kinds of relief in cases involving

6   counterfeiters who use online marketplaces as an intermediary to advertise and sell their

7   fraudulent goods. *See, e.g., Talavera Hair Prod.*, 2018 WL 3413866, at *6-7 (granting TRO

8   barring Internet marketplace website operators from providing access to listings of Defendants'

9   infringing products via the eCommerce stores under their respective Seller IDs and compelling

10  removal of infringing material from search engines); *Spy Optic*, 2017 WL 10592133, at *2–3

11  (granting preliminary injunction requiring eBay and PayPal to restrain and divert funds from

12  infringing sales and compelling removal of infringing material from search engines).

13         Cisco has demonstrated that Defendants are using the CISCO Marks and/or selling

14  counterfeit Cisco products without authorization. The requested relief is necessary to effectively

15  prevent Defendants from continuing their advertising, sales, and distribution of counterfeit and

16  infringing Cisco products while this case is pending, either through the existing seller

17  identifications and marketplaces or by simply redirecting traffic to new identifications on such

18  marketplaces. As noted above, any additional infringement would irreparably harm Cisco. Any

19  hardship Defendants might claim from the requested relief should be disregarded, and in any event

20  is outweighed by Cisco's interest in removing counterfeit products from the market, and by the

21  public interest in avoiding confusion and inferior and potentially dangerous counterfeits.

22  Therefore, the Court should grant the requested relief.

23         **D.      The Court Should Permit Cisco to Conduct Expedited Discovery**

24         Cisco seeks expedited discovery to investigate and root out the ongoing manufacturing,

25  advertising, selling, and distribution of counterfeit Cisco transceivers. Courts have discretion to

26  expedite discovery, particularly in cases where plaintiffs seek temporary or preliminary injunctive

27  relief. *See* Fed. R. Civ. P. 26(d) (allowing for expedited discovery "by court order") and Advisory

28  Comm. Note on 1993 Amendment (stating "[d]iscovery can begin earlier" and "[t]his will be

1    appropriate in some cases, such as those involving requests for a preliminary injunction").

2    Expedited discovery can be granted for good cause "where the need for expedited discovery, in

3    consideration of the administration of justice, outweighs the prejudice to the responding party,"

4    and "good cause is frequently found in cases involving claims of infringement and unfair

5    competition." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).

6          Courts in the Ninth Circuit have found good cause for expedited discovery to enable

7    plaintiffs in counterfeiting cases to identify: 1) accounts used for and transactions associated with

8    infringing sales; 2) original sources of and pending shipments of counterfeit products; and 3) other

9    parties involved in counterfeiting activities. *See Spy Optic*, 2017 WL 10592133, at *2 (ordering

10   eBay and PayPal to identify all funds transmitted to Defendants' accounts and to provide plaintiffs

11   with data and accounting of all funds, accounts, and transactions); *SATA GmbH & Co. Kg v.*

12   *Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO (Ex), 2015 WL 6680807, at *11 (C.D.

13   Cal. Oct. 19, 2015) (granting expedited discovery to enable plaintiff to ascertain sources of the

14   counterfeit products and learn of any pending shipments of such products); *Sas v. Sawabeh Info.*

15   *Servs. Co.*, No. CV 11-04147 GAF (MANx), 2011 WL 13130013, at *6–7 (C.D. Cal. May 17,

16   2011) (granting expedited discovery to gather evidence for preliminary injunction to stop

17   infringement, identify others involved in counterfeiting, and prevent destruction of evidence).

18   None of these cases involved counterfeit products that were as important as networking devices

19   used in critical infrastructure like the Cisco transceivers at issue here.

20         Cisco seeks three types of expedited discovery. First, to identify other party(ies) from

21   whom Defendants bought or to whom they sold counterfeit Cisco transceivers, Cisco seeks from

22   each Defendant documents sufficient to show the names, addresses, and other contact information

23   of all individuals and entities that each Defendant bought Cisco transceivers from and/or sold

24   them to, along with quantities and prices of all such purchases and sales. Second, Cisco seeks from

25   any third party providing services to Defendants, e.g., any eCommerce Website, search engine,

26   Common Carrier, or financial institution or service, documents concerning: 1) contact information

27   of each Defendant and all entities and individuals associated or acting in concert therewith; 2) any

28   accounts owned or controlled by each Defendant and all entities and individuals associated or

1  acting in concert therewith; and 3) each Defendant's operations, payment methods, transportation,

2  and listing history concerning purported Cisco products. Discovery of these entities and

3  individuals and their accounts and services is necessary to ensure that Defendants' unlawful

4  activities will be contained and that Cisco can promptly identify the full scope of infringing

5  activities connected to Defendants. Lastly, Cisco seeks disclosure of the identities and contact

6  information of the owners of the identified seller identifications and registrants of the identified

7  Domain Names, to the extent they are concealed by privacy protections on eCommerce Websites

8  or with domain name registrars.

9           There is good cause for such expedited discovery to aid the Court's consideration of a

10  preliminary injunction, and to ensure that Cisco can identify the full scope of infringing activities

11  and immediately halt the manufacture and distribution of counterfeit products and resulting

12  irreparable harm while this case is pending. Cisco also needs it to be able to identify potential

13  sources for equitable relief. The requested discovery is narrowly focused and the documents

14  should be easily identifiable, while the need outweighs any minimal prejudice to Defendants from

15  having to produce these indisputably discoverable documents sooner rather than on the normal

16  timeline of discovery. Thus, the Court should grant the requested expedited discovery.

17           **E.       The Court Should Authorize Alternative Service of Process**

18           Cisco requests an order authorizing it to serve Defendants by email because of the urgency

19  involved in this matter, and the extreme difficulty and delays in effecting service in China through

20  the Hague Convention, as well as the additional obstacles posed by the COVID-19 emergency.

21  For defendants located in foreign countries, courts are permitted to authorize service of process

22  "by other means not prohibited by international agreement." Fed. R. Civ. P. 4(f)(3). The only

23  requirements under Rule 4(f)(3) are that service be directed by the court and not prohibited by

24  international agreement. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir.

25  2002). "[C]ourt-directed service under Rule 4(f)(3) is as favored as service available under Rules

26  [4(f)(1-2)]" and does not require first attempting other means. *Id.* To provide due process in this

27  context, courts evaluate whether a service method is "'reasonably calculated, under all the

28  circumstances, to apprise interested parties of the pendency of the action and afford them an

1   opportunity to present their objections.'" *Id.* at 1016 (quoting *Mullane v. Cent. Hanover Bank &*

2   *Trust Co.,* 339 U.S. 306, 314 (1950)). In *Rio*, the Ninth Circuit agreed that service by email was

3   appropriate, particularly where the defendant conducted its business by email. *Id.* at 1017-18.

4          Service by email on defendants in China is not barred by any international agreement.

5   *Microsoft Corp. v. Goldah.com Network Tech. Co.*, No. 17-CV-02896-LHK, 2017 WL 4536417,

6   at *4 (N.D. Cal. Oct. 11, 2017). Courts in this district have authorized email service and found that

7   it is reasonably calculated to provide notice to foreign defendants, including defendants based in

8   China, where receipt is confirmed, the email addresses were previously used to communicate with

9   the plaintiffs, or the defendants operate online and use email for their businesses. *Id.* at *5-6

10  (affirming that email service on defendants in China was sufficient where receipt confirmed);

11  *Carson v. Griffin*, No. 13-CV-0520 KAW, 2013 WL 2403601, at *1-2 (N.D. Cal. May 31, 2013)

12  (authorizing service by email where the plaintiff previously corresponded with the defendants via

13  email); *Jenkins v. Pooke*, No. C 07-03112 JSW, 2009 WL 412987, at *2-3 (N.D. Cal. Feb. 17,

14  2009) (same); *Facebook, Inc. v. Banana Ads, LLC*, No. C-11-3619 YGR, 2012 WL 1038752, at

15  *1-2 (N.D. Cal. Mar. 27, 2012) (authorizing email service, including in Hong Kong, where

16  defendants operated online and relied on email communications for their businesses).

17         In the present case, Defendants are based in China and operate Internet-based businesses

18  trafficking in counterfeit Cisco products, they provide email addresses for communication, and

19  they ultimately negotiated and consummated transactions for the infringing products obtained by

20  Cisco's consultant via email. *See* Decl. No. 3 ¶¶ 4, 7-10, 16-23. Email service is appropriate and

21  important in the present case because of the urgency in shutting down sales of inferior transceivers

22  that threaten Cisco's reputation and the integrity of critical U.S. infrastructure that relies on such

23  products. At the same time, while China has signed the Hague Convention on Service, district

24  courts have recognized that China often obstructs and substantially delays service under that

25  process for many months. *See Micron Tech., Inc. v. United Microelectronics Corp.*, No. 17-CV-

26  06932-MMC, 2018 WL 6069646, at *1–2 (N.D. Cal. Nov. 20, 2018); *Nike, Inc. v. Wu*, 349

27  F. Supp. 3d 310, 338 (S.D.N.Y. 2018); *see also* https://www.iam-media.com/frandseps/suing-

28

chinese-entity-in-the-united-states-expect-two-year-wait-serve-process (reporting it can take 1-2 years to effect service in China through the Hague Convention process).

**F.    The Court Should Not Require Cisco to Post a Bond to Secure the Injunctive Relief, or Alternatively, Should Set It at No More Than $10,000**

"The district court is afforded wide discretion in setting the amount of the bond, [] and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (internal citations omitted); *see also Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *17 (N.D. Cal. Apr. 12, 2019) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."); *Cuviello v. City of Oakland*, No. C 06-05517 MHP (EMC), 2007 WL 2349325, at *8 (N.D. Cal. Aug. 15, 2007) (recommending no bond be required in part because there was no proof of likelihood of harm to the party enjoined).

Because of the clear evidence of Defendants' counterfeiting, infringement, and unfair competition, Cisco requests that the Court dispense with the filing of a bond. If the Court deems a bond appropriate, then Cisco requests that a bond of no more than $10,000 would be sufficient, as ordered in similar cases issuing similar injunctive relief. *See Ubiquiti Networks*, 2012 WL 2343670, at *17; *see also Microsoft Corp.*, 2017 WL 4536417, at *2.

**V.    CONCLUSION**

As shown herein, Defendants are counterfeiting Cisco's products and marks, thereby causing irreparable harm to its reputation and risking the functionality of critical infrastructure in the U.S. The Court should grant Cisco's motion for a TRO and issue an order to show cause for a preliminary injunction barring further infringement, issue an asset freeze order and other relief as to Defendants' online presence, and permit expedited discovery and alternative service of process.

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

DATED:  July 15, 2020

Respectfully submitted,

BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation

By: _____

PATRICK M. RYAN
Attorneys for Plaintiffs
CISCO SYSTEMS, INC. and
CISCO TECHNOLOGY, INC.

PLAINTIFFS' MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, *EX PARTE* MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION