PATRICK M. RYAN (SBN 203215)
  *pryan@bzbm.com*
STEPHEN C. STEINBERG (SBN 230656)
  *ssteinberg@bzbm.com*
GABRIELLA A. WILKINS (SBN 306173)
  *gwilkins@bzbm.com*
BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation
One Embarcadero Center, Suite 800
San Francisco, California 94111
Telephone: (415) 956-1900
Facsimile:  (415) 956-1152

Attorneys for Plaintiffs CISCO SYSTEMS, INC.,
CISCO TECHNOLOGY, INC. and CIENA CORP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CISCO SYSTEMS, INC.; and CISCO TECHNOLOGY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> SHENZHEN USOURCE TECHNOLOGY CO.; SHENZHEN WAREX TECHNOLOGIES CO., LTD.; and WAREX TECHNOLOGIES LIMITED; <br><br> Defendants. | Case No. 5:20-cv-04773-EJD <br><br> **[~~PROPOSED~~] ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER, ASSET FREEZE ORDER, EXPEDITED DISCOVERY, ORDER AUTHORIZING ALTERNATIVE SERVICE OF PROCESS, AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION** <br><br> **[RE: ECF 10]_** |

1    Pending before the Court is Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.'s

2  (collectively "Cisco" or "Plaintiffs") *ex parte* motion for a temporary restraining order, an order to

3  show cause, an order freezing Defendants Shenzhen Usource Technology Co. ("Usource"),

4  Shenzhen Warex Technologies Co. and Warex Technologies Limited's (together, "Warex")

5  (collectively, "Defendants") assets, expedited discovery, and an order authorizing alternative

6  service of process by email. The Court has reviewed Plaintiffs' motion papers and held an *ex parte*

7  hearing on _July 20, 2020____. Because Plaintiffs moved *ex parte*, requesting that no notice be

8  provided and said request is granted herein, Defendants were not heard. For the reasons set forth

9  below, Plaintiffs' motion is GRANTED.

10  **I.    BACKGROUND**

11    **A.    Cisco and Its Transceivers**

12    Cisco is the leading designer and manufacturer of transceivers—devices that transmit and

13  receive data—used in public and private networks. *See* 7/14/20 Decl. of First Witness ("Decl.

14  No. 1")[1] ¶¶ 4, 11-13, ECF __. Cisco's customers include the U.S. government and military,

15  healthcare systems and hospitals, Internet Service Providers ("ISPs"), wireless phone carriers, and

16  public transit systems and utilities, among others. *Id.* Cisco's transceivers are a key foundational

17  component of the United States' communications infrastructure. *Id.*

18    Transceivers are electronic devices that transmit and receive data. *See* 7/14/20 Decl. of

19  Second Witness ("Decl. No. 2") ¶ 7, ECF __. A transceiver encodes and decodes data by

20  converting an electrical signal into light pulses and back again, which are sent through a fiber

21  optic cable. *Id.* Transceivers provide the vital connections in networks. *See* Decl. No. 1 ¶ 11, ECF

22  __. The quality and performance of networks in the U.S. and around the world depend on

23  authentic and high-quality Cisco transceivers. *See id.*

24

25  [1] To avoid revealing the identities of the Cisco personnel conducting the investigation and the

26  consultants participating in the investigation, the names of the declarants are undisclosed herein,

27  and have been replaced with the number of the declaration in order of filing, as the names have

28  been sealed pursuant to an Order entered contemporaneous with this opinion.

Cisco sells a range of transceivers varying in size, functionality, and price. *See* Decl. No. 2 ¶ 7, ECF __. Cisco designs all of its transceivers to meet and exceed industry standards for quality, reliability, safety, and performance, which vary depending on the industry, e.g. there are higher standards for military than commercial applications. *Id.* A variety of U.S. industries, including the government and military, healthcare systems and hospitals, and ISPs and wireless phone carriers, rely on Cisco transceivers to perform critical applications and to ensure the integrity of data transfer and communications. *See* Decl. No. 1, ECF __.

Cisco owns the following well-established famous and registered trademarks, among others (together, the "CISCO Marks") that appear on genuine Cisco transceivers and other products:

- "CISCO" (U.S. Trademark Reg. Nos. 1,542,339; 2,498,746; 3,709,076; 3,978,294; 3,985,844; 3,990,147; 4,005,670)

- **cisco** (U.S. Trademark Reg. No. 3,759,451)

*See* Decl. No. 1 ¶¶ 5-10, Ex. 1, ECF __. Cisco has used, and is currently using, the CISCO Marks continuously and exclusively in commerce, including in connection with its sale of Cisco transceivers, and plans to continue such use in the future. *Id.*

Cisco has invested heavily in the Cisco brand, and prominently displays the CISCO Marks in its advertising materials. *Id.* As a result, the CISCO Marks are widely recognized and well-known to the public, and are known for their quality. *Id.* Cisco has spent, and continues to spend, billions of dollars marketing and promoting in interstate commerce its products in connection with the CISCO Marks. *Id.* Due to Cisco's longtime use of and investment in the CISCO Marks and the quality of Cisco's products, the Cisco brand has built up a tremendous amount of consumer goodwill. *Id.* The CISCO Marks are famous and symbolize this goodwill, and are invaluable assets to Cisco. *Id.*

Authentic Cisco transceivers are manufactured by well-vetted and carefully controlled and monitored third-party vendors called original equipment manufacturers ("OEMs"). *See* Decl. No. 2 ¶ 8, ECF __. Each of these OEMs utilizes specialized equipment and heavily tested processes and components to produce consistent, high-performing products on which customers can rely. *Id.*

Cisco requires its OEMs to follow strict quality control standards that govern the entire lifecycle of each transceiver, from its design, components, and manufacture to distribution and post-sale support. *Id.* ¶ 9. Each OEM undergoes reliability testing to expose potential defects in the manufacturing process and regular reviews to examine the OEM's practices and procedures and identify areas for improvement. *Id.* Cisco regularly audits each OEM, which must maintain detailed records for each product's movement throughout the supply chain to enable Cisco to monitor each transceiver's distribution and support customers via serial number traceability. *Id.* Cisco uses these controls to safeguard its reputation for quality, safety, and reliability. *Id.*

In order to fight counterfeiting, Cisco has a robust brand protection program that takes a multilayered approach to the problem of counterfeiting, which is global in scope and affects the entirety of the network industry. *See* Decl. No. 1 ¶ 3, ECF __. Cisco's strategies include collaborating with law enforcement in various countries where counterfeits are made or sold, including both the U.S. and China. *Id.* Cisco also employs third-party private investigators or consultants to identify and purchase suspected inauthentic Cisco products, online. *Id.*

Defendants are companies based in China. As part of Cisco's global anti-counterfeiting efforts, Cisco discovered that Defendants were offering purported Cisco transceivers online to U.S. customers. *See* Decl. No. 3 ¶¶ 3-4, 6-7, 16, ECF __. Cisco's consultant attested to having purchased purported Cisco transceivers from Defendants, who then shipped the transceivers to this District. *Id.* ¶¶ 7-14, 16-26. Cisco attests that it analyzed and tested these purported Cisco transceivers and confirmed that they were inauthentic in that they were not made by or associated with Cisco. *See* Decl. No. 2 ¶¶ 3, 14-25. Cisco's manufacturing partners also confirmed that the transceivers were inauthentic. *Id.* ¶¶ 19-20.

Cisco presented evidence that Defendants' counterfeit transceivers are advertised, offered for sale, and/or have product labels with counterfeit CISCO Marks referenced above, and/or are otherwise designed to create the impression that they are authentic Cisco transceivers. Cisco attests that testing also revealed that the transceivers use unapproved, untested, and non-genuine components, and do not meet Cisco's design, build, and inspection standards.

**B.      Discovery and Testing of Counterfeit Cisco Transceivers**

Certain details of Cisco's investigation and testing are sealed; thus, this order does not refer to them with specificity.

The success of Cisco's brand has attracted criminal counterfeiters who illegally profit by selling fake Cisco products. To combat this, Cisco investigates suspicious listings in online marketplaces by arranging for a consultant to buy suspect Cisco transceivers from Defendants. *See* Decl. No. 2 ¶ 14; 7/14/20 Decl. of Third Witness ("Decl. No. 3") ¶¶ 3-4, 6, ECF __.

Cisco has labs and engineering investigators who can test potentially counterfeit products, using specialized tools and product data to compare suspect products with authentic products. *See* Decl. No. 2 ¶¶ 12-13, ECF __. Defendants delivered transceivers purchased by Cisco's consultants to an address in this District, and the consultants then shipped each such product to Cisco for testing. *Id.* ¶ 15; Decl. No. 3 ¶¶ 6, 28-29, ECF __.

A Cisco expert in product testing, analysis, and authentication, analyzed each transceiver received from Defendants to determine whether it was genuine. *See generally* Decl. No. 2. As set forth below, Cisco's engineering investigator first personally evaluated each product using Cisco's standard techniques for evaluating potential counterfeits, and in each case determined that Defendants' product was, in fact, inauthentic in that it was indisputable  it had not been manufactured by Cisco or by someone associated with Cisco. *Id.* ¶ 15. If an OEM was identified on the product label, Cisco's engineer provided images of the product to the OEM, and in each case, the OEM determined that the suspect transceiver was not manufactured by Cisco or by someone associated with Cisco. *Id.* This analysis was set forth in Cisco's engineering



PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

1  investigator's declaration, and it shows that the Cisco transceivers from Defendants are

2  inauthentic. *Id.* ¶ 25. The findings for each Defendant are summarized below.

### 1.   Usource

4      In May 2020, Cisco's consultant ordered two purported Cisco transceivers from Usource.

5  *See* Decl. No. 3 ¶¶ 7-9, ECF __. Usource advertised, offered, and sold these transceivers as Cisco-

6  brand transceivers. *Id.* Usource sent them to Cisco's consultant  in this District, who found they

7  were labelled with the CISCO Marks.  *Id.* ¶ 14. Cisco's consultant then sent the purported Cisco

8  transceivers to Cisco for examination. *See id.* ¶¶ 28-29; Decl. No. 2 ¶¶ 16-17, ECF __.

9      On July 1, 2020, Cisco's engineering investigator examined the two suspect purported

10  Cisco transceivers received from Usource. *See* Decl. No. 2 ¶ 18, ECF __.  Each suspect transceiver

11  had a top label with the Cisco name and logo. *Id.* After his own analysis and testing, Cisco's

12  engineer provided images of the transceivers to the purported OEM identified on the product

13  labels, and that OEM's product engineers reviewed and analyzed the images and provided their

14  findings. *Id.* ¶ 19. Both Cisco's engineer and the OEM confirmed that the products were clearly

15  inauthentic in that they were not manufactured by Cisco or by someone associated with Cisco in

16  light of the many differences between them and authentic Cisco transceivers. *Id.* ¶¶ 18-19.

### 2.   Warex

18      In May 2020, Cisco's consultant ordered four purported Cisco transceivers from Warex.

19  *See* Decl. No. 3 ¶¶ 16-22, ECF __. Warex advertised and offered these transceivers using the

20  CISCO Marks as if they were genuine Cisco transceivers. *Id.* Cisco's consultant emphasized that

21  they only wanted to order the products if they could pass for Cisco products either externally or

22  electronically, as their customers were not interested in third-party products, and Warex confirmed

23  they would, indicating that it knew the products were intended to be passed off to end customers

24  as genuine Cisco products. *Id.* Warex sent the products to Cisco's consultants in this District, who

25  sent them to Cisco for examination. *Id.* ¶¶ 6, 28-29; Decl. No. 2 ¶¶ 21-22, ECF __. Warex's

26  invoice confirmed that the order was for two units each of the "SFP-10G-LR-C" and "SFP-10G-

27  SR-C" (nearly identical to Cisco part numbers) that were "Cisco compatible." *Id.* ¶¶ 20-21.

28

1    On July 1, 2020, Cisco's engineering investigator examined the four suspect purported

2  Cisco transceivers received from Warex. *See* Decl. No. 2 ¶ 23. Each suspect transceiver was

3  labeled with what looks like a real Cisco part number, and had certain electronic data to enable it

4  to work as if it were a genuine Cisco product. *Id.* For all four suspect transceivers received from

5  Warex, Cisco's engineer confirmed that the products were clearly inauthentic as they were not

6  manufactured by Cisco or by someone associated with Cisco in light of the many differences

7  between them and authentic Cisco transceivers. *Id.* ¶ 24.

8    Based on these findings, Plaintiffs filed this action under seal on July 15, 2020, alleging

9  federal claims for Trademark Infringement (15 U.S.C. § 1114–1117), Dilution of Mark (15 U.S.C.

10 § 1125), and Unfair Competition (15 U.S.C. § 1125), as well as California law claims for False

11 Advertising (Cal. Bus. & Prof. Code § 17500) and Unfair Competition (Cal. Bus. & Prof. Code

12 § 17200). Cisco moves *ex parte* for a temporary restraining order, order to show cause, seizure

13 order, expedited discovery, an order freezing Defendants' assets, and an order authorizing it to

14 serve Defendants by email.

15   For the reasons expressed below, Plaintiffs' motion is GRANTED.

16 **II.    LEGAL STANDARD**

17   **A.    Notice**

18   This Court may issue a TRO without notice to the adverse party if (1) "specific facts in an

19 affidavit or a verified complaint" show that immediate and irreparable injury will occur before the

20 adverse party can be heard and (2) the movant's attorney certifies in writing what efforts were

21 made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b).

22   The Ninth Circuit recognizes the issuance of an *ex parte* TRO is warranted where notice to

23 the defendant would render further prosecution fruitless, e.g. "[i]n the trademark arena, such cases

24 include situations where an alleged infringer is likely to dispose of the infringing goods before the

25 hearing." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). An

26 applicant can justify excusal of the notice requirement on this ground by showing "that the adverse

27 party has a history of disposing of evidence or violating court orders or that persons similar to the

28

1  adverse party have such a history." *Id.* (quoting *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d

2  641, 651 (6th Cir.1993)).

3      The Court finds *Talavera Hair Prod., Inc. v. Taizhou Yunsung Elec. Appliance Co., LTD*

4  (*Talavera*) instructive. No. 18–CV–823–JLS (JLB), 2018 WL 3413866 (S.D. Cal. May 10, 2018).

5  There, the defendants sold their infringing products through online eCommerce marketplaces

6  including Amazon and eBay, and the plaintiff had tried to stop similar sellers, only to see the same

7  goods reappear under new sellers. *Id.* at *4. *Talavera* also noted nine other cases where TROs

8  were granted against similar online infringers who used eCommerce marketplaces to sell their

9  infringing products. *Id.* Thus, the court found that notice to the defendants would likely result in

10  the disappearance or transfer of the counterfeit products, so notice was not required and the

11  plaintiff could proceed *ex parte*. *Id.*

12      Similarly, *Gucci Am., Inc. v. Los Altos Boots, Inc.* supports the Court's decision to excuse

13  notice here. No. CV1406680BROAJWX, 2014 WL 12561613 (C.D. Cal. Aug. 27, 2014). There,

14  the court excused the plaintiff from providing notice before issuing a TRO because: 1) the

15  defendant could easily conceal the counterfeit goods and related records given their nature and

16  location outside the U.S.; and 2) similarly situated defendants in trademark infringement cases

17  have a history of ignoring court orders to preserve and instead destroying evidence after *ex parte*

18  TROs and seizure orders were denied. *Id.* at *3–4.

19      Here, as explained in greater detail below, Plaintiffs have presented substantial evidence

20  that Defendants likewise are willfully advertising and selling transceivers using counterfeit CISCO

21  Marks, largely through third-party eCommerce websites like Alibaba, and are able and likely to

22  dispose of evidence if given advance notice of the present motion. For good cause shown,

23  Plaintiffs are relieved from giving notice to Defendants.

24      **B.      Standard for Issuing TRO**

25      The standard for issuing a TRO is identical to the standard for a preliminary injunction.

26  *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001);

27  *Lockheed Missile & Space Co. v. Hughes Aircraft*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). A

28  plaintiff seeking preliminary injunctive relief must establish that: (1) "[it] is likely to succeed on

1    the merits"; (2) "[it] is likely to suffer irreparable harm in the absence of preliminary relief"; (3)

2    "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Winter*

3    *v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that

4    there are serious questions going to the merits—a lesser showing than likelihood of success on the

5    merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the

6    plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v.*

7    *Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted)

8    (emphasis in original).

9         Preliminary injunctions are routinely granted in cases involving trademark infringement.

10   The principle "that trademark infringement causes irreparable injury and necessitates immediate

11   injunctive relief" is well settled and "is universally recognized in the courts of [the Ninth] circuit."

12   *Steinway & Sons v. Robert Demars & Friends*, 1981 WL 40530, *7 (N.D. Cal. Jan. 28, 1981).

13   **III.    DISCUSSION**

14        **A.    Temporary Restraining Order**

15        As described above, a court's decision to grant a TRO is governed by four factors:

16   (1) whether the applicant is likely to succeed on the merits of his action; (2) whether the applicant

17   is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of

18   equities tip in the applicant's favor; (4) and that an injunction is in the public interest. The Court

19   discusses each in turn.

20             **1.    Likelihood of Success**

21        Plaintiffs assert federal claims for trademark infringement, counterfeiting, and false

22   designation of origin and advertising under the federal Lanham Act, as well as claims for unfair

23   competition and false advertising under California state law. Plaintiffs have demonstrated a

24   likelihood of success with respect to all their claims.

25             **a.    Federal Claims**

26        A plaintiff claiming trademark infringement under the Lanham Act must show that it

27   "owns a valid mark, and thus a protectable interest" and that Defendants' "use of the mark is likely

28

to cause confusion, or to cause mistake, or to deceive." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009) (internal quotation omitted); *see also* 15 U.S.C. § 1114(1).

Cisco has established that it owns federal trademark registrations for the CISCO Marks. Decl. No. 1 ¶¶ 5-10, Ex. 1, ECF __. Cisco has also shown that Defendants are using those marks in connection with selling counterfeit Cisco transceivers in the U.S.

"To determine whether a likelihood of consumer confusion exists," courts in the Ninth Circuit rely "on the eight-factor *Sleekcraft* test, which reviews: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)), abrogated in part on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003)). "The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a rote checklist." *Id.* (internal quotation marks and citation omitted).

Proving false designation of origin based on the same or similar trade names or symbols requires the same showing of a likelihood of confusion. *See Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534–35 (9th Cir. 1989) ("[T]he same broad standards of protection apply to trademarks and trade names. . . .  [L]ikelihood of confusion is unquestionably the key to a finding of infringement in either case."); *see also* 15 U.S.C. § 1125(a)(1); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 n. 8 (9th Cir. 1999) (noting that while Lanham Act § 32 of the (15 U.S.C. § 1114) protects registered marks, § 43(a) (15 U.S.C. § 1125(a)) also protects against infringement of unregistered marks and trade dress and against a wider range of practices such as false advertising, but "the analysis under the two provisions is oftentimes identical").

The Ninth Circuit has held that the *Sleekcraft* test is appropriate to determine likelihood of confusion regarding a claim for false designation of origin. *Accuride Int'l, Inc.*, 871 F.2d at 1536. But courts in this district and around the Ninth Circuit hold that in cases involving counterfeiting, "it is unnecessary to perform the eight-factor evaluation because counterfeit marks are inherently

confusing." *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. C 12-2582 CW, 2012 WL 2343670, at *14 (N.D. Cal. June 20, 2012) (granting TRO and OSC re preliminary injunction) (citing *Phillip Morris USA Inc. v. Shalabi*, 352 F.Supp.2d 1067, 1073 (C.D. Cal. 2004)); *Microsoft Corp. v. Buy More, Inc.*, 136 F. Supp. 3d 1148, 1157 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476 (9th Cir. 2017) (quoting *Phillip Morris*, 352 F.Supp.2d at 1073); *Daimler AG v. A-Z Wheels LLC*, 334 F. Supp. 3d 1087, 1096 (S.D. Cal. 2018) (citing *Phillip Morris*, 352 F.Supp.2d 1067 at 1073).

A counterfeit mark is: "(1) a non-genuine mark identical to the registered, genuine mark of another, where (2) the genuine mark was registered for use on the same goods to which the infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946 (9th Cir. 2011) (citing *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005)). As Cisco has shown that this is a clear case of counterfeiting, including the use of identical marks in connection with, supposedly, the same goods, there is a likelihood of confusion as a matter of law.

Cisco also meets the standard under *Sleekcraft* to show a likelihood of confusion. Cisco has used its trade name and the CISCO Marks since 1984, in connection with networking products including transceivers, so the marks are strong (*Sleekcraft* factor 1). Decl. No. 1 ¶¶ 4–6, ECF __. Defendants are selling the same kinds of products as Cisco—transceivers (factor 2)—and using identical marks and trade names (factor 3). And the use of identical marks and trade names to sell counterfeit products shows that Defendants intend to copy them and confuse the public (factor 7). This establishes that Cisco is likely to succeed on the merits of its federal trademark infringement, false designation of origin, and unfair competition claims.

Therefore, Cisco has shown that it is likely to succeed on the merits of its federal trademark infringement, false designation of origin, and unfair competition claims.

### b.   State Law Claims

Cisco has also demonstrated a probability of success with respect to its state law claims for unfair competition and false advertising. The Ninth Circuit "has consistently held" that these claims "are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). "An action for unfair competition under Cal. Bus.

& Prof. Code §§ 17200 et seq. is substantially congruent to a trademark infringement claim under the Lanham Act. . . . Under both, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (internal quotation marks omitted).

Similarly, where plaintiffs establish that they are likely to succeed on the merits of federal Lanham Act claims, then they also demonstrate a likelihood of success on parallel false advertising claims under California law. *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. 14-CV-04050-MEJ, 2014 WL 6788310, at *16–17 (N.D. Cal. Dec. 2, 2014) (finding showing of likelihood of success under Lanham Act sufficient to meet burden for unfair competition under Section 17200 and false advertising under Section 17500).

As Cisco has shown it is likely to succeed on the merits of its federal claims, Cisco has also shown it is likely to succeed on its parallel claims for unfair competition and false advertising under California law.

## 2.    Irreparable Harm

To demonstrate the likelihood of irreparable harm, Plaintiffs must show that "remedies available at law, such as monetary damages, are inadequate to compensate for the injury." *Herb Reed Enters., LLC v. Fl. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). The Ninth Circuit has recognized that "intangible injuries," including loss of goodwill, can constitute irreparable harm. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). More specifically, the sale of counterfeited products may cause irreparable harm because such sale may "prevent [Plaintiffs] from controlling the reputation of [their] highly recognizable" brands. *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009) *aff'd*, 348 F. App'x 288 (9th Cir. 2009).

Here, Cisco has demonstrated that it spent decades investing in and building the goodwill in its brand and reputation for designing, making, and selling high quality products. *See* Decl. No. 1 ¶¶ 4–10, ECF __. Defendants' sales of counterfeit Cisco transceivers mislead customers, and they threaten irreparable harm to Cisco's goodwill that cannot be adequately addressed by awarding damages after-the-fact. This is particularly true as Defendants' counterfeit products were

not subject to the same rigorous quality control measures and safety testing, and appear to be inferior to genuine Cisco transceivers. *See* Decl. No. 2 ¶¶ 7–9, 20, 24, ECF __. Thus, temporary and preliminary injunctive relief are appropriate to prevent further irreparable harm to, and ensure that Cisco can regain and maintain control over, its reputation and goodwill.

### 3.   Balance of Equities

"Courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 7, 24 (2008). "[C]ourts will not shy away from issuing" preliminary injunctive relief "where to do so would be to aid a second comer who has sought to trade upon the efforts and good will of the first comer." *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977). Here, the balance of equities tips strongly in favor of the issuance of injunctive relief.

A TRO or preliminary injunction will impose no legally cognizable hardship on Defendants. "Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration.'" *Sream*, 2019 WL 2180224, at *10 (quoting *Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (superseded on other grounds)); *see also, United Tactical Sys.*, 2014 WL 6788310 at *23 (disregarding claimed hardship from loss of infringing sales).

Defendants have no right to sell counterfeit Cisco transceivers or use the CISCO Marks. Therefore, any claimed hardship of their being barred from doing so must be disregarded. At the same time, every sale of a counterfeit transceiver by Defendants is a lost sale for Cisco that detracts from the value of its trademarks and goodwill and risks serious and irreparable harm to its reputation (not to mention the public) by being inferior products. Accordingly, the balance of equities supports issuing a TRO and preliminary injunction in this case.

### 4.   Public Interest

Public policy favors granting an injunction when there is a likelihood of consumer confusion. *See Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982) ("In addition to the harm caused the trademark owner, the consuming public is equally injured by an inadequate judicial response to trademark infringement.").

In this case public policy favors injunctive relief even more than the usual counterfeiting case because Plaintiffs have offered substantial evidence that Defendants' conduct poses a threat to health and safety. Counterfeits use untested and unapproved components and manufacturing processes, and as such they may not function properly or at all, and/or may not function correctly in combination with authentic Cisco products and components. Decl. No. 2 ¶¶ 15–25, ECF __; Decl. No. 1 ¶¶ 15–16, 19–22, ECF __. Nor are they updated with the latest Cisco software, which exposes users to security and intrusion vulnerabilities. *Id.* Data integrity is critical to Cisco's customers, and they need to reliably and securely transmit and receive sensitive data. *Id.*

The risk posed by counterfeit transceivers also includes physical harm. *Id.* ¶¶ 22-23. Cisco transceivers use transmitter laser technologies, which require extensive eye safety testing and manufacturing calibration to ensure users' physical safety. *Id.* Counterfeit transceivers are unlikely to be subjected to this testing or meet these standards. *Id.* A poorly designed transceiver, such as the counterfeits sold by Defendants, can emit excessive electromagnetic energy that interferes with adjacent equipment, which could be detrimental in a sensitive environment, e.g. a military facility or a hospital. *Id.*

Counterfeit transceivers put lives in jeopardy. In a criminal action against a counterfeiter of Cisco networking hardware, *U.S. v. Ehab Ashoor*, No. H-09-CR-307 (S.D. Tex. 2010), U.S. Marines Staff Sergeant Lee Chieffalo testified that "[t]he Marine Corps' network infrastructure is solely Cisco equipment," and "the equipment that Cisco uses has proprietary protocols and software on them that operates only with other Cisco gear" that is "built to specifications that [the Marine Corps] use[s] for reliability and environmental hardness." Decl. No. 1 ¶ 13 & Ex. 2, ECF __. He testified that the use of substandard counterfeit Cisco products presented the risk that "Marines could die." *Id.*

The above facts clearly demonstrate that the public interest favors injunctive relief. Accordingly, Plaintiffs' request for a TRO directed to Defendants' conduct is GRANTED.

### B.     Asset Freeze

Plaintiffs seek another *ex parte* TRO freezing Defendants' assets to preserve the possibility of equitable relief, including an accounting and return of their ill-gotten gains from counterfeiting.

The Ninth Circuit holds that when a plaintiff seeks equitable remedies under the Lanham Act, including recovery of a defendant's profits under 15 U.S.C. § 1117, a district court has "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992). This includes "the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." *Id.* (quoting *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1364 (9th Cir.1988) (*en banc*)). The Ninth Circuit explained "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement," and affirmed the district court's granting of TROs and preliminary injunctions to freeze the defendants' assets, in addition to preventing various counterfeiting-related activities. *Id.* at 560 (quoting *Playboy Enters.,* 692 F.2d at 1275).

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Given the deceitful and secretive nature of counterfeiting, courts in this Circuit routinely find that dissipation of assets is likely and grant asset freezes in such cases, particularly when defendants are overseas where they can hide assets from a potential judgment. *Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521, 1527 (S.D. Cal. 1989), *aff'd* 970 F.2d at 563 ("[d]ue to the international aspect of the defendants' business, the Court is concerned that unless the assets are frozen, defendants may hide their allegedly ill-gotten funds"); *see also, FTC v. Affordable Media*, 179 F.3d 1228, 1236–37 (9th Cir. 1999) (finding dissipation likely based on defendants keeping funds in the Cook Islands); *Chanel, Inc. v. Sunus Online Group, LLC*, 2014 WL 12558780, at *3 (C.D. Cal. Jan. 15, 2014) ("based on Defendants' blatant violations of trademark laws there is likelihood that Defendants would transfer or hide the illegally obtained assets in order to avoid a judgment in this action," and thus, granted a preliminary injunction freezing their assets. Other Circuits agree that asset freezes are warranted to preserve assets in counterfeiting cases, particularly overseas and/or online. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987–88 (11th Cir. 1995) (affirming preliminary injunction freezing assets of U.S.-based defendants who arranged for making

counterfeit Levi's jeans in China for sale in Europe); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132–33 (2d Cir. 2014) (confirming trial authority to issue TRO and preliminary injunction freezing assets of defendants selling counterfeit goods online); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) (affirming TRO and preliminary injunction freezing assets of defendants selling counterfeits).

Cisco seeks recovery of Defendants' profits from their wrongful use of the CISCO Marks in connection with sales of transceivers, among other relief, so the Court is authorized to freeze Defendants' assets under *Reebok*, 970 F.2d at 559. *See* Dkt. 1 (Compl.) at Prayer for Relief ¶¶ J-K, ECF __. The present action involves blatant unauthorized use of the CISCO Marks by Defendants, in their advertising for transceivers and sometimes on the transceivers themselves, and Defendants are based in China and use third-party eCommerce online platforms like Alibaba to market and sell their non-genuine Cisco products into the U.S. 7/14/20 Decl. of Third Witness ("Decl. No. 3") ¶¶ 7, 16, Exs. 1–2, ECF __. It is not only likely that Defendants can and will dissipate their assets during the pendency of this case if given the opportunity to do so, but it is also difficult if not impossible to enforce U.S. judgments in China. *See, e.g.,* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judges.html (noting no treaty or convention provides for reciprocal recognition and enforcement of judgments); *Yee v. NIVS Intellimedia Tech. Group, Inc.*, No. CV 11-8472 JGB (AJWx), 2013 WL 1276024, *5 (C.D. Cal. March 25, 2013) (stating that Chinese company whose executives are Chinese residents "bore no real risk of sanctions" given the difficulty of enforcing a U.S. judgment against a Chinese national); *Redwen v. Sino Clean Energy, Inc.*, No. CV 11-3936 PA (SSx), 2013 WL 12303367, at *5–6 (C.D. Cal. Jul. 9, 2013) (finding that the plaintiff "would face significant obstacles in enforcing any judgment against the defendants' assets in China"); *Gucci America, Inc. v. Wang Huoqing*, No. CV, 2011 WL 31191, at *16 (N.D. Cal. Jan. 3, 2011) (noting that enforcing a judgment may be difficult in China, and compelling transfer of counterfeiter's domain names to plaintiffs).

The Court's authority is not limited to freezing specific identified assets, nor to assets within this District or the U.S., and can extend to banks and other non-parties that have custody of

1   Defendants' assets or provide payment services to Defendants. *See Reebok*, 737 F. Supp. at 1527–

2   28 (TRO and preliminary injunction that "any banks, savings and loan associations, or other

3   financial institutions . . . who receive actual notice of this order by personal service or otherwise,

4   are preliminarily enjoined from transferring, disposing of, or secreting any money, stocks or other

5   assets of these defendants, until further order of the court" except in limited circumstances); *Gucci*

6   *Am., Inc.*, 768 F.3d at 133 (rejecting argument that plaintiff had to identify particular property

7   derived from counterfeiting before obtaining TRO and preliminary injunction freezing all assets).

8       Accordingly, Plaintiffs' request for an Order freezing Defendants' assets is GRANTED.

9   **C.      Seizure Order**

10      **1.      Freezing Defendants' Domain Names and Seller Identifications**

11      The Counterfeiting Act of 1984 permits the Court to issue an *ex parte* order for the seizure

12  of goods and counterfeit marks. 15 U.S.C. § 1116(d)(1)(A). Courts in this Circuit recognize, in

13  cases involving online counterfeiters, this seizure power authorizes orders freezing counterfeiters'

14  domain names and seller identifications used on eCommerce websites. *See, e.g., Williams-*

15  *Sonoma, Inc. v. Friendfinder, Inc.*, No. C06-6572JSW (MEJ), 2007 WL 4973848, at *10 (N.D.

16  Cal. Dec. 6, 2007), *report and recommendation adopted as modified sub nom. Williams-Sonoma,*

17  *Inc. v. Online Mktg. Servs., Ltd.*, No. C 06-06572 JSW, 2008 WL 596251 (N.D. Cal. Mar. 4, 2008)

18  (granting order temporarily barring sale or transfer of defendants' domain names); *Spy Optic Inc.*

19  *v. Individuals, Partnerships & Unincorporated Ass'ns Identified on Schedule A*, No. CV 17-7649

20  DSF (KSX), 2017 WL 10592133, at *2–3 (C.D. Cal. Nov. 27, 2017) (granting preliminary

21  injunction barring transfer of defendants' "Internet based e-commerce store businesses under their

22  seller IDs").

23      The Lanham Act also expressly provides that in certain cases of online trademark

24  infringement, domain name registrars, who control the transfer of domain names, must deposit

25  domain name certificates with the court. *See* 15 U.S.C.§ 1114(2)(D); 15 U.S.C.§ 1125(d)(2).

26      Such relief is necessary because counterfeiters operating online can, and often will, as soon

27  as they receive notice of litigation, take steps to conceal their activities and move their illegal

28  businesses to other online channels to thwart plaintiffs' ability to obtain and courts' ability to

1  award meaningful relief, e.g., modifying domain name registrations; redirecting visitors to new

2  seller identifications or domain names; and/or transferring ownership of seller identifications and

3  domain names. *See* Decl. No. 1 ¶ 24, ECF ___.

4          Here, Cisco has adduced substantial evidence that Defendants sell counterfeit Cisco

5  transceivers through at least two primary channels on the Internet: a) stores on third-party

6  eCommerce marketplaces such as Alibaba ("eCommerce Websites"), using their respective seller

7  identifications on those websites; and b) separate commercial websites maintained by Defendants

8  themselves ("Domain Names"). Decl. No. 3 ¶¶ 7, 16, Exs. 1–2, ECF ___.

9          Moreover, an order barring Defendants from transferring their seller identifications and

10 Domain Names, requiring transfer of control of such domain names to a U.S.-based registrar of

11 Cisco's choice (while legal ownership remains with Defendants), and requiring deposit of domain

12 name certificates with the Court, would impose no real burden on Defendants. At the same time, it

13 would ensure that ownership of the domain names cannot be changed until this action is resolved

14 on the merits, thereby maintaining the potential for Cisco to obtain full relief. Accordingly,

15 Plaintiffs' request for this relief is GRANTED.

16                    **2.      Redirection of Defendants' Domain Names to U.S.-Based Registrar**

17         Cisco also seeks to have Defendants' Domain Names automatically redirect to a website

18 that provides notice of and access to filings in this action or, alternatively, disable such websites.

19 Such preliminary relief has been granted in cases involving online counterfeiters. *See, e.g.,*

20 *Chanel*, 2011 WL 6955734, at *5–6 (granting preliminary injunction directing registrar to redirect

21 domain names to webpage with copy of documents from the action); *Asmodus, Inc. v. Junbiao Ou*,

22 No. EDCV162511JGBDTBX, 2017 WL 2954360, at *5–6, 19 (C.D. Cal. May 12, 2017) (granting

23 preliminary injunction ordering defendant to post notice of the order on its websites, including that

24 they had no affiliation with plaintiff trademark holder and could not sell products with plaintiff's

25 marks); *Otter Prod., LLC v. Anke Grp. Indus. Ltd.*, No. 2:13-CV-00029-MMD, 2013 WL

26 5910882, at *4 (D. Nev. Jan. 8, 2013) (granting TRO ordering any web hosting company, domain

27 name registry, and/or domain name registrar getting notice to remove counterfeit and infringing

28 products from defendant's website or alternatively to disable access to the website).

Redirecting Defendants' domain names would help prevent further infringement while this case proceeds, as Defendants could no longer advertise and sell counterfeit Cisco transceivers through those channels. Redirecting those domain names to notice of and filings from this case would also ensure that each Defendant receives prompt notice of this case and the relief sought by Cisco, as they would see it upon visiting their own websites. Moreover, Defendants cannot complain about the potential impact of such relief, as the only hardship would be lost profits from infringing activities. Accordingly, Plaintiffs' request for this relief is GRANTED.

### D.   Expedited Discovery

The Counterfeiting Act authorizes expedited discovery in connection with seizure orders. See 15 U.S.C. § 1116(d)(10)(B) (permitting the Court to modify time limits for discovery in connection with a seizure order). Expedited discovery may be granted for good cause "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party," and "good cause is frequently found in cases involving claims of infringement and unfair competition." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). Such good cause is shown "where a well-known trademark . . . has been counterfeited and the sources or purchasers of the counterfeit products are unknown to plaintiff." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248, 250 (S.D. Fla. 1982).

Courts in the Ninth Circuit routinely find good cause for expedited discovery to enable plaintiffs in counterfeiting cases to identify: 1) accounts used for and transactions associated with infringing sales; 2) original sources of and pending shipments of counterfeit products; and 3) other parties involved in counterfeiting activities. *See Spy Optic*, 2017 WL 10592133, at *2 (ordering eBay and PayPal to identify all funds transmitted to defendants' accounts and to provide plaintiffs with data and accounting of all funds, accounts, and transactions); *SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO (EX), 2015 WL 6680807, at *11 (C.D. Cal. Oct. 19, 2015) (granting expedited discovery to enable plaintiff to ascertain sources of the counterfeit products and learn of any pending shipments of such products); *Sas v. Sawabeh Info. Servs. Co.*, No. CV1104147GAFMANX, 2011 WL 13130013, at *6–7 (C.D. Cal. May 17, 2011)

(granting expedited discovery to gather evidence for preliminary injunction to stop infringement, identify others involved in counterfeiting, and prevent destruction of evidence).

In the present case, Cisco seeks three types of expedited discovery. First, to identify other parties from whom Defendants bought or to whom they sold counterfeit Cisco transceivers, Cisco seeks from each Defendant documents sufficient to show the names, addresses, and other contact information of all individuals and entities that each Defendant bought Cisco transceivers from and/or sold them to, along with quantities and prices of all such purchases and sales.

Second, Cisco seeks from any third party providing services to Defendants, e.g., any eCommerce Website, search engine, Common Carrier, or financial institution or service, documents concerning: 1) contact information of each Defendant and all entities and individuals associated or acting in concert therewith; 2) any accounts owned or controlled by each Defendant and all entities and individuals associated or acting in concert therewith; and 3) each Defendant's operations, payment methods, transportation, and listing history concerning Cisco-marked products and/or products advertised using the CISCO Marks. Discovery of these entities and individuals and their accounts and services is necessary to ensure that Defendants' unlawful activities will be contained and that Cisco can promptly identify the full scope of infringing activities connected to Defendants.

Lastly, Cisco seeks disclosure of the true identities and contact information of the owners of the identified seller identifications and registrants of the identified Domain Names, to the extent they may be concealed by privacy protections on the eCommerce Websites or with the domain name registrars.

As in the above-cited cases, there is good cause for such expedited discovery as Cisco has demonstrated that it needs it for the Court's consideration of a preliminary injunction, and to ensure that Cisco can identify the full scope of infringing activities and immediately halt the manufacture and distribution of inferior counterfeit products and resulting irreparable harm while this case is pending. Cisco has also demonstrated that it needs expedited discovery in order to identify potential sources for equitable relief. Moreover, given the Court's prior finding of the likelihood that Defendants may destroy or hide evidence, expedited discovery is appropriate, and

1   Plaintiffs may be prejudiced without it. Accordingly, Plaintiffs' motion for expedited discovery is

2   GRANTED.

**E.      Security**

4       "The district court is afforded wide discretion in setting the amount of the bond, . . . and

5   the bond amount may be zero if there is no evidence the party will suffer damages from the

6   injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th

7   Cir. 2003) (internal citations omitted); *see also, Align Tech., Inc. v. Strauss Diamond Instruments,*

8   *Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *17 (N.D. Cal. Apr. 12, 2019) ("The district

9   court may dispense with the filing of a bond when it concludes there is no realistic likelihood of

10  harm to the defendant from enjoining his or her conduct."); *Cuviello v. City of Oakland*, No. C 06-

11  05517 MHP EMC, 2007 WL 2349325, at *8 (N.D. Cal. Aug. 15, 2007) (recommending no bond

12  be required in part because there was no proof of likelihood of harm to the party enjoined).

13      Because of the clear evidence of Defendants' counterfeiting, infringement, and unfair

14  competition, the Court finds it appropriate to issue the TRO without requiring Plaintiffs to provide

15  security.

**F.      Duration of TRO**

17      The TRO will expire "at the time after entry—not to exceed 14 days—that the court sets,

18  unless before that time the court, for good cause, extends it for a like period or the adverse party

19  consents to a longer extension." Fed. R. Civ. P. 65(b)(2). "The reasons for an extension must be

20  entered in the record." *Id.* Because service of Defendants is complicated by the fact that they are

21  located in China, Plaintiffs have requested leave to effect service by email. As discussed below,

22  the Court finds that request to be well-taken and will grant Plaintiffs' request. The Court therefore

23  finds good cause to extend the TRO to August 13, 2020.

24      The Court hereby sets a hearing in this matter for _August 13, 2020 at _9:00 a.m. At the

25  hearing, Defendants must show cause why a preliminary injunction should not issue.

**G.      Alternative Service of Process**

27      Cisco requests an order authorizing it to serve Defendants by email. For defendants located

28  in foreign countries, courts are permitted to authorize service of process "by other means not

prohibited by international agreement." Fed. R. of Civ. Proc. 4(f)(3). The only requirements under Rule 4(f)(3) are that service be directed by the court and not prohibited by international agreement. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002). "[C]ourt-directed service under Rule 4(f)(3) is as favored as service available under Rules [4(f)(1–2)]" and does not require first attempting other means. *Id.*

To comport with due process, courts simply need to evaluate whether a service method is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 1016 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)). In *Rio*, the Ninth Circuit agreed that service by email was appropriate, particularly where the defendant conducted its business by email. *Id.* at 1017–18.

As a threshold matter, service by email on defendants in China is not barred by any international agreement. *Microsoft Corp. v. Goldah.com Network Tech. Co.*, No. 17-CV-02896-LHK, 2017 WL 4536417, at *4 (N.D. Cal. Oct. 11, 2017). Courts in this district have authorized email service and found that it is reasonably calculated to provide notice to foreign defendants, including defendants based in China, where receipt is confirmed, the email addresses were previously used to communicate with the plaintiffs, or the defendants operate online and use email for their businesses. *Microsoft Corp.*, 2017 WL 4536417 at *5–6 (affirming that email service on defendants in China was sufficient where receipt confirmed); *Carson v. Griffin*, No. 13-CV-0520 KAW, 2013 WL 2403601, at *1–2 (N.D. Cal. May 31, 2013) (authorizing service by email where the plaintiff previously corresponded with the defendants via email); *Jenkins v. Pooke*, No. C 07-03112 JSW, 2009 WL 412987, at *2–3 (N.D. Cal. Feb. 17, 2009) (same); *Facebook, Inc. v. Banana Ads, LLC*, No. C-11-3619 YGR, 2012 WL 1038752, at *1–2 (N.D. Cal. Mar. 27, 2012) (authorizing email service, including in Hong Kong, where defendants operated online and relied on email communications for their businesses).

In the present case, Defendants are based in China and operate Internet-based businesses trafficking in counterfeit Cisco products. They provide email addresses for communication, and they ultimately negotiated and consummated transactions for sale of the infringing products

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

obtained by Cisco's investigator via email. *See* Decl. No. 3 ¶¶ 4, 7–11, 16–23, ECF __. Email service is appropriate and important in the present case because of the urgency in shutting down sales of inferior transceivers that threaten Cisco's reputation and the integrity of critical U.S. infrastructure that relies on such products.

The Court therefore GRANTS Plaintiffs' request for leave to effect service of the summons and complaint in this action via email to each Defendant at the respective email address(es) they used to communicate with and/or that were listed on the invoices sent to Cisco's investigator.

## IV.   ORDER

### A.   Temporary Restraining Order

Pending further order of this Court, Defendants and their owners, principals, agents, officers, directors, members, servants, employees, successors, assigns, and all other persons in concert and participation with them (collectively, the "Restrained Parties") shall be immediately temporarily restrained from:

1. Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any of the CISCO Marks (as defined above), whether counterfeit or authentic, or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of counterfeit or authentic Cisco products;

2. Using any logo, trade name, or trademark confusingly similar to any of the CISCO Marks which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of any or all of the Restrained Parties or others are sponsored by, authorized by, or in any way associated with Cisco;

3. Infringing any of the CISCO Marks;

4. Otherwise unfairly competing with Cisco in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Cisco products;

5. Falsely representing any or all of the Defendants as being connected with Cisco or sponsored by or associated with Cisco or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that any or all of the Restrained Parties are associated with Cisco;

6. Using any reproduction, counterfeit, copy, or colorable imitation of any of the CISCO Marks in connection with the publicity, promotion, sale, or advertising of counterfeit Cisco products;

7. Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being Cisco products and from offering such goods in commerce;

8. Diluting any of the CISCO Marks;

9. Removing from their premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating to Defendants' assets and operations or relating in any way to the purchase, sale, manufacture, offer for sale, distribution, negotiation, importation, advertisement, promotion, or receipt of any products purporting to be Cisco; and

10. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (i) above.

**B.      Freezing Defendants' Assets**

Immediately upon receipt of this Order, Defendants shall be restrained from secreting any assets, and from transferring or conveying any assets held by, for, or on account of any of the Restrained Parties, and a full accounting of the restrained assets shall be provided to counsel for Cisco within three business days of receipt of this Order.

1. Immediately upon receipt of this Order, all assets and funds held by, for, or on account of any of the Restrained Parties, or in an account owned or controlled by any of the Restrained Parties, or in an account as to which any of the Restrained

Parties has signature authority, shall be frozen and restrained, and a full accounting of the restrained assets shall be provided to counsel for Cisco within three business days of receipt of this Order.

2. Immediately upon receipt of this Order, any bank, brokerage house, financial institution, credit card association, merchant account provider, escrow service, savings and loan association, payment provider, payment processing service provider, money transmission service, third-party processor, or other financial institution (including, but not limited to, MasterCard, VISA, American Express, Discover, PayPal, Inc., Alipay, Wish.com, Amazon Pay, WeChat Pay, and any correspondent, issuing, or member bank or account) (collectively, "Payment Services") holding any assets by, for, or on account of, or any balance, payable, or receivable owed to or held on account of, any of the Restrained Parties, or in an account as to which any of the Restrained Parties has signature authority, shall locate all accounts and funds, whether located inside or outside the United States, connected to any Restrained Parties and be restrained from releasing such funds until further order of this Court, and within three business days of receipt of this Order shall provide to counsel for Cisco a full accounting of the restrained assets.

3. Immediately upon receipt of this Order, any eCommerce Website, retailer, wholesaler, fulfillment center, warehouse, or any business or individual that has any money, property, or inventory owned by, or receivable owed to, any Restrained Party shall hold such money, property, inventory, or receivable until further order of this Court, and shall within three business days of receipt of this Order provide to counsel for Cisco a full accounting of all money, property, inventory, and receivables being held.

**C.     eCommerce Websites**

Immediately upon receipt of this Order, any Internet store or online marketplace platform, including, but not limited to, iOffer, eBay, AliExpress, Alibaba, Amazon, Wish.com, Facebook, and Dhgate (collectively, "eCommerce Websites") shall disable and be restrained from providing

any services or payment to any Restrained Party, currently or in the future, in relation to any Cisco-marked product and/or product advertised using the CISCO Marks, including fulfillment of any pending orders; transfer to Cisco's control any seller identifications (including, but not limited to, the seller identifications identified in Exhibits 3D and 3E to the 7/14/20 Decl. of Third Witness, ECF __ attached hereto) associated with any of the Restrained Parties' advertisement, offer for sale, or sale of Cisco-marked products and/or using the CISCO Marks, pending final hearing and determination of this action; disable and be restrained from displaying any advertisements used by or associated with any Restrained Party in connection with the advertisement, offer for sale, or sale of Cisco-marked products or otherwise using the CISCO Marks; disable access to any Restrained Party from any platform (including, but not limited to, direct, group, seller product management, vendor product management, and brand registry platforms) of any listings and associated images of Cisco-marked products or otherwise using the CISCO Marks (including, but not limited to, any listings and associated images identified by the "parent" or "child" Amazon Standard Identification Numbers ("ASIN"), and any other listings and images of products associated with any "parent" or "child" ASIN linked to any Restrained Party or linked to any other alias of a Restrained Party being used or controlled to offer for sale products using the CISCO Marks); remove links to any online marketplace accounts on which Defendants advertise, offer for sale, or sell Cisco-marked products and/or products advertised using the CISCO Marks; take all steps necessary to prevent links to Defendants' online marketplace accounts from displaying any Cisco-marked product and/or product advertised using the CISCO Marks in search results; and within three business days of receipt of this Order provide to counsel for Cisco a statement certifying compliance with the requirements of this paragraph.

### D.   Domain Names

Immediately upon receipt of this Order:

1. Any registrar for any domain names owned, operated, or controlled by, or otherwise associated with, any Restrained Party (including, but not limited to, the domain names identified in Exhibit 3D and 3E to the 7/14/20 Decl. of Third Witness, ECF __) (collectively, Domain Names"), shall disable and be restrained

from providing any services to any Restrained Party, currently or in the future, in

relation to any Cisco-marked product and/or product advertised using the CISCO

Marks; deposit with a registrar of Cisco's choosing the domain certificates of any

domain names owned, operated, or controlled by, or otherwise associated with, any

Restrained Party pending final hearing and determination of this action; be

restrained from transferring use and control of any of the Domain Names to any

individual or entity other than a registrar of Cisco's choosing; take all steps

necessary to prevent Defendants from displaying any Cisco-marked product and/or

product advertised using the CISCO Marks on any domain name in the registrar's

possession, custody, or control; and within three business days of receipt of this

Order provide to counsel for Cisco a statement certifying compliance with the

requirements of this paragraph.

2. The Restrained Parties shall be restrained from modifying control of or transferring

use and control of any of the Domain Names.

**E.      Internet Search Engines**

Immediately upon receipt of this Order, any Internet search engine, web host, sponsored

search engine, or ad-word provider (including, but not limited to Google, Bing, Baidu, and Yahoo)

(collectively, "Internet Search Engines") shall deindex, delist, or otherwise remove from its index

and search results any URL owned, controlled, or otherwise associated with any Restrained

Party's advertisement, offer for sale, or sale of Cisco-marked products and/or products advertised

using the CISCO Marks; disable and be restrained from providing any services to any Restrained

Party, currently or in the future, in relation to the advertisement, offer for sale, or sale of Cisco-

marked products and/or products advertised using the CISCO Marks; disable and be restrained

from displaying any advertisements used by or associated with any Restrained Party in connection

with the advertisement, offer for sale, or sale of Cisco-marked products and/or otherwise using the

CISCO Marks; remove links to any of the Defendants' online marketplace accounts owned,

operated, or controlled by, or otherwise associated with, any Restrained Party in connection with

the advertisement, offer for sale, or sale of Cisco-marked products and/or products advertised

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO

using the CISCO Marks (including, but not limited to, the Domain Names identified in Exhibits 3D and 3E to the 7/14/20 Decl. of Third Witness, ECF __); take all steps necessary to prevent links to Defendants' online marketplace accounts from displaying any Cisco-marked product and/or product advertised using the CISCO Marks in search results; and within three business days of receipt of this Order provide to counsel for Cisco a statement certifying compliance with the requirements of this paragraph.

**F.     Common Carriers**

Immediately upon receipt of this Order, any person or company that transports or provides transportation services (including, but not limited to, United Parcel Service a/k/a UPS, FedEx, and DHL) (collectively, "Common Carriers") shall be restrained from fulfilling any shipments, accepting any shipments, or otherwise providing any services to any of the Restrained Parties, and within three business days of receipt of this Order shall provide to counsel for Cisco a statement certifying compliance with the requirements of this paragraph.

**G.     Sequestration and Inspection of Cisco-Marked Products and Products Advertised Using the CISCO Marks**

Immediately upon receipt of this Order:

1. The Restrained Parties shall sequester and deliver to counsel for Cisco all Cisco-marked products and/or products advertised using the CISCO Marks in their inventory, possession, custody, or control to be examined and held by Cisco until further order of this Court.

2. Any eCommerce Website (as defined above) or Common Carrier shall sequester and deliver to counsel for Cisco all Cisco-marked products and/or products advertised using the CISCO Marks offered for sale by any Restrained Party that are in their possession, custody, or control to be examined and held by Cisco until further order of this Court.

**H.     Order to Show Cause Re: Preliminary Injunction and Expedited Discovery**

Show Cause Hearing. Defendants Shenzhen Usource Technology Co., Shenzhen Warex Technologies Co., and Warex Technologies Limited (collectively, "Defendants"), are here by

ordered to show cause before this Court on the _13th__ day of _August_____, 2020 at _9:00__

o'clock a.m., why a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil

Procedure, should not be issued enjoining Defendants and their principals, agents, officers,

directors, members, servants, employees, successors, assigns, and all other persons in concert and

participation with them, pending the final hearing and determination of this action from:

1. Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any of the CISCO Marks (as defined herein) on any counterfeit or authentic product, or any marks confusingly similar thereto in connection with any Cisco products or other products. The "CISCO Marks" are:

- "CISCO" (U.S. Trademark Reg. Nos. 1,542,339; 2,498,746; 3,709,076; 3,978,294; 3,985,844; 3,990,147; 4,005,670)

- cisco (U.S. Trademark Reg. No. 3,759,451)

2. Using any logo, trade name, or trademark confusingly similar to any of the CISCO Marks which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of any or all of the Defendants or of others are sponsored by, authorized by, or in any way associated with Cisco;

3. Infringing any of the CISCO Marks;

4. Otherwise unfairly competing with Cisco in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Cisco products;

5. Falsely representing any or all of Defendants as being connected with Cisco or sponsored by or associated with Cisco or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that any or all of Defendants are associated with Cisco;

6. Using any reproduction, counterfeit, copy, or colorable imitation of any of the CISCO Marks in connection with the publicity, promotion, sale, or advertising of counterfeit Cisco products;

7. Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to

falsely describe or represent such goods as being Cisco products and from offering such goods in commerce;

8.  Diluting any of the CISCO Marks;

9.  Removing from their premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating to Defendants' assets and operations or relating in any way to the purchase, sale, manufacture, offer for sale, distribution, negotiation, importation, advertisement, promotion, or receipt of any products purporting to be Cisco; and

10. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (i) above.

Defendants' failure to attend the show cause hearing scheduled herein shall result in the immediate issuance and confirmation of the preliminary injunction, and failure of Defendants to respond to this Order by the _7th__ day of _August_____, 2020, shall result in the automatic issuance of a preliminary injunction, which shall be deemed to take effect immediately and shall extend during the pendency of this action. The Restrained Parties shall be deemed to have actual notice of the issuance and terms of such preliminary injunction, and that any act by any of the Restrained Parties in violation of any of its terms may be considered and prosecuted as contempt of this Court.

**I.     Expedited Discovery**

**1.     Defendants**

Within three business days of receipt of this Order, the Restrained Parties shall produce to Cisco a summary document showing the dates, quantities, names, addresses, and other contact information, including any and all associated email addresses, of all suppliers and customers for the preceding twenty-four months from whom they have purchased or to whom they have sold any products using the CISCO Marks.

**2.      Third Parties**

Within three business days of receipt of this Order, any Payment Service, eCommerce Website, Internet Search Engine, Common Carrier, or any other non-party that has information about the Restrained Parties shall produce to Cisco expedited discovery, including copies of all documents and records in such person's or entity's possession, custody, or control relating or referring to:

1.   the names, addresses, and other contact information, including any and all associated email addresses, of any of the Restrained Parties;

2.   the nature of any of the Defendants' operations (including, but not limited to, identifying information associated with any Internet stores or online marketplace accounts), methods of payment, transportation, and listing history concerning the advertisement, offer for sale, or sale of Cisco-marked products and/or products advertised using the CISCO Marks;

3.   any online marketplace accounts registered by Defendants, along with the true identities and contact information of the registrants of each online marketplace account to the extent the privacy protection service for any of Defendants' Internet stores, seller identifications, online marketplace accounts, commercial Internet websites, store URLs, and email addresses has concealed the registrant's identity and contact information;

4.   any financial accounts owned or controlled by any of the Restrained Parties, including such accounts residing with or under the control of any Payment Service (as defined above);

5.   the names and electronic and physical addresses of every owner and employee of each of the Restrained Parties; and

6.   any other documents concerning or relating to any of the Restrained Parties.

**J.      Alternative Service of Process**

Service of the Summons and Complaint and of this Order, together with copies of the papers in support thereof, shall be made within seven business days of the undersigned date on

1   Defendants by delivering true copies thereof on Shenzhen Usource Technology Co. by email to

2   kc@usourcetech.com, service@usourcetech.com, and usourcetech@gmail.com; and on Shenzhen

3   Warex Technologies Co. and Warex Technologies Limited by email to Laural@warex.cn and

4   sales@warex.cn, and that such service be deemed sufficient service. Additionally, for any domain

5   name that has been transferred from any of the Restrained Parties' control to Cisco's control

6   pending the final hearing and determination of this action, Cisco may disable and redirect the

7   domain name to a link on which copies of the Summons and Complaint and this Order, together

8   with copies of the papers in support thereof, are electronically published.

9

10       IT IS SO ORDERED.

11

12   DATED: _July 20_____, 2020 at 5:10 p.m.   _____

13                                              United States District Court Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROPOSED ORDER GRANTING PLAINTIFFS' *EX PARTE* MOTION FOR TRO