1  PATRICK M. RYAN (SBN 203215)
   *pryan@bzbm.com*
2  STEPHEN C. STEINBERG (SBN 230656)
   *ssteinberg@bzbm.com*
3  GABRIELLA A. WILKINS (SBN 306173)
   *gwilkins@bzbm.com*
4  BARTKO ZANKEL BUNZEL & MILLER
   A Professional Law Corporation
5  One Embarcadero Center, Suite 800
   San Francisco, California 94111
6  Telephone: (415) 956-1900
   Facsimile:  (415) 956-1152
7
   Attorneys for Plaintiffs CISCO SYSTEMS, INC., CISCO
8  TECHNOLOGY, INC., and CIENA CORPORATION

9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12

13  CISCO SYSTEMS, INC.; CISCO          Case No. 5:20-cv-04773-EJD
    TECHNOLOGY, INC.; and CIENA
14  CORPORATION,                        [PROPOSED] ORDER GRANTING
                                        PLAINTIFF CIENA CORPORATION'S
15           Plaintiffs,                *EX PARTE* MOTION FOR TEMPORARY
                                        RESTRAINING ORDER, ASSET FREEZE
16       v.                             ORDER, EXPEDITED DISCOVERY,
                                        ORDER AUTHORIZING ALTERNATIVE
17  SHENZHEN USOURCE TECHNOLOGY CO.;    SERVICE OF PROCESS, AND ORDER
    SHENZHEN WAREX TECHNOLOGIES CO.,    TO SHOW CAUSE RE: PRELIMINARY
18  LTD.; and WAREX TECHNOLOGIES        INJUNCTION
    LIMITED;
19                                      RE: ECF 19
             Defendants.
20

21

22

23

24

25

26

27

28

1  Pending before the Court is Plaintiff Ciena Corporation's ("Ciena") *ex parte* motion for a

2  temporary restraining order, an order to show cause, an order freezing Defendants Shenzhen

3  Usource Technology Co. ("Usource"), Shenzhen Warex Technologies Co. and Warex

4  Technologies Limited's (together, "Warex") (collectively, "Defendants") assets, expedited

5  discovery, and an order authorizing alternative service of process by email. The Court has

6  reviewed Ciena's motion papers and exercised its discretion to enter this ruling without a hearing.

7  Because Plaintiff moved *ex parte*, requesting that no notice be provided and said request is granted

8  herein, Defendants were not heard.

9  On July 20, 2020 at ECF 12 (*Cisco Systems, Inc. v. Shenzhen Usource Technology Co.*,

10  No. 5:20-CV-04773-EJD, 2020 WL 4196273 (N.D. Cal., July 20, 2020)), based on substantially

11  similar law and facts against the same Defendants, this Court granted a substantially similar

12  motion to the present one upon the motion of Plaintiffs Cisco Systems, Inc. and Cisco

13  Technologies, Inc. (collectively "Cisco"). For substantially similar reasons to those stated in the

14  "July 20 Order," the basis of which are set forth below, Ciena's motion is likewise GRANTED.

15  **I.    BACKGROUND**

16  **A.    Ciena and Its Transceivers**

17  Ciena is a national and world leader in developing, designing, manufacturing, and

18  providing telecommunications networking equipment, software, and services, including

19  transceivers. *See* 7/31/20 Decl. of First Witness ("Decl. No. 1")[1] ¶ 5. ECF 19-1. Ciena provides

20  solutions that help its customers create the Adaptive Network™ in response to constantly

21  changing demands of their users. First Am. Compl. ("FAC") ¶ 20, ECF 16. Ciena is known for

22  delivering high-class networking technology through high-touch consultative relationships,

---

[1] To avoid revealing the identities of the Ciena personnel conducting the investigation and the

consultants participating in the investigation, the names of the declarants are undisclosed herein,

and have been replaced with the number of the declaration in order of filing, as the names have

been sealed pursuant to an Order entered contemporaneous with this opinion.

[2] Cisco initially filed this action against the same Defendants on July 16, 2020 alleging virtually

building some of the world's most agile networks with automation, openness, and scale. *Id.* Ciena transceivers are crucial components in its networking systems, and are known for being reliable and high-quality. Ciena ships over 300,000 transceivers generating over $300 million in revenue per year. *Id.*

Transceivers are electronic devices that transmit and receive data. *See* 8/5/20 Decl. of Second Witness ("Decl. No. 2") ¶ 7. A transceiver encodes and decodes data by converting an electrical signal into light pulses and back again, which are sent through a fiber optic cable. *Id.* Transceivers provide the vital connections in networks. *See* Decl. No. 1 ¶ 11. The quality and performance of networks in the U.S. and around the world depend on authentic and high-quality Ciena transceivers. *Id.* ¶¶ 11-12.

Ciena sells a wide-range of transceivers varying in size, functionality, and price. *See* Decl. No. 2 ¶ 7. Ciena designs all of its transceivers to meet and exceed industry standards for quality, reliability, safety, and performance, which vary depending on the industry. *Id.* A variety of U.S. industries, including federal and state government entities, telecommunications companies, research and education institutions like universities and colleges, utility companies, and major healthcare centers, rely on Ciena transceivers to perform critical applications, and ensure the integrity of data transfer and communications. *See* Decl. No. 1 ¶ 12.

Ciena owns well-established trademarks, including the "CIENA" word mark, which is registered under U.S. Trademark Registration Nos. 2,070,330 and 3,026,860, and the CIENA logo (together, the "CIENA Marks"):



*Id.* ¶¶ 6-10, Ex. 1A. Ciena has used, and is currently using, the CIENA Marks continuously and exclusively in commerce, including in connection with its sale of Ciena transceivers, and plans to continue such use in the future. *Id.* ¶ 8.

Ciena has invested heavily in the Ciena brand, and prominently displays the CIENA Marks in its advertising materials. *Id.* ¶ 9. And as a result, the CIENA Marks are widely recognized and

2

1   well-known to the public, and are known for reliability and quality. *Id.* Ciena has spent, and

2   continues to spend, millions of dollars marketing and promoting in interstate commerce its

3   products in connection with the CIENA Marks. *Id.* Due to Ciena's longtime use of and investment

4   in the CIENA Marks and the quality of Ciena's products, the Ciena brand has built up a

5   tremendous amount of consumer goodwill. *Id.* ¶ 10. The CIENA Marks symbolize this goodwill,

6   and are invaluable assets to Ciena. *Id.*

7         Authentic Ciena transceivers are manufactured by well-vetted third-party vendors called

8   original equipment manufacturers ("OEMs"). *See* Decl. No. 2 ¶ 8. Each of these OEMs utilize

9   specialized equipment and heavily tested processes to produce consistent, high-performing

10  products on which users rely. *Id.* Ciena requires its OEMs to follow strict quality and control

11  standards that govern the entire lifecycle of each transceiver. *Id.* ¶ 9. Each model undergoes

12  multiple kinds of testing before going into production. Each OEM must maintain ongoing

13  reliability monitoring and is subject to stringent audits and regular business reviews to ensure

14  quality standards continue to be met and to identify areas for improvement. *Id.* And OEMs must

15  maintain detailed records for each product and its movement through the supply chain to enable

16  Ciena to support customers via serial number traceability. *Id.*

17        **B.**    **Discovery and Testing of Counterfeit Ciena Transceivers**

18        Certain details of Ciena's investigation and testing are sealed; thus, this Order does not

19  refer to them with specificity.

20        The success of Ciena's brand has attracted criminal counterfeiters who illegally profit by

21  selling fake Ciena products. To combat this, Ciena investigates suspicious listings on online

22  marketplaces, and arranged for a consultant to investigate and buy suspect Ciena transceivers from

23  Defendants. *See* Decl. No. 2 ¶ 13; Decl. No. 3 ¶¶ 3-4, 6. Defendants are companies based in

24  China. Ciena's consultant discovered that Defendants were offering purported Ciena transceivers

25  online to U.S. customers, and attested to having purchased purported Ciena transceivers from

26  Defendants, who then shipped the transceivers to this District. *See* Decl. No. 3 ¶¶ 3-4, 6. Ciena

27  presented evidence that Defendants' counterfeit transceivers are advertised, offered for sale,

28  and/or have product labels with counterfeit CIENA Marks referenced above, and/or are otherwise

designed to create the impression that they are authentic Ciena transceivers. *See* Decl. No. 3 ¶¶ 7-10, 15, 18-23.

The consultant shipped the transceivers to Ciena. *Id.* ¶¶ 29-30. A Ciena expert in product testing, analysis, and authentication, analyzed and tested the transceivers from Defendants to determine whether they were genuine. Decl. No. 2 ¶¶ 3, 13-23. As set forth below, Ciena's engineer first evaluated each product and determined that Defendants' product was, in fact, inauthentic in that it was indisputable it had not been manufactured by Ciena or by someone associated with Ciena, and did not meet Ciena's standards. *Id.* Where an OEM was identified on the product label, Ciena's engineer provided the serial number to the OEM, and the OEM confirmed that the suspect transceiver was not manufactured by Ciena or by someone associated with Ciena. *Id.* ¶ 22. This analysis was set forth in Ciena's engineer's declaration. The findings for each Defendant are summarized below.

### 1. Usource

In May 2020, Ciena's consultant ordered two purported Ciena transceivers from Usource. *See* Decl. No. 3 ¶¶ 7-10. Usource offered these transceivers with Ciena labels at the outset, sent an invoice for two "Ciena" transceivers, and when the products arrived, Ciena's consultant found they were labelled with the CIENA Marks as shown below:



*Id.* ¶ 9, 15. Ciena's consultant then sent the purported Ciena transceivers to Ciena for examination. *See id.* ¶¶ 29-30; Decl. No. 2 ¶¶ 15-16.

On July 6, 2020, Ciena's engineer examined one of the suspect purported Ciena transceivers received from Usource. *See* Decl. No. 2 ¶ 17. As shown above, the suspect transceiver

1   had a label with the Ciena name and logo. *Id.* But Ciena's engineer confirmed that the product was

2   clearly inauthentic in that it was not manufactured by Ciena or by someone associated with Ciena

3   in light of the many differences between it and authentic Ciena transceivers. *See* Decl. No. 2

4   ¶¶ 17-18.

5         **2.   Warex**

6        In May 2020, Ciena's consultant ordered four purported Ciena transceivers from Warex.

7   *See* Decl. No. 3 ¶¶ 18-23. Warex advertised and offered these transceivers using the CIENA

8   Marks as if they were genuine Ciena transceivers, and also advertised that they could customize

9   labels. *Id.* ¶ 18, 20. Ciena's consultant emphasized that they only wanted the products if they

10  could pass for Ciena products either externally or electronically, as their customers were not

11  interested in third-party products, and Warex confirmed they would, indicating that it knew the

12  products were intended to be passed off to end customers as genuine Ciena products. *Id.* ¶ 20.

13  Warex's invoice confirmed that the order was for two units each of the "XCVR-S10V31-C" and

14  "XCVR-S00Z85-C" (nearly identical to Ciena part numbers) that were "Ciena-compatible." *Id.*

15  ¶¶ 21-22. Warex sent the products to Ciena's consultant in this District, who then sent them to

16  Ciena for examination. *Id.* ¶¶ 6, 29-30; Decl. No. 2 ¶¶ 19-20.

17       On July 6, 2020, Ciena's engineer examined one of each model of the purported Ciena

18  transceivers received from Warex. *See* Decl. No. 2 ¶ 21. Each suspect transceiver was labeled with

19  what looks like a real Ciena part number. *Id.* However, Ciena's engineer confirmed that the

20  transceivers received from Warex were clearly inauthentic as they were not manufactured by

21  Ciena or by someone associated with Ciena in light of the many differences between them and

22  authentic Ciena transceivers. *Id.* ¶¶ 21-23. Ciena's engineer also provided the serial numbers to the

23  purported OEM, which confirmed that the serial numbers do not correspond to genuine Ciena

24  transceivers. *Id.* ¶ 22.

25       Based on these findings, Plaintiffs filed a First Amended Complaint[2] under seal on August

26  6, 2020, alleging federal claims for Trademark Infringement (15 U.SC. § 1114–1117), Dilution of

27       ————————————

[2] Cisco initially filed this action against the same Defendants on July 16, 2020 alleging virtually

28

1  Mark (15 U.S.C. § 1125), and Unfair Competition (15 U.S.C. § 1125), as well as California law

2  claims for False Advertising (Cal. Bus. & Prof. Code § 17500) and Unfair Competition (Cal. Bus.

3  & Prof. Code § 17200). Ciena moves *ex parte* for a temporary restraining order, order to show

4  cause, seizure order, expedited discovery, an order freezing Defendants' assets, and an order

5  authorizing it to serve Defendants by email.

6       For the reasons expressed below, which are substantially similar to those provided in the

7  July 20 Order[3] previously entered by this Court upon Cisco's motion against the same Defendants,

8  Ciena's motion is likewise GRANTED.

9  **II.    LEGAL STANDARD**

10      **A.    Notice**

11      This Court may issue a TRO without notice to the adverse party if (1) "specific facts in an

12  affidavit or a verified complaint" show that immediate and irreparable injury will occur before the

13  adverse party can be heard and (2) the movant's attorney certifies in writing what efforts were

14  made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b).

15      The Ninth Circuit recognizes the issuance of an *ex parte* TRO is warranted where notice to

16  the defendant would render further prosecution fruitless, e.g. "[i]n the trademark arena, such cases

17  include situations where an alleged infringer is likely to dispose of the infringing goods before the

18  hearing." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). An

19  applicant can justify excusal of the notice requirement on this ground by showing "that the adverse

20  party has a history of disposing of evidence or violating court orders or that persons similar to the

21  adverse party have such a history." *Id.* (quoting *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d

22  641, 651 (6th Cir.1993)).

23  ─────────────────────

   identical conduct. *See* ECF 1.

24
   [3] Cisco previously moved for the same relief against the same Defendants on July 16, 2020, and
25  the Court granted the Motion and issued a TRO on July 20, 2020 without prior notice to the same

26  Defendants. *See* ECF 12, *Cisco Systems, Inc. v. Shenzhen Usource Technology Co.*, No. 5:20-CV-

27  04773-EJD, 2020 WL 4196273 (N.D. Cal., July 20, 2020).

28

1    The Court finds *Talavera Hair Prod., Inc. v. Taizhou Yunsung Elec. Appliance Co., LTD*

2    (*Talavera*) instructive. No. 18–CV–823–JLS (JLB), 2018 WL 3413866 (S.D. Cal. May 10, 2018).

3    There, the defendants sold their infringing products through online eCommerce marketplaces

4    including Amazon and eBay, and the plaintiff had tried to stop similar sellers, only to see the same

5    goods reappear under new sellers. *Id.* at *4. *Talavera* also noted nine other cases where TROs

6    were granted against similar online infringers who used eCommerce marketplaces to sell their

7    infringing products. *Id.* Thus, the court found that notice to the defendants would likely result in

8    the disappearance or transfer of the counterfeit products, so notice was not required and the

9    plaintiff could proceed *ex parte*. *Id.*

10    Similarly, *Gucci Am., Inc. v. Los Altos Boots, Inc.* supports the Court's decision to excuse

11    notice here. No. CV1406680BROAJWX, 2014 WL 12561613 (C.D. Cal. Aug. 27, 2014). There,

12    the court excused the plaintiff from providing notice before issuing a TRO because: 1) the

13    defendant could easily conceal the counterfeit goods and related records given their nature and

14    location outside the U.S.; and 2) similarly situated defendants in trademark infringement cases

15    have a history of ignoring court orders to preserve and instead destroying evidence after *ex parte*

16    TROs and seizure orders were denied. *Id.* at *3–4.

17    Here, as explained in greater detail below, Plaintiff has presented substantial evidence that

18    Defendants likewise are willfully advertising and selling transceivers using counterfeit CIENA

19    Marks, largely through third-party eCommerce websites like Alibaba, and are able and likely to

20    dispose of evidence if given advance notice of the present motion. For good cause shown, Plaintiff

21    is relieved from giving notice to Defendants.

22    **B.    Standard for Issuing TRO**

23    The standard for issuing a TRO is identical to the standard for a preliminary injunction.

24    *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001);

25    *Lockheed Missile & Space Co. v. Hughes Aircraft*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). A

26    plaintiff seeking preliminary injunctive relief must establish that: (1) "[it] is likely to succeed on

27    the merits"; (2) "[it] is likely to suffer irreparable harm in the absence of preliminary relief"; (3)

28    "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Winter*

*v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted) (emphasis in original).

Preliminary injunctions are routinely granted in cases involving trademark infringement. The principle "that trademark infringement causes irreparable injury and necessitates immediate injunctive relief" is well settled and "is universally recognized in the courts of [the Ninth] circuit." *Steinway & Sons v. Robert Demars & Friends*, 1981 WL 40530, \*7 (N.D. Cal. Jan. 28, 1981).

## III.    DISCUSSION

### A.    Temporary Restraining Order

As described above, a court's decision to grant a TRO is governed by four factors: (1) whether the applicant is likely to succeed on the merits of his action; (2) whether the applicant is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tip in the applicant's favor; (4) and that an injunction is in the public interest. The Court discusses each in turn.

#### 1.    Likelihood of Success

Plaintiff asserts federal claims for trademark infringement, counterfeiting, and false designation of origin and advertising under the federal Lanham Act, as well as claims for unfair competition and false advertising under California state law. Plaintiff has demonstrated a likelihood of success with respect to all their claims.

##### a.    Federal Claims

A plaintiff claiming trademark infringement under the Lanham Act must show that it "owns a valid mark, and thus a protectable interest" and that Defendants' "use of the mark is likely to cause confusion, or to cause mistake, or to deceive." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009) (internal quotation omitted); *see also* 15 U.S.C. § 1114(1).

Plaintiff has established that it owns federal trademark registrations for the CIENA Marks. Decl. No. 1 ¶¶ 6-10, Ex. 1A, ECF 19-2. Ciena has also shown that Defendants are using those marks in connection with selling counterfeit Ciena transceivers in the U.S.

"To determine whether a likelihood of consumer confusion exists," courts in the Ninth Circuit rely "on the eight-factor *Sleekcraft* test, which reviews: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979)), abrogated in part on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 (9th Cir. 2003)). "The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a rote checklist." *Id.* (internal quotation marks and citation omitted).

Proving false designation of origin based on the same or similar trade names or symbols requires the same showing of a likelihood of confusion. *See Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534–35 (9th Cir. 1989) ("[T]he same broad standards of protection apply to trademarks and trade names. . . . [L]ikelihood of confusion is unquestionably the key to a finding of infringement in either case."); *see also* 15 U.S.C. § 1125(a)(1); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 n. 8 (9th Cir. 1999) (noting that while Lanham Act § 32 of the (15 U.S.C. § 1114) protects registered marks, § 43(a) (15 U.S.C. § 1125(a)) also protects against infringement of unregistered marks and trade dress and against a wider range of practices such as false advertising, but "the analysis under the two provisions is oftentimes identical").

The Ninth Circuit has held that the *Sleekcraft* test is appropriate to determine likelihood of confusion regarding a claim for false designation of origin. *Accuride Int'l, Inc.*, 871 F.2d at 1536. But courts in this district and around the Ninth Circuit hold that in cases involving counterfeiting, "it is unnecessary to perform the eight-factor evaluation because counterfeit marks are inherently confusing." *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, No. C 12-2582 CW, 2012 WL 2343670, at *14 (N.D. Cal. June 20, 2012) (granting TRO and OSC re preliminary injunction)

1   (citing *Phillip Morris USA Inc. v. Shalabi,* 352 F.Supp.2d 1067, 1073 (C.D. Cal. 2004)); *Microsoft*

2   *Corp. v. Buy More, Inc.*, 136 F. Supp. 3d 1148, 1157 (C.D. Cal. 2015), *aff'd*, 703 F. App'x 476

3   (9th Cir. 2017) (quoting *Phillip Morris*, 352 F.Supp.2d at 1073); *Daimler AG v. A-Z Wheels LLC*,

4   334 F. Supp. 3d 1087, 1096 (S.D. Cal. 2018) (citing *Phillip Morris*, 352 F.Supp.2d 1067 at 1073).

5        A counterfeit mark is: "(1) a non-genuine mark identical to the registered, genuine mark of

6   another, where (2) the genuine mark was registered for use on the same goods to which the

7   infringer applied the mark." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 946

8   (9th Cir. 2011) (citing *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708,

9   721 (9th Cir. 2005)). As Ciena has shown that this is a clear case of counterfeiting, including the

10  use of identical marks in connection with, supposedly, the same goods, there is a likelihood of

11  confusion as a matter of law.

12       Ciena also meets the standard under *Sleekcraft* to show a likelihood of confusion. Ciena

13  has used its trade name and the CIENA Marks since 1992, in connection with networking products

14  including transceivers, so the marks are strong (*Sleekcraft* factor 1). Decl. No. 1 ¶ 5, ECF 19-1.

15  Defendants are selling the same kinds of products as Ciena—transceivers (factor 2)—and using

16  identical marks and trade names (factor 3). And the use of identical marks and trade names to sell

17  counterfeit products shows that Defendants intend to copy them and confuse the public (factor 7).

18  This establishes that Ciena is likely to succeed on the merits of its federal trademark infringement,

19  false designation of origin, and unfair competition claims.

20       Therefore, Ciena has shown that it is likely to succeed on the merits of its federal

21  trademark infringement, false designation of origin, and unfair competition claims.

22                          **b.    State Law Claims**

23       Ciena has also demonstrated a probability of success with respect to its state law claims for

24  unfair competition and false advertising. The Ninth Circuit "has consistently held" that these

25  claims "are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News*

26  *Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). "An action for unfair competition under Cal. Bus.

27  & Prof. Code §§ 17200 et seq. is substantially congruent to a trademark infringement claim under

28  the Lanham Act. . . . Under both, the ultimate test is whether the public is likely to be deceived or

confused by the similarity of the marks." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (internal quotation marks omitted).

Similarly, where plaintiffs establish that they are likely to succeed on the merits of federal Lanham Act claims, then they also demonstrate a likelihood of success on parallel false advertising claims under California law. *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. 14-CV-04050-MEJ, 2014 WL 6788310, at *16–17 (N.D. Cal. Dec. 2, 2014) (finding showing of likelihood of success under Lanham Act sufficient to meet burden for unfair competition under Section 17200 and false advertising under Section 17500).

As Ciena has shown it is likely to succeed on the merits of its federal claims, Ciena has also shown it is likely to succeed on its parallel claims for unfair competition and false advertising under California law.

## 2. Irreparable Harm

To demonstrate the likelihood of irreparable harm, Plaintiff must show that "remedies available at law, such as monetary damages, are inadequate to compensate for the injury." *Herb Reed Enters., LLC v. Fl. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013). The Ninth Circuit has recognized that "intangible injuries," including loss of goodwill, can constitute irreparable harm. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). More specifically, the sale of counterfeited products may cause irreparable harm because such sale may "prevent [Plaintiff] from controlling the reputation of its highly recognizable" brands. *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F. Supp. 2d 1051, 1081 (E.D. Cal. 2009) *aff'd*, 348 F. App'x 288 (9th Cir. 2009).

Here, Ciena has demonstrated that it spent decades investing in and building the goodwill in its brand and reputation for designing, making, and selling high quality products. *See* Decl. No. 1 ¶¶ 5-10, ECF __. Defendants' sales of counterfeit Ciena transceivers mislead customers, and they threaten irreparable harm to Ciena's goodwill that cannot be adequately addressed by awarding damages after-the-fact. This is particularly true as Defendants' counterfeit products were not subject to the same rigorous quality control measures and safety testing, and appear to be inferior to genuine Ciena transceivers. *See* Decl. No. 1 ¶¶ 13-18, ECF 19-1. Thus, temporary and

1  preliminary injunctive relief are appropriate to prevent further irreparable harm to, and ensure that

2  Ciena can regain and maintain control over, its reputation and goodwill.

3  **3.    Balance of Equities**

4  "Courts must balance the competing claims of injury and must consider the effect on each

5  party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 7, 24 (2008).

6  "[C]ourts will not shy away from issuing" preliminary injunctive relief "where to do so would be

7  to aid a second comer who has sought to trade upon the efforts and good will of the first comer."

8  *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333 (7th Cir. 1977). Here,

9  the balance of equities tips strongly in favor of the issuance of injunctive relief.

10  A TRO or preliminary injunction will impose no legally cognizable hardship on

11  Defendants. "Where the only hardship that the defendant will suffer is lost profits from an activity

12  which has been shown likely to be infringing, such an argument in defense 'merits little equitable

13  consideration.'" *Sream*, 2019 WL 2180224, at *10 (quoting *Triad Sys. Corp. v. Se. Exp. Co.*, 64

14  F.3d 1330, 1338 (9th Cir. 1995) (superseded on other grounds)); *see also, United Tactical Sys.*,

15  2014 WL 6788310 at *23 (disregarding claimed hardship from loss of infringing sales).

16  Defendants have no right to sell counterfeit Ciena transceivers or use the CIENA Marks.

17  Therefore, any claimed hardship of their being barred from doing so must be disregarded. At the

18  same time, every sale of a counterfeit transceiver by Defendants is a lost sale for Ciena that

19  detracts from the value of its trademarks and goodwill and risks serious and irreparable harm to its

20  reputation (not to mention the public) by being inferior products. Accordingly, the balance of

21  equities supports issuing a TRO and preliminary injunction in this case.

22  **4.    Public Interest**

23  Public policy favors granting an injunction when there is a likelihood of consumer

24  confusion. *See Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir.

25  1982) ("In addition to the harm caused the trademark owner, the consuming public is equally

26  injured by an inadequate judicial response to trademark infringement.").

27  In this case public policy favors injunctive relief even more than the usual counterfeiting

28  case because Plaintiff has offered substantial evidence that Defendants' conduct poses a threat to

health and safety. Counterfeits use untested and unapproved components and manufacturing processes, and as such they may not function properly or in combination with authentic Ciena products and components in a network, may be unsafe to use, and/or may lead to network performance degradation. Decl. No. 1 ¶¶ 14-17, ECF 19-1. Reliability and data integrity are critical to industries that use Ciena transceivers, and counterfeit transceivers jeopardize the integrity of these networks and threaten the people they serve. *Id.* ¶ 18. Counterfeit transceivers also pose a risk of physical harm. Ciena transceivers use transmitter laser technologies, which require eye safety testing and manufacturing calibration to ensure users' physical safety. *Id.* Counterfeit transceivers are unlikely to be subjected to this testing or meet these standards. *Id.* A poorly designed transceiver can also emit excessive electromagnetic energy that interferes with adjacent equipment, which could be detrimental in a sensitive environment, e.g., a healthcare center. *Id.* Packaging transceivers so as to prevent electrostatic discharge ("ESD") from harming them is also crucial to maintaining their reliability, and Defendants' counterfeit transceivers are not packaged with any such precautions, making it more likely they may not function properly and/or will fail. *Id.*; Decl. No. 2 ¶¶ 18, 23, ECF 19-3. Substandard components in Defendants' counterfeit transceivers are also more likely to operate at a higher power, potentially overheat and take out network transmission or degrade and cause failures. Decl. No. 1 ¶ 18.

The above facts clearly demonstrate that the public interest favors injunctive relief. Accordingly, Ciena's request for a TRO directed to Defendants' conduct is GRANTED.

**B.     Asset Freeze**

Plaintiff seeks another *ex parte* TRO freezing Defendants' assets to preserve the possibility of equitable relief, including an accounting and return of their ill-gotten gains from counterfeiting.

The Ninth Circuit holds that when a plaintiff seeks equitable remedies under the Lanham Act, including recovery of a defendant's profits under 15 U.S.C. § 1117, a district court has "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992). This includes "the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies." *Id.* (quoting

1    *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1364 (9th Cir.1988) (*en banc*)). The Ninth

2    Circuit explained "it is essential that the trial courts carefully fashion remedies which will take all

3    the economic incentive out of trademark infringement," and affirmed the district court's granting

4    of TROs and preliminary injunctions to freeze the defendants' assets, in addition to preventing

5    various counterfeiting-related activities. *Id.* at 560 (quoting *Playboy Enters.,* 692 F.2d at 1275).

6         "A party seeking an asset freeze must show a likelihood of dissipation of the claimed

7    assets, or other inability to recover monetary damages, if relief is not granted." *Johnson v.*

8    *Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009). Given the deceitful and secretive nature of

9    counterfeiting, courts in this Circuit routinely find that dissipation of assets is likely and grant

10   asset freezes in such cases, particularly when defendants are overseas where they can hide assets

11   from a potential judgment. *Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, 737 F. Supp. 1521,

12   1527 (S.D. Cal. 1989), *aff'd* 970 F.2d at 563 ("[d]ue to the international aspect of the defendants'

13   business, the Court is concerned that unless the assets are frozen, defendants may hide their

14   allegedly ill-gotten funds"); *see also, FTC v. Affordable Media*, 179 F.3d 1228, 1236–37 (9th Cir.

15   1999) (finding dissipation likely based on defendants keeping funds in the Cook Islands); *Chanel,*

16   *Inc. v. Sunus Online Group, LLC*, 2014 WL 12558780, at \*3 (C.D. Cal. Jan. 15, 2014) ("based on

17   Defendants' blatant violations of trademark laws there is likelihood that Defendants would

18   transfer or hide the illegally obtained assets in order to avoid a judgment in this action," and thus,

19   granted a preliminary injunction freezing their assets). Other Circuits agree that asset freezes are

20   warranted to preserve assets in counterfeiting cases, particularly overseas and/or online. *See, e.g.,*

21   *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987–88 (11th Cir. 1995) (affirming

22   preliminary injunction freezing assets of U.S.-based defendants who arranged for making

23   counterfeit Levi's jeans in China for sale in Europe); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122,

24   132–33 (2d Cir. 2014) (confirming trial authority to issue TRO and preliminary injunction

25   freezing assets of defendants selling counterfeit goods online); *Animale Grp. Inc. v. Sunny's*

26   *Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) (affirming TRO and preliminary injunction

27   freezing assets of defendants selling counterfeits).

28

                                    14

Ciena seeks recovery of Defendants' profits from their wrongful use of the CIENA Marks in connection with sales of transceivers, among other relief, so the Court is authorized to freeze Defendants' assets under *Reebok*, 970 F.2d at 559. *See* First Am. Compl. at Prayer for Relief ¶¶ J-K, ECF 16. The present action involves unauthorized use of the CIENA Marks by Defendants, in their advertising for transceivers and sometimes on the transceivers themselves, and Defendants are based in China and use third-party eCommerce online platforms like Alibaba to market and sell their non-genuine Ciena products into the U.S. Decl. No. 3 ¶¶ 4, 6-28, ECF 19-4. It is not only likely that Defendants can and will dissipate their assets during the pendency of this case if given the opportunity to do so, but it is also difficult if not impossible to enforce U.S. judgments in China. *See, e.g.,* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Enforcement-of-Judges.html (noting no treaty or convention provides for reciprocal recognition and enforcement of judgments); *Yee v. NIVS Intellimedia Tech. Group, Inc.*, No. CV 11-8472 JGB (AJWx), 2013 WL 1276024, *5 (C.D. Cal. March 25, 2013) (stating that Chinese company whose executives are Chinese residents "bore no real risk of sanctions" given the difficulty of enforcing a U.S. judgment against a Chinese national); *Redwen v. Sino Clean Energy, Inc.*, No. CV 11-3936 PA (SSx), 2013 WL 12303367, at *5–6 (C.D. Cal. Jul. 9, 2013) (finding that the plaintiff "would face significant obstacles in enforcing any judgment against the defendants' assets in China"); *Gucci America, Inc. v. Wang Huoqing*, No. CV, 2011 WL 31191, at *16 (N.D. Cal. Jan. 3, 2011) (noting that enforcing a judgment may be difficult in China, and compelling transfer of counterfeiter's domain names to plaintiffs).

The Court's authority is not limited to freezing specific identified assets, nor to assets within this District or the U.S., and can extend to banks and other non-parties that have custody of Defendants' assets or provide payment services to Defendants. *See Reebok*, 737 F. Supp. at 1527–28 (TRO and preliminary injunction that "any banks, savings and loan associations, or other financial institutions . . . who receive actual notice of this order by personal service or otherwise, are preliminarily enjoined from transferring, disposing of, or secreting any money, stocks or other assets of these defendants, until further order of the court" except in limited circumstances); *Gucci*

*Am., Inc.*, 768 F.3d at 133 (rejecting argument that plaintiff had to identify particular property derived from counterfeiting before obtaining TRO and preliminary injunction freezing all assets).

Accordingly, Ciena's request for an Order freezing Defendants' assets is GRANTED.

**C.      Seizure Order**

**1.      Freezing Defendants' Domain Names and Seller Identifications**

The Counterfeiting Act of 1984 permits the Court to issue an *ex parte* order for the seizure of goods and counterfeit marks. 15 U.S.C. § 1116(d)(1)(A). Courts in this Circuit recognize, in cases involving online counterfeiters, this seizure power authorizes orders freezing counterfeiters' domain names and seller identifications used on eCommerce websites. *See, e.g.*, *Williams-Sonoma, Inc. v. Friendfinder, Inc.*, No. C06-6572JSW (MEJ), 2007 WL 4973848, at *10 (N.D. Cal. Dec. 6, 2007), *report and recommendation adopted as modified sub nom. Williams-Sonoma, Inc. v. Online Mktg. Servs., Ltd.*, No. C 06-06572 JSW, 2008 WL 596251 (N.D. Cal. Mar. 4, 2008) (granting order temporarily barring sale or transfer of defendants' domain names); *Spy Optic Inc. v. Individuals, Partnerships & Unincorporated Ass'ns Identified on Schedule A*, No. CV 17-7649 DSF (KSX), 2017 WL 10592133, at *2–3 (C.D. Cal. Nov. 27, 2017) (granting preliminary injunction barring transfer of defendants' "Internet based e-commerce store businesses under their seller IDs").

The Lanham Act also expressly provides that in certain cases of online trademark infringement, domain name registrars, who control the transfer of domain names, must deposit domain name certificates with the court. *See* 15 U.S.C.§ 1114(2)(D); 15 U.S.C.§ 1125(d)(2).

Such relief is necessary because counterfeiters operating online can, and often will, as soon as they receive notice of litigation, take steps to conceal their activities and move their illegal businesses to other online channels to thwart plaintiffs' ability to obtain and courts' ability to award meaningful relief, e.g., modifying domain name registrations; redirecting visitors to new seller identifications or domain names; and/or transferring ownership of seller identifications and domain names. *See* Decl. No. 1 ¶ 20, ECF 19-1.

Here, Ciena has adduced substantial evidence that Defendants sell counterfeit Ciena transceivers through at least two primary channels on the Internet: a) stores on third-party

1   eCommerce marketplaces such as Alibaba ("eCommerce Websites"), using their respective seller

2   identifications on those websites; and b) separate commercial websites maintained by Defendants

3   themselves ("Domain Names"). Decl. No. 3 ¶¶ 7, 18, Exs. 3B-3C, ECF 19-5, 19-6.

4          Moreover, an order barring Defendants from transferring their seller identifications and

5   Domain Names, requiring transfer of control of such domain names to a U.S.-based registrar of

6   Ciena's choice (while legal ownership remains with Defendants), and requiring deposit of domain

7   name certificates with the Court, would impose no real burden on Defendants. At the same time, it

8   would ensure that ownership of the domain names cannot be changed until this action is resolved

9   on the merits, thereby maintaining the potential for Ciena to obtain full relief. Accordingly,

10  Ciena's request for this relief is GRANTED.

11         **2.      Redirection of Defendants' Domain Names to U.S.-Based Registrar**

12         Ciena also seeks to have Defendants' Domain Names automatically redirect to a website

13  that provides notice of and access to filings in this action or, alternatively, disable such websites.

14  Such preliminary relief has been granted in cases involving online counterfeiters. *See, e.g.,*

15  *Chanel*, 2011 WL 6955734, at *5–6 (granting preliminary injunction directing registrar to redirect

16  domain names to webpage with copy of documents from the action); *Asmodus, Inc. v. Junbiao Ou*,

17  No. EDCV162511JGBDTBX, 2017 WL 2954360, at *5–6, 19 (C.D. Cal. May 12, 2017) (granting

18  preliminary injunction ordering defendant to post notice of the order on its websites, including that

19  they had no affiliation with plaintiff trademark holder and could not sell products with plaintiff's

20  marks); *Otter Prod., LLC v. Anke Grp. Indus. Ltd.*, No. 2:13-CV-00029-MMD, 2013 WL

21  5910882, at *4 (D. Nev. Jan. 8, 2013) (granting TRO ordering any web hosting company, domain

22  name registry, and/or domain name registrar getting notice to remove counterfeit and infringing

23  products from defendant's website or alternatively to disable access to the website).

24         Redirecting Defendants' domain names would help prevent further infringement while this

25  case proceeds, as Defendants could no longer advertise and sell counterfeit Ciena transceivers

26  through those channels. Redirecting those domain names to notice of and filings from this case

27  would also ensure that each Defendant receives prompt notice of this case and the relief sought by

28  Ciena, as they would see it upon visiting their own websites. Moreover, Defendants cannot

17

complain about the potential impact of such relief, as the only hardship would be lost profits from infringing activities. Accordingly, Ciena's request for this relief is GRANTED.

**D.      Expedited Discovery**

The Counterfeiting Act authorizes expedited discovery in connection with seizure orders. See 15 U.S.C. § 1116(d)(10)(B) (permitting the Court to modify time limits for discovery in connection with a seizure order). Expedited discovery may be granted for good cause "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party," and "good cause is frequently found in cases involving claims of infringement and unfair competition." *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). Such good cause is shown "where a well-known trademark . . . has been counterfeited and the sources or purchasers of the counterfeit products are unknown to plaintiff." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248, 250 (S.D. Fla. 1982).

Courts in the Ninth Circuit routinely find good cause for expedited discovery to enable plaintiffs in counterfeiting cases to identify: 1) accounts used for and transactions associated with infringing sales; 2) original sources of and pending shipments of counterfeit products; and 3) other parties involved in counterfeiting activities. *See Spy Optic*, 2017 WL 10592133, at *2 (ordering eBay and PayPal to identify all funds transmitted to defendants' accounts and to provide plaintiffs with data and accounting of all funds, accounts, and transactions); *SATA GmbH & Co. Kg v. Wenzhou New Century Int'l, Ltd.*, No. CV 15-08157-BRO (EX), 2015 WL 6680807, at *11 (C.D. Cal. Oct. 19, 2015) (granting expedited discovery to enable plaintiff to ascertain sources of the counterfeit products and learn of any pending shipments of such products); *Sas v. Sawabeh Info. Servs. Co.*, No. CV1104147GAFMANX, 2011 WL 13130013, at *6–7 (C.D. Cal. May 17, 2011) (granting expedited discovery to gather evidence for preliminary injunction to stop infringement, identify others involved in counterfeiting, and prevent destruction of evidence).

In the present case, Ciena seeks three types of expedited discovery. First, to identify other parties from whom Defendants bought or to whom they sold counterfeit Ciena transceivers, Ciena seeks from each Defendant documents sufficient to show the names, addresses, and other contact

1  information of all individuals and entities that each Defendant bought Ciena transceivers from
2  and/or sold them to, along with quantities and prices of all such purchases and sales.

3       Second, Ciena seeks from any third party providing services to Defendants, e.g., any
4  eCommerce Website, search engine, Common Carrier, or financial institution or service,
5  documents concerning: 1) contact information of each Defendant and all entities and individuals
6  associated or acting in concert therewith; 2) any accounts owned or controlled by each Defendant
7  and all entities and individuals associated or acting in concert therewith; and 3) each Defendant's
8  operations, payment methods, transportation, and listing history concerning Ciena-marked
9  products and/or products advertised using the CIENA Marks. Discovery of these entities and
10 individuals and their accounts and services is necessary to ensure that Defendants' unlawful
11 activities will be contained and that Ciena can promptly identify the full scope of infringing
12 activities connected to Defendants.

13      Lastly, Ciena seeks disclosure of the true identities and contact information of the owners
14 of the identified seller identifications and registrants of the identified Domain Names, to the extent
15 they may be concealed by privacy protections on the eCommerce Websites or with the domain
16 name registrars.

17      As in the above-cited cases, there is good cause for such expedited discovery as Ciena has
18 demonstrated that it needs it for the Court's consideration of a preliminary injunction, and to
19 ensure that Ciena can identify the full scope of infringing activities and immediately halt the
20 manufacture and distribution of inferior counterfeit products and resulting irreparable harm while
21 this case is pending. Ciena has also demonstrated that it needs expedited discovery in order to
22 identify potential sources for equitable relief. Moreover, given the Court's prior finding of the
23 likelihood that Defendants may destroy or hide evidence, expedited discovery is appropriate, and
24 Plaintiff may be prejudiced without it. Accordingly, Ciena's motion for expedited discovery is
25 GRANTED.

26      **E.     Security**

27      "The district court is afforded wide discretion in setting the amount of the bond, . . . and
28 the bond amount may be zero if there is no evidence the party will suffer damages from the

injunction." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (internal citations omitted); *see also, Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *17 (N.D. Cal. Apr. 12, 2019) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."); *Cuviello v. City of Oakland*, No. C 06-05517 MHP EMC, 2007 WL 2349325, at *8 (N.D. Cal. Aug. 15, 2007) (recommending no bond be required in part because there was no proof of likelihood of harm to the party enjoined).

Because of the clear evidence of Defendants' counterfeiting, infringement, and unfair competition, the Court finds it appropriate to issue the TRO without requiring Plaintiff to provide security.

### F.    Duration of TRO

The TRO will expire "at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." Fed. R. Civ. P. 65(b)(2). The Court hereby sets a hearing on the Order to Show Cause regarding a Preliminary Injunction as to Ciena for August 13, 2020 at 9:00 a.m., to be held concurrently with the hearing on the Order to Show Cause regarding a Preliminary Injunction as to Cisco seeking the same relief. At the hearing, Defendants must show cause why a preliminary injunction should not issue.

### G.    Alternative Service of Process

Ciena requests an order authorizing it to serve Defendants by email. For defendants located in foreign countries, courts are permitted to authorize service of process "by other means not prohibited by international agreement." Fed. R. of Civ. Proc. 4(f)(3). The only requirements under Rule 4(f)(3) are that service be directed by the court and not prohibited by international agreement. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002). "[C]ourt-directed service under Rule 4(f)(3) is as favored as service available under Rules [4(f)(1–2)]" and does not require first attempting other means. *Id.*

To comport with due process, courts simply need to evaluate whether a service method is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

of the action and afford them an opportunity to present their objections." *Id.* at 1016 (quoting

*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950)). In *Rio*, the Ninth Circuit

agreed that service by email was appropriate, particularly where the defendant conducted its

business by email. *Id.* at 1017–18.

As a threshold matter, service by email on defendants in China is not barred by any

international agreement. *Microsoft Corp. v. Goldah.com Network Tech. Co.*, No. 17-CV-02896-

LHK, 2017 WL 4536417, at *4 (N.D. Cal. Oct. 11, 2017). Courts in this district have authorized

email service and found that it is reasonably calculated to provide notice to foreign defendants,

including defendants based in China, where receipt is confirmed, the email addresses were

previously used to communicate with the plaintiffs, or the defendants operate online and use email

for their businesses. *Microsoft Corp.*, 2017 WL 4536417 at *5–6 (affirming that email service on

defendants in China was sufficient where receipt confirmed); *Carson v. Griffin*, No. 13-CV-0520

KAW, 2013 WL 2403601, at *1–2 (N.D. Cal. May 31, 2013) (authorizing service by email where

the plaintiff previously corresponded with the defendants via email); *Jenkins v. Pooke*, No. C 07-

03112 JSW, 2009 WL 412987, at *2–3 (N.D. Cal. Feb. 17, 2009) (same); *Facebook, Inc. v.

Banana Ads, LLC*, No. C-11-3619 YGR, 2012 WL 1038752, at *1–2 (N.D. Cal. Mar. 27, 2012)

(authorizing email service, including in Hong Kong, where defendants operated online and relied

on email communications for their businesses).

In the present case, Defendants are based in China and operate Internet-based businesses

trafficking in counterfeit Ciena products. They provide email addresses for communication, and

they ultimately negotiated and consummated transactions for sale of the infringing products

obtained by Ciena's investigator via email. *See* Decl. No. 3 ¶¶ 11-12, 19, 24, ECF 19-4. Email

service is appropriate and important in the present case because of the urgency in shutting down

sales of inferior transceivers that threaten Ciena's reputation and the integrity of critical U.S.

infrastructure that relies on such products.

The Court therefore GRANTS Ciena's request for leave to effect service of the Summons

and First Amended Complaint in this action via email to each Defendant at the respective email

address(es) they used to communicate with and/or that were listed on the invoices sent to Ciena's investigator.

## IV.     ORDER

### A.     Temporary Restraining Order

Pending further order of this Court, Defendants and their owners, principals, agents, officers, directors, members, servants, employees, successors, assigns, and all other persons in concert and participation with them (collectively, the "Restrained Parties") shall be immediately temporarily restrained from:

1.  Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any of the CIENA Marks (as defined above), whether counterfeit or authentic, or any marks confusingly similar thereto in connection with the manufacture, sale, offer for sale, distribution, advertisement, or any other use of counterfeit or authentic Ciena products;

2.  Using any logo, trade name, or trademark confusingly similar to any of the CIENA Marks which may be calculated to falsely represent or which has the effect of falsely representing that the services or products of any or all of the Restrained Parties or others are sponsored by, authorized by, or in any way associated with Ciena;

3.  Infringing any of the CIENA Marks;

4.  Otherwise unfairly competing with Ciena in the manufacture, sale, offering for sale, distribution, advertisement, or any other use of Ciena products;

5.  Falsely representing any or all of the Defendants as being connected with Ciena or sponsored by or associated with Ciena or engaging in any act which is likely to cause the trade, retailers, and/or members of the purchasing public to believe that any or all of the Restrained Parties are associated with Ciena;

6.  Using any reproduction, counterfeit, copy, or colorable imitation of any of the CIENA Marks in connection with the publicity, promotion, sale, or advertising of counterfeit Ciena products;

7.  Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being Ciena products and from offering such goods in commerce;

8.  Diluting any of the CIENA Marks;

9.  Removing from their premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating to Defendants' assets and operations or relating in any way to the purchase, sale, manufacture, offer for sale, distribution, negotiation, importation, advertisement, promotion, or receipt of any products purporting to be Ciena; and

10. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (i) above.

**B.      Freezing Defendants' Assets[4]**

Immediately upon receipt of this Order, Defendants shall be restrained from secreting any assets, and from transferring or conveying any assets held by, for, or on account of any of the Restrained Parties, and a full accounting of the restrained assets shall be provided to counsel for Ciena within three business days of receipt of this Order.

1.  Immediately upon receipt of this Order, all assets and funds held by, for, or on account of any of the Restrained Parties, or in an account owned or controlled by any of the Restrained Parties, or in an account as to which any of the Restrained Parties has signature authority, shall be frozen and restrained, and a full accounting

---

[4] To the extent a financial institution, eCommerce Website, or other third party subject to the asset freeze portions of this Court's July 20 Order has already complied and no further action is required by the third party in light of this Order, the third party need not take any further action and Ciena is relieved from serving them should Ciena's counsel determine that no further action would be required by such third parties in light of their compliance with the July 20 Order.

of the restrained assets shall be provided to counsel for Ciena within three business days of receipt of this Order.

2. Immediately upon receipt of this Order, any bank, brokerage house, financial institution, credit card association, merchant account provider, escrow service, savings and loan association, payment provider, payment processing service provider, money transmission service, third-party processor, or other financial institution (including, but not limited to, MasterCard, VISA, American Express, Discover, PayPal, Inc., Alipay, Wish.com, Amazon Pay, WeChat Pay, and any correspondent, issuing, or member bank or account) (collectively, "Payment Services") holding any assets by, for, or on account of, or any balance, payable, or receivable owed to or held on account of, any of the Restrained Parties, or in an account as to which any of the Restrained Parties has signature authority, shall locate all accounts and funds, whether located inside or outside the United States, connected to any Restrained Parties and be restrained from releasing such funds until further order of this Court, and within three business days of receipt of this Order shall provide to counsel for Ciena a full accounting of the restrained assets.

3. Immediately upon receipt of this Order, any eCommerce Website, retailer, wholesaler, fulfillment center, warehouse, or any business or individual that has any money, property, or inventory owned by, or receivable owed to, any Restrained Party shall hold such money, property, inventory, or receivable until further order of this Court, and shall within three business days of receipt of this Order provide to counsel for Ciena a full accounting of all money, property, inventory, and receivables being held.

**C.   eCommerce Websites**

Immediately upon receipt of this Order, any Internet store or online marketplace platform, including, but not limited to, iOffer, eBay, AliExpress, Alibaba, Amazon, Wish.com, Facebook, and Dhgate (collectively, "eCommerce Websites") shall disable and be restrained from providing any services or payment to any Restrained Party, currently or in the future, in relation to any

Ciena-marked product and/or product advertised using the CIENA Marks, including fulfillment of any pending orders; transfer to Ciena's control any seller identifications (including, but not limited to, the seller identifications identified in Exhibits 3B-3C to the Decl. of Third Witness, ECF 19-5 and ECF 19-6 attached hereto) associated with any of the Restrained Parties' advertisement, offer for sale, or sale of Ciena-marked products and/or using the CIENA Marks, pending final hearing and determination of this action; disable and be restrained from displaying any advertisements used by or associated with any Restrained Party in connection with the advertisement, offer for sale, or sale of Ciena-marked products or otherwise using the CIENA Marks; disable access to any Restrained Party from any platform (including, but not limited to, direct, group, seller product management, vendor product management, and brand registry platforms) of any listings and associated images of Ciena-marked products or otherwise using the CIENA Marks (including, but not limited to, any listings and associated images identified by the "parent" or "child" Amazon Standard Identification Numbers ("ASIN"), and any other listings and images of products associated with any "parent" or "child" ASIN linked to any Restrained Party or linked to any other alias of a Restrained Party being used or controlled to offer for sale products using the CIENA Marks); remove links to any online marketplace accounts on which Defendants advertise, offer for sale, or sell Ciena-marked products and/or products advertised using the CIENA Marks; take all steps necessary to prevent links to Defendants' online marketplace accounts from displaying any Ciena-marked product and/or product advertised using the CIENA Marks in search results; and within three business days of receipt of this Order provide to counsel for Ciena a statement certifying compliance with the requirements of this paragraph.

**D.    Domain Names**[5]

Immediately upon receipt of this Order:

1.  Any registrar for any domain names owned, operated, or controlled by, or otherwise associated with, any Restrained Party (including, but not limited to, the domain names identified in Exhibits 3B-3C to the Decl. of Third Witness, ECF __) (collectively, Domain Names"), shall disable and be restrained from providing any services to any Restrained Party, currently or in the future, in relation to any Ciena-marked product and/or product advertised using the CIENA Marks; deposit with a registrar of Ciena's choosing the domain certificates of any domain names owned, operated, or controlled by, or otherwise associated with, any Restrained Party pending final hearing and determination of this action; be restrained from transferring use and control of any of the Domain Names to any individual or entity other than a registrar of Ciena's choosing; take all steps necessary to prevent Defendants from displaying any Ciena-marked product and/or product advertised using the CIENA Marks on any domain name in the registrar's possession, custody, or control; and within three business days of receipt of this Order provide to counsel for Ciena a statement certifying compliance with the requirements of this paragraph.

2.  The Restrained Parties shall be restrained from modifying control of or transferring use and control of any of the Domain Names.

---

[5] To the extent a registrar or other third party subject to this Court's July 20 Order with respect to domain names has already complied, such third parties are directed to work with Plaintiffs' counsel to ensure that they are in compliance as to any domain names newly identified by Ciena or Cisco, and to ensure that each of the Plaintiffs and both Ciena's and Cisco's marks are protected and all aspects of both Orders are taken into account.

1

**E.    Internet Search Engines**[6]

2        Immediately upon receipt of this Order, any Internet search engine, web host, sponsored

3   search engine, or ad-word provider (including, but not limited to Google, Bing, Baidu, and Yahoo)

4   (collectively, "Internet Search Engines") shall deindex, delist, or otherwise remove from its index

5   and search results any URL owned, controlled, or otherwise associated with any Restrained

6   Party's advertisement, offer for sale, or sale of Ciena-marked products and/or products advertised

7   using the CIENA Marks (including, but not limited to, the URLs identified in Exhibits 3B-3C to

8   the Decl. of Third Witness, ECF 19-5, 19-6); disable and be restrained from providing any

9   services to any Restrained Party, currently or in the future, in relation to the advertisement, offer

10  for sale, or sale of Ciena-marked products and/or products advertised using the CIENA Marks;

11  disable and be restrained from displaying any advertisements used by or associated with any

12  Restrained Party in connection with the advertisement, offer for sale, or sale of Ciena-marked

13  products and/or otherwise using the CIENA Marks; remove links to any of the Defendants' online

14  marketplace accounts owned, operated, or controlled by, or otherwise associated with, any

15  Restrained Party in connection with the advertisement, offer for sale, or sale of Ciena-marked

16  products and/or products advertised using the CIENA Marks (including, but not limited to, the

17  URLs identified in Exhibits 3B-3C to the Decl. of Third Witness, ECF 19-5, 19-6); take all steps

18  necessary to prevent links to Defendants' online marketplace accounts from displaying any Ciena-

19  marked product and/or product advertised using the CIENA Marks in search results; and within

20  three business days of receipt of this Order provide to counsel for Ciena a statement certifying

21  compliance with the requirements of this paragraph.

22

23  _____

[6] To the extent a search engine or other third party subject to this Court's July 20 Order with

24  respect to search engines has already complied, such third parties are directed to work with

25  Plaintiffs' counsel to ensure that they are in compliance as to any URLs newly identified by Ciena

26  or Cisco, and to ensure that each of the Plaintiffs and both Ciena's and Cisco's marks are

27  protected and all aspects of both Orders are taken into account.

28

**F.     Common Carriers[7]**

Immediately upon receipt of this Order, any person or company that transports or provides transportation services (including, but not limited to, United Parcel Service a/k/a UPS, FedEx, and DHL) (collectively, "Common Carriers") shall be restrained from fulfilling any shipments, accepting any shipments, or otherwise providing any services to any of the Restrained Parties, and within three business days of receipt of this Order shall provide to counsel for Ciena a statement certifying compliance with the requirements of this paragraph.

**G.     Sequestration and Inspection of Ciena-Marked Products and Products Advertised Using the CIENA Marks**

Immediately upon receipt of this Order:

1.  The Restrained Parties shall sequester and deliver to counsel for Ciena all Ciena-marked products and/or products advertised using the CIENA Marks in their inventory, possession, custody, or control to be examined and held by Ciena until further order of this Court.

2.  Any eCommerce Website (as defined above) or Common Carrier shall sequester and deliver to counsel for Ciena all Ciena-marked products and/or products advertised using the CIENA Marks offered for sale by any Restrained Party that are in their possession, custody, or control to be examined and held by Ciena until further order of this Court.

**H.     Order to Show Cause Re: Preliminary Injunction and Expedited Discovery**

Show Cause Hearing. Defendants Shenzhen Usource Technology Co., Shenzhen Warex Technologies Co., and Warex Technologies Limited (collectively, "Defendants"), are hereby

---

[7] To the extent a common carrier or other third party subject to the common carrier portions of this Court's July 20 Order has already complied and no further action is required by the third party in light of this Order, the third party need not take any further action and Ciena is relieved from serving them should Ciena's counsel determine that no further action would be required by such third parties in light of their compliance with the July 20 Order.

ordered to show cause before this Court on the 13th day of August, 2020 at 9:00 o'clock a.m., why

a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, should not

be issued enjoining Defendants and their principals, agents, officers, directors, members, servants,

employees, successors, assigns, and all other persons in concert and participation with them,

pending the final hearing and determination of this action from:

1. Purchasing, selling, distributing, marketing, manufacturing, or otherwise using any
   of the CIENA Marks (as defined herein) on any counterfeit or authentic product, or
   any marks confusingly similar thereto in connection with any Ciena products or
   other products. The "CIENA Marks" are:

   • The "CIENA" word mark, which is registered under U.S. Trademark
     Registration Nos. 2,070,330 and 3,026,860; and

   • The CIENA logo:



2. Using any logo, trade name, or trademark confusingly similar to any of the CIENA
   Marks which may be calculated to falsely represent or which has the effect of
   falsely representing that the services or products of any or all of the Defendants or
   of others are sponsored by, authorized by, or in any way associated with Ciena;

3. Infringing any of the CIENA Marks;

4. Otherwise unfairly competing with Ciena in the manufacture, sale, offering for
   sale, distribution, advertisement, or any other use of Ciena products;

5. Falsely representing any or all of Defendants as being connected with Ciena or
   sponsored by or associated with Ciena or engaging in any act which is likely to
   cause the trade, retailers, and/or members of the purchasing public to believe that
   any or all of Defendants are associated with Ciena;

6.   Using any reproduction, counterfeit, copy, or colorable imitation of any of the CIENA Marks in connection with the publicity, promotion, sale, or advertising of counterfeit Ciena products;

7.   Affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation including words or other symbols tending to falsely describe or represent such goods as being Ciena products and from offering such goods in commerce;

8.   Diluting any of the CIENA Marks;

9.   Removing from their premises, or discarding, destroying, transferring, or disposing in any manner any information, computer files, electronic files, business records (including but not limited to e-mail communications), or other documents relating to Defendants' assets and operations or relating in any way to the purchase, sale, manufacture, offer for sale, distribution, negotiation, importation, advertisement, promotion, or receipt of any products purporting to be Ciena; and

10. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (a) through (i) above.

Defendants' failure to attend the show cause hearing scheduled herein shall result in the immediate issuance and confirmation of the preliminary injunction, which shall be deemed to take effect immediately and shall extend during the pendency of this action. Defendants are permitted to respond to this Order by no later than August 11, 2020. The Restrained Parties shall be deemed to have actual notice of the issuance and terms of such preliminary injunction, and that any act by any of the Restrained Parties in violation of any of its terms may be considered and prosecuted as contempt of this Court.

**I.      Expedited Discovery**

**1.      Defendants**

Within three business days of receipt of this Order, the Restrained Parties shall produce to Ciena a summary document showing the dates, quantities, names, addresses, and other contact information, including any and all associated email addresses, of all suppliers and customers for

the preceding twenty-four months from whom they have purchased or to whom they have sold any products using the CIENA Marks.

## 2.    Third Parties

To the extent not already in full compliance in light of the their compliance with the July 20 Order, within three business days of receipt of this Order (service of which is not required should Plaintiffs' counsel determine that a third party is already in full compliance in light of their compliance with the July 20 Order), any Payment Service, eCommerce Website, Internet Search Engine, Common Carrier, or any other non-party that has information about the Restrained Parties shall produce to Ciena expedited discovery, including copies of all documents and records in such person's or entity's possession, custody, or control relating or referring to:

1.   the names, addresses, and other contact information, including any and all associated email addresses, of any of the Restrained Parties;

2.   the nature of any of the Defendants' operations (including, but not limited to, identifying information associated with any Internet stores or online marketplace accounts), methods of payment, transportation, and listing history concerning the advertisement, offer for sale, or sale of Ciena-marked products and/or products advertised using the CIENA Marks;

3.   any online marketplace accounts registered by Defendants, along with the true identities and contact information of the registrants of each online marketplace account to the extent the privacy protection service for any of Defendants' Internet stores, seller identifications, online marketplace accounts, commercial Internet websites, store URLs, and email addresses has concealed the registrant's identity and contact information;

4.   any financial accounts owned or controlled by any of the Restrained Parties, including such accounts residing with or under the control of any Payment Service (as defined above);

5.   the names and electronic and physical addresses of every owner and employee of each of the Restrained Parties; and

1    6.  any other documents concerning or relating to any of the Restrained Parties.

2    **J.      Alternative Service of Process**

3    Service of the Summons and First Amended Complaint and of this Order, together with

4    copies of the papers in support thereof, shall be made within one calendar day of the undersigned

5    date on Defendants by delivering true copies thereof on Shenzhen Usource Technology Co. by

6    email to kc@usourcetech.com, service@usourcetech.com, and usourcetech@gmail.com; and on

7    Shenzhen Warex Technologies Co. and Warex Technologies Limited by email to

8    Laural@warex.cn and sales@warex.cn, and that such service be deemed sufficient service.

9    Additionally, for any domain name that has been transferred from any of the Restrained Parties'

10   control to Ciena's control (or has already been transferred to Cisco's control pursuant to the July

11   20 Order) pending the final hearing and determination of this action, Plaintiffs may disable and

12   redirect the domain name to a link on which copies of the Summons and First Amended

13   Complaint, the July 20 Order, and this Order, together with copies of the papers in support thereof,

14   are electronically published.

15

16   IT IS SO ORDERED.

17

18   DATED:   August 10, 2020

19                                                         EDWARD J. DAVILA
                                                           United States District Court Judge

20

21

22

23

24

25

26

27

28

2790.000/1543171.4

~~PROPOSED~~ ORDER GRANTING PLAINTIFF CIENA CORPORATION'S *EX PARTE* MOTION FOR TRO